1

02:00:00
```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF OHIO
 2                          WESTERN DIVISION
                              -   -   -
 3     UNITED STATES OF AMERICA,        : CASE NO. 1:18-cr-0043
                                        :
 4                 Plaintiff,           :
                vs.                     : TRIAL EXCERPT
 5                                      :
       YANJUN XU, also known as XU      : 29th of OCTOBER, 2021
 6     YANJUN, also known as QU HUI,    : 1:55 P.M.
       also known as ZHANG HUI,         :
 7                                      :
                   Defendant.           :
 8                              -   -   -
                        TRANSCRIPT OF PROCEEDINGS
 9           BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
                              -   -   -
10
       APPEARANCES:
11     For the Plaintiff:
                           Timothy S. Mangan, Esq.
12                         Emily N. Glatfelter, Esq.
                           Assistant United States Attorneys
13                         221 East Fourth Street, Suite 400
                           Cincinnati, Ohio 45202
14                                      and
                           Matthew John McKenzie, Esq.
15                         United States Department of Justice
                           National Security Division
16                         950 Pennsylvania Avenue NW
                           Washington, D.C. 20530
17                                      and
                           Jacqueline K. Prim
18                         Special Assistant, Paralegal
                           United States Department of Justice
19                         National Security Division
                           950 Pennsylvania Avenue NW
20                         Washington, D.C. 20530

21     For the Defendant:
                           Ralph William Kohnen, Esq.
22                         Jeanne Marie Cors, Esq.
                           Sanna-Rae Taylor, Esq.
23                         Taft Stettinius and Hollister
                           425 East Walnut Street, Suite 1800
24                         Cincinnati, Ohio 45202
                                        and
25
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1                           Robert K. McBride, Esq.
                             Amanda Johnson, Esq.
 2                           Taft Stettinius and Hollister
                             50 East RiverCenter Boulevard
 3                           Suite 850
                             Covington, Kentucky 41011
 4                                       and
                             Florian Miedel, Esq.
 5                           Miedel & Mysliwiec, LLP
                             80 Broad Street, Suite 1900
 6                           New York, New York 10004

 7     Also present:        Mae Harmon, Interpreter
                            Robin Murphy, Interpreter
 8                          Yanjun Xu, Defendant

 9     Law Clerk:          Cristina V. Frankian, Esq.

10     Courtroom Deputy:  Bill Miller

11     Stenographer:       Mary Schweinhagen, RPR, RMR, RDR, CRR
                           United States District Court
12                         200 West Second Street, Room 910
                           Dayton, Ohio 45402

13

14        Proceedings reported by mechanical stenography,
       transcript produced by computer.
15                                   *** *** *** ***

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF WITNESSES

 2                 FRIDAY, OCTOBER 29, 2021

 3                   DIRECT   CROSS   REDIRECT   RECROSS

 4   PLAINTIFF'S WITNESSES

 5   JAMES OLSON               5      73       91          92

 6

 7                   *    *    *    *    *

 8

 9                    INDEX OF EXHIBITS

10   GOVERNMENT'S                      ADMITTED

11    100 - Demonstrative                  20

12

13                   *    *    *    *    *

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | P-R-O-C-E-E-D-I-N-G-S                    1:55 P.M. |
| | 2 | (Proceedings reported but not transcribed.) |
| 01:55:37 | 3 | THE COURT:  Where do we stand from the government's |
| 01:55:38 | 4 | perspective? MR. MANGAN:  We have a witness ready to go, Your |
| 01:55:43 | 5 | Honor. |
| 01:55:43 | 6 | THE COURT:  Okay.  Do you want to call that witness? |
| 01:55:44 | 7 | MR. MANGAN:  Yes, Your Honor.  The government calls |
| 01:55:46 | 8 | Jim Olson. |
| 01:55:48 | 9 | THE COURT:  Is somebody going to get him or her? |
| 01:55:53 | 10 | MS. GLATFELTER:  Yes, Your Honor. |
| 01:56:39 | 11 | THE COURT:  If the witness would be willing to |
| 01:56:40 | 12 | approach, we're going to put you on the witness stand. |
| 01:56:49 | 13 | Sir, if you'd be willing to pause.  I am going to |
| 01:56:52 | 14 | administer the oath to tell the truth. |
| 01:56:54 | 15 | Would you raise your right hand.  Do you solemnly swear |
| 01:56:57 | 16 | or affirm that your testimony today will be the truth, subject |
| 01:56:59 | 17 | to the penalty of perjury? |
| 01:57:01 | 18 | THE WITNESS:  I do. |
| 01:57:02 | 19 | THE COURT:  Very well.  Be seated in the witness |
| 01:57:05 | 20 | stand. |
| 01:57:09 | 21 | In the spirit of full disclosure that seat sometimes tips |
| 01:57:14 | 22 | back, okay?  We'll need you close to that microphone.  Thank |
| 01:57:18 | 23 | you, sir. |
| 01:57:20 | 24 | Mr. Mangan, you can begin. |
| 01:57:26 | 25 | You will have some questions from the government's |

OLSON - DIRECT (Mangan)                                    5

| | | |
|---|---|---|
| 01:57:28 | 1 | lawyer. |
| 01:57:28 | 2 | MR. MANGAN:  Thank you, Your Honor. |
| 01:57:29 | 3 | **DIRECT EXAMINATION** |
| 01:57:29 | 4 | BY MR. MANGAN: |
| 01:57:30 | 5 | **Q.**    Good afternoon, Mr. Olson. |
| 01:57:31 | 6 | **A.**    Good afternoon. |
| 01:57:31 | 7 | **Q.**    Could you state your full name and spell your last name? |
| 01:57:34 | 8 | **A.**    My full name is James Michael Olson, O-L-S-O-N. |
| 01:57:38 | 9 | **Q.**    And, Mr. Olson, could you tell the jury your educational |
| 01:57:42 | 10 | background? |
| 01:57:42 | 11 | **A.**    Yes.  I have a bachelor's in law degrees from the |
| 01:57:47 | 12 | University of Iowa. |
| 01:57:50 | 13 | **Q.**    And did you ever serve in the military? |
| 01:57:52 | 14 | **A.**    Yes, I did.  I was in the United States Navy, served |
| 01:57:57 | 15 | aboard guided missile destroyers and frigates and stayed in |
| 01:58:01 | 16 | the reserves after three and a half years of active duty. |
| 01:58:04 | 17 | And eventually achieved the rank of lieutenant commander. |
| 01:58:10 | 18 | **Q.**    And when did you complete your service with the Navy? |
| 01:58:13 | 19 | **A.**    I completed my service in the Navy in 1966. |
| 01:58:16 | 20 | **Q.**    Thank you.  Can you explain to the jury where you worked |
| 01:58:20 | 21 | for most of your career? |
| 01:58:22 | 22 | **A.**    Most of my career was with the Central Intelligence |
| 01:58:26 | 23 | Agency.  I served there for 31 years. |
| 01:58:29 | 24 | **Q.**    Let's start with what the CIA does.  That agency is |
| 01:58:35 | 25 | typically referred to as the CIA, correct? |

| | | |
|---|---|---|
| 01:58:38 | 1 | **A.** Yes. The CIA is responsible for collection, |
| 01:58:43 | 2 | dissemination, analysis of intelligence from foreign sources |
| 01:58:50 | 3 | to provide necessary intelligence to U.S. policymakers. |
| 01:58:55 | 4 | **Q.** And during your service with the CIA, what was your |
| 01:59:02 | 5 | primary role? |
| 01:59:03 | 6 | **A.** I was what we call a case officer. I was undercover |
| 01:59:05 | 7 | the entire time, and my job was to collect intelligence |
| 01:59:09 | 8 | overseas in foreign countries. |
| 01:59:16 | 9 | **Q.** Have you heard the term "clandestine service"? |
| 01:59:19 | 10 | **A.** Yes. I was part of the clandestine service, or the |
| 01:59:23 | 11 | director of operations, as we sometimes call it. |
| 01:59:25 | 12 | **Q.** Can you explain what that is? |
| 01:59:26 | 13 | **A.** The clandestine service is the part of the CIA that is |
| 01:59:30 | 14 | undercover and conducts espionage and covert action on |
| 01:59:34 | 15 | behalf the of the United States government. |
| 01:59:36 | 16 | **Q.** Explain what you mean by "undercover." You said most of |
| 01:59:38 | 17 | your career you were operating undercover? |
| 01:59:40 | 18 | **A.** Yes. I was undercover the entire time. In fact, my |
| 01:59:46 | 19 | parents did not know that I was in the CIA. Our children |
| 01:59:50 | 20 | did not know. And you have cover for purposes of concealing |
| 01:59:54 | 21 | your identity and your intelligence affiliation and your |
| 01:59:59 | 22 | purpose while you are overseas. |
| 02:00:01 | 23 | **Q.** By the way, was your wife also in the service? |
| 02:00:07 | 24 | **A.** Yes. I met my wife, Meredith, at the CIA. We were an |
| 02:00:12 | 25 | undercover husband and wife CIA team. |

OLSON - DIRECT (Mangan)                                    7

02:00:15 1    Q.    All right.  Can you explain what kind of training a

02:00:21 2    person goes through to do what you do?

02:00:23 3    A.    Training is rigorous.  Most of the clandestine service

02:00:27 4    training takes place at an undercover base that we call The

02:00:30 5    Farm.  And we learn all the techniques of espionage, the

02:00:34 6    tradecraft, what we call the recruitment cycle, and we also

02:00:38 7    have some paramilitary training to go along with that.

02:00:41 8    Q.    You mentioned that you worked in the CIA for about 31

02:00:47 9    years.  About how many of those years were you operational

02:00:51 10   overseas?

02:00:52 11   A.    I was operational probably 25 of those 31 years,

02:00:58 12   outside the country.

02:00:59 13   Q.    And generally what continent did you typically work in?

02:01:03 14   A.    I worked primarily in Europe, but I also served in

02:01:07 15   Latin America.

02:01:09 16   Q.    And during those overseas postings, did you perform what

02:01:16 17   might be called intelligence operations?

02:01:18 18   A.    Yes, I did.  I was collecting intelligence through

02:01:23 19   intelligence operations against foreign targets.

02:01:25 20   Q.    Can you just explain a little bit more about what that

02:01:29 21   means, to do an intelligence operation?

02:01:31 22   A.    It's spying.  It is finding foreign people who have

02:01:36 23   access to information that our country needs for its own

02:01:41 24   security.  And our job is to induce them to share that

02:01:44 25   information with us in return for money or some other

| | | |
|---|---|---|
| 02:01:48 | 1 | consideration. |
| 02:01:50 | 2 | **Q.**   Later in your career, did you end up taking a position at |
| 02:01:55 | 3 | CIA headquarters? |
| 02:01:56 | 4 | **A.**   Yes.  I had a couple of assignments at CIA |
| 02:02:00 | 5 | headquarters.  At one point I was chief of Soviet |
| 02:02:04 | 6 | operations, and then later my most significant position at |
| 02:02:06 | 7 | CIA headquarters was as chief of counterintelligence. |
| 02:02:10 | 8 | **Q.**   And how long were you the chief of counterintelligence at |
| 02:02:14 | 9 | the CIA? |
| 02:02:14 | 10 | **A.**   I was deputy chief of counterintelligence for one year |
| 02:02:18 | 11 | and chief for two years. |
| 02:02:19 | 12 | **Q.**   What do you oversee as the chief of counterintelligence? |
| 02:02:26 | 13 | **A.**   As chief of counterintelligence, my responsibility was |
| 02:02:29 | 14 | to monitor the activities of foreign intelligence services |
| 02:02:32 | 15 | around the world and do what we could to identify who they |
| 02:02:39 | 16 | were and what they were doing and to support those |
| 02:02:40 | 17 | activities, to bring with the aid of U.S. government |
| 02:02:44 | 18 | prosecutors those guilty of treason against the United |
| 02:02:47 | 19 | States to justice. |
| 02:02:48 | 20 | **Q.**   All right.  As part of your training and your work, what |
| 02:02:54 | 21 | languages do you speak? |
| 02:02:55 | 22 | **A.**   I speak French, Russian, German, Spanish, Swedish, and |
| 02:03:04 | 23 | I read Latin. |
| 02:03:06 | 24 | **Q.**   During your time with the CIA, did you receive any |
| 02:03:11 | 25 | commendations for your work? |

OLSON - DIRECT (Mangan)                                    9

02:03:12  1   **A.**   Yes, I did.  I was awarded the Intelligence Medal of

02:03:19  2   Merit, the Career Intelligence Medal, the Distinguished

02:03:24  3   Intelligence Medal, the Counterintelligence Medal, and the

02:03:28  4   Donovan Award, and maybe a few others.

02:03:30  5   **Q.**   Are you familiar with something called the Joint Military

02:03:34  6   Intelligence College?

02:03:34  7   **A.**   Yes, the Joint Military Intelligence College is one of

02:03:38  8   the leading training facilities for the United States

02:03:40  9   military, teaching intelligence and counterintelligence.

02:03:45  10  And I actually taught there for a year.

02:03:47  11  **Q.**   What kinds of things did you teach?

02:03:49  12  **A.**   Counterintelligence.

02:03:50  13  **Q.**   All right.  At some point did you take on a role at Texas

02:03:55  14  A&M University?

02:03:55  15  **A.**   Yes, I did.  After lengthy service in the CIA, I had

02:04:03  16  always thought I might like to teach some day.  And when

02:04:08  17  President George Bush decided to put his presidential

02:04:11  18  library and museum at Texas A&M University, he wanted to

02:04:16  19  have a school of government in his name.  He wanted to make

02:04:20  20  certain that intelligence was part of the curriculum.  And

02:04:23  21  so he asked the director of the CIA to send someone to Texas

02:04:31  22  A&M University to build the intelligence studies program,

02:04:34  23  and I had the honor to be chosen to do that.

02:04:36  24  **Q.**   When you were selected to do that, did you need to come

02:04:39  25  out from cover?

OLSON - DIRECT (Mangan)                                    10

02:04:39   1    A.   Yes, yes.  The CIA does not allow its officers to be on
02:04:44   2    college compuses covertly.  And that was a traumatic
02:04:48   3    decision for Meredith and me because we had never wanted to
02:04:51   4    come out from undercover.  But it was such a privilege to be
02:04:54   5    able to go there and to work at that school that we decided
02:04:57   6    we'd accept the consequences of coming out.
02:04:59   7    Q.   And what does that mean, to come out from cover?
02:05:01   8    A.   It means announcing to the whole world that you were a
02:05:04   9    spy, that you were lying to your friends and your family for
02:05:07  10    many, many years.  It's something that we don't enjoy doing,
02:05:13  11    but it is necessary to have the opportunity to be a
02:05:17  12    professor, as I am now.
02:05:19  13    Q.   Are you still at Texas A&M?
02:05:21  14    A.   Yes, I am.
02:05:22  15    Q.   And what is your position?
02:05:23  16    A.   I am a professor of the practice and also the director
02:05:29  17    of the intelligence studies program at the Bush school.
02:05:33  18    Q.   You mentioned you were still with the CIA when you
02:05:38  19    started at the university.
02:05:39  20    A.   Yes.  For the first two and a half years at Texas A&M
02:05:43  21    University I was still a serving counterintelligence officer
02:05:46  22    for the CIA.  I was on loan to the Bush school of Texas A&M
02:05:52  23    University.  But after two and a half years, I was eligible
02:05:55  24    to retire, and the CIA offered some attractive positions
02:05:59  25    back in Washington.  But the Bush school came in and said,

| | | |
|---|---|---|
| 02:06:03 | 1 | Jim, if you would like to stay here, we will offer you a |
| 02:06:06 | 2 | professorship.  And that was very appealing to me because I |
| 02:06:09 | 3 | identified with the mission of preparing young men and women |
| 02:06:12 | 4 | for careers in intelligence. |
| 02:06:13 | 5 | **Q.**   What year did you retire from the CIA? |
| 02:06:18 | 6 | **A.**   I retired in the year 2000. |
| 02:06:20 | 7 | **Q.**   All right.  And have you been at Texas A&M ever since? |
| 02:06:24 | 8 | **A.**   Yes, I have. |
| 02:06:25 | 9 | **Q.**   In your current work at the university, how do you stay |
| 02:06:30 | 10 | apprised of current matters related to espionage and |
| 02:06:36 | 11 | counterintelligence? |
| 02:06:36 | 12 | **A.**   I follow all the literature.  I follow the press |
| 02:06:40 | 13 | reporting.  I follow the FBI Department of Justice |
| 02:06:43 | 14 | affidavits.  I read the indictments and other sources.  One |
| 02:06:49 | 15 | of the best sources that I followed is the reports of the |
| 02:06:53 | 16 | National Counterintelligence Security Center.  Those are |
| 02:06:57 | 17 | excellent. |
| 02:06:57 | 18 |     I'm also in regular contact with the currently serving |
| 02:07:01 | 19 | counterintelligence professionals around the community. |
| 02:07:04 | 20 | **Q.**   Is there a close relationship between your program at |
| 02:07:08 | 21 | Texas A&M and the agency? |
| 02:07:10 | 22 | **A.**   Yes. |
| 02:07:13 | 23 | **Q.**   Have you written any books related to espionage or |
| 02:07:16 | 24 | spying? |
| 02:07:16 | 25 | **A.**   I have written two books, the first book was called |

OLSON - DIRECT (Mangan)                                              12

02:07:20  1    *Fair Play*, *The Moral Limits of Spying*.  And then my more

02:07:25  2    recent book, which was published in 2019, is called *To Catch*

02:07:30  3    *a Spy, The Art of Counterintelligence*.

02:07:33  4    **Q.**   Now, Mr. Olson, based on your experience, are you

02:07:37  5    familiar with the methods and techniques used by intelligence

02:07:41  6    officers to acquire information?

02:07:42  7    **A.**   Yes, I am.

02:07:43  8    **Q.**   Are you familiar with China's intelligence-gathering

02:07:47  9    operations?

02:07:48  10   **A.**   Yes, I am.

02:07:48  11   **Q.**   And are you familiar with China's intelligence-gathering

02:07:53  12   agencies and methods?

02:07:54  13   **A.**   Yes.

02:07:55  14   **Q.**   Now, let me talk generally about intelligence gathering,

02:08:01  15   if we might.  Can you explain from your experience, you know,

02:08:06  16   what the typical goal is for an intelligence-gathering agency

02:08:09  17   for a country?

02:08:10  18   **A.**   The intelligence services of a foreign country are to

02:08:15  19   collect intelligence, to enhance the security of that

02:08:18  20   country, or its economy or its technological sector.  They

02:08:24  21   have many, many objectives to use the tools of espionage to

02:08:29  22   enhance the security, the well-being of their people.

02:08:32  23   **Q.**   All right.  If you use the word "espionage," what does

02:08:36  24   that mean in your -- your parlance?

02:08:39  25   **A.**   Espionage is spying.  It's stealing secrets.  It's

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                      13

02:08:43  1    collecting intelligence.

02:08:44  2    **Q.**   Are you familiar with the term "industrial espionage"?

02:08:49  3    **A.**   Yes, I am.

02:08:49  4    **Q.**   And what would that mean?

02:08:50  5    **A.**   Industrial espionage is stealing another country's

02:08:54  6    industrial secrets, its trade secrets, proprietary

02:08:58  7    information, its technology for the benefit of your own

02:09:01  8    country.

02:09:01  9    **Q.**   All right.  In working for an intelligence agency --

02:09:05  10   let's go back to your role when you were a case officer.  How

02:09:10  11   do you know what information is needed?

02:09:12  12   **A.**   We call that the requirements process, and it is a

02:09:18  13   formal process of determining what your consumers need.  And

02:09:25  14   you then talk to them.  You obtain lists of requirements,

02:09:31  15   information, and, for some countries, technology, other

02:09:35  16   things that they need.  And so that's your starting point in

02:09:39  17   the process of collecting intelligence.  You have got to

02:09:44  18   need to know up front what it is that you're seeking.

02:09:46  19   **Q.**   All right.  You said you're gathering information for

02:09:49  20   your consumers.  What do you mean by "consumers"?

02:09:52  21   **A.**   Well, for us it would be the U.S. policymakers.  It

02:09:57  22   would be the President of the United States in the first

02:09:59  23   place.  It would be the Department of Defense.  It would be,

02:10:02  24   for all the mainline agencies, the policymakers of the

02:10:06  25   United States government.  They depend on us to provide them

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    14

| Time | Line | Text |
|---|---|---|
| 02:10:09 | 1 | with the best intelligence that we can. |
| 02:10:10 | 2 | **Q.**   All right.  Have you heard the term "open-source |
| 02:10:14 | 3 | information"? |
| 02:10:14 | 4 | **A.**   Yes. |
| 02:10:15 | 5 | **Q.**   And can you explain what your understanding of that is? |
| 02:10:18 | 6 | **A.**   Every intelligence service has analysts whose job it is |
| 02:10:24 | 7 | to monitor the international press, the speeches, the public |
| 02:10:34 | 8 | documents, things that are in the public domain.  And we |
| 02:10:38 | 9 | call that open-source.  Those are things that are publicly |
| 02:10:42 | 10 | available.  And that is something that every intelligence |
| 02:10:47 | 11 | service does through its analysts. |
| 02:10:49 | 12 | **Q.**   When you talk about the requirements that an intelligence |
| 02:10:51 | 13 | officer is looking for, are those typically found in |
| 02:10:55 | 14 | open-source areas? |
| 02:10:56 | 15 | **A.**   Not at all, no. |
| 02:10:59 | 16 | **Q.**   Can you explain that? |
| 02:11:00 | 17 | **A.**   Yes.  Operators are different, and I was an operator. |
| 02:11:06 | 18 | And we operators do not want to waste our time and resources |
| 02:11:10 | 19 | on what is publicly or commercially available.  We go after |
| 02:11:16 | 20 | what is secret and controlled.  That is our mission, and |
| 02:11:20 | 21 | that's what we do. |
| 02:11:23 | 22 | **Q.**   So is your focus strictly on that category of information |
| 02:11:27 | 23 | that may not be available? |
| 02:11:28 | 24 | **A.**   Completely.  We do not go after open-source. |
| 02:11:33 | 25 | **Q.**   Does the open-source information help define the |

OLSON - DIRECT (Mangan)                                    15

| | | |
|---|---|---|
| 02:11:38 | 1 | requirements? |
| 02:11:38 | 2 | **A.** Yes. It's useful as a starting point, as a foundation, |
| 02:11:42 | 3 | as a basis. You need to know what's out there in the public |
| 02:11:47 | 4 | domain, and then you have to identify what's not in the |
| 02:11:49 | 5 | public domain, and that's what you go after as a clandestine |
| 02:11:53 | 6 | service officer. |
| 02:11:54 | 7 | **Q.** All right. Sir, are you familiar with China's |
| 02:11:58 | 8 | intelligence-gathering operations? |
| 02:12:00 | 9 | **A.** Yes, I am. |
| 02:12:01 | 10 | **Q.** All right. What is the primary agency within China that |
| 02:12:05 | 11 | conducts external intelligence operations? |
| 02:12:07 | 12 | **A.** That is the Ministry of State Security, or MSS as we |
| 02:12:12 | 13 | call it. |
| 02:12:13 | 14 | **Q.** All right. In terms of a parallel agency for the CIA, |
| 02:12:17 | 15 | what would that parallel be in China? |
| 02:12:19 | 16 | **A.** The MSS. |
| 02:12:20 | 17 | **Q.** All right. Do they also have some domestic |
| 02:12:24 | 18 | responsibilities as well? |
| 02:12:25 | 19 | **A.** Yes, the MSS does have some collateral responsibilities |
| 02:12:30 | 20 | for counterintelligence, for tracking political dissidents, |
| 02:12:36 | 21 | but their overriding mission is overseas espionage outside |
| 02:12:42 | 22 | China. |
| 02:12:42 | 23 | **Q.** All right. Is there another ministry in China that is |
| 02:12:45 | 24 | strictly for internal intelligence? |
| 02:12:47 | 25 | **A.** Yes, it's the Ministry of Public Safety, or MPS as we |

OLSON - DIRECT (Mangan)                                16

02:12:51  1   call it.  And it is in charge of domestic security, counter-
02:12:56  2   terrorism, counterintelligence, that kind of thing.
02:12:59  3   Q.   Have you heard of the term the "PLA"?
02:13:01  4   A.   Yes.
02:13:01  5   Q.   Is that the People's Liberation Army?
02:13:04  6   A.   Yes.  That's the Chinese military, and the PLA,
02:13:10  7   People's Liberation Army, also has an intelligence arm.  And
02:13:12  8   they, for one thing, are responsible for most of the cyber
02:13:15  9   attacks on the United States.
02:13:17  10  Q.   When it comes to intelligence-gathering operations, is
02:13:21  11  there one particular ministry that is the most dominant in
02:13:25  12  China?
02:13:25  13  A.   The MSS is dominant.
02:13:28  14  Q.   Can you talk a little bit about what are China's
02:13:38  15  espionage efforts geared towards?
02:13:42  16  A.   The MSS does collect against the traditional espionage
02:13:48  17  targets of political and military secrets, but its number
02:13:51  18  one objective is to acquire western technology, to steal
02:13:56  19  western technology.  That is the main purpose of the MSS.
02:14:01  20  Q.   Is that different from how the CIA worked?
02:14:06  21  A.   Yes, it's completely different because we do not do
02:14:09  22  that kind of thing.  We do not engage in industrial
02:14:12  23  espionage in our country.
02:14:14  24  Q.   All right.  Let me talk about -- go back to this idea of
02:14:24  25  the requirements, if I might.  When you're trying to define

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    17

02:14:34  1    those requirements for the case officers, do you sometimes

02:14:38  2    have to work with technical experts?

02:14:41  3    A.   Yes, you do.  If you are going after technical

02:14:43  4    intelligence, you want to talk to technical experts in your

02:14:46  5    country to determine what it is that they need.

02:14:49  6    Q.   Okay.  Do they help define those requirements --

02:14:49  7    A.   Yes, they do.

02:14:50  8    Q.   -- for you?

02:14:50  9    A.   Yes, they do.

02:14:52  10   Q.   And after you've gathered information, does the officer

02:14:56  11   sometimes go back to those experts to help understand whether

02:14:59  12   they hit the requirements or not?

02:15:01  13   A.   Yes, that's very common.

02:15:03  14   Q.   All right.  To what extent is the intelligence officer's

02:15:09  15   mission driven by those requirements?

02:15:11  16   A.   They guide what we do.  I mean, we only go after secret

02:15:17  17   information that is desired, which is a priority of the

02:15:20  18   United States government.  We do not stray away from that.

02:15:25  19   We know exactly what our marching orders are, what the

02:15:28  20   United States government needs in terms of intelligence, and

02:15:32  21   that's what our objectives are.

02:15:34  22   Q.   Okay.  Let me go through a couple terms just to make sure

02:15:40  23   we're all learning your lingo or using the same lingo here.

02:15:44  24   A.   Sure.

02:15:45  25   Q.   I think you referred to yourself as a case officer; is

OLSON - DIRECT (Mangan)                                    18

02:15:47  1    that correct?

02:15:48  2    **A.**    I'm a case officer.

02:15:49  3    **Q.**    Or you were?

02:15:49  4    **A.**    Yes.  I'm proud of being called a case officer.

02:15:52  5    **Q.**    If someone says "intelligence officer," is that a similar

02:15:56  6    term?

02:15:56  7    **A.**    Yes.

02:15:57  8    **Q.**    All right.  And would you consider that a spy?

02:16:02  9    **A.**    Yes.

02:16:02  10   **Q.**    All right.  How about when a case officer recruits a

02:16:08  11   person in a foreign country to help provide information, what

02:16:14  12   do you refer to that person as?

02:16:15  13   **A.**    An agent.

02:16:18  14   **Q.**    All right.

02:16:18  15   **A.**    So in our jargon, our parlance, it's a case officer who

02:16:24  16   recruits and handles an agent.

02:16:26  17   **Q.**    Okay.  Are there sometimes other words used for an agent?

02:16:31  18   **A.**    Spy, source, informant.

02:16:39  19   **Q.**    All right.  I think we already talked about covers.

02:16:44  20         Let me ask you about, are some operation -- in your area,

02:16:48  21   are most of the operations considered covert?

02:16:51  22   **A.**    Yes.

02:16:51  23   **Q.**    And can you explain what you mean by that?

02:16:55  24   **A.**    "Covert" just means secret, that we protect the purpose

02:17:03  25   of our operations and our methodologies.  We keep secrets as

OLSON - DIRECT (Mangan)                                    19

02:17:08   1   well.

02:17:08   2   **Q.**   Okay.  And then I wanted to ask you about the term --

02:17:11   3   have you heard of the term "humint," H-U-M-I-N-T?

02:17:18   4   **A.**   Oh, yes, I have.

02:17:19   5   **Q.**   What is that?

02:17:19   6   **A.**   That was my specialty.  Humint is H-U-M-I-N-T.  It is

02:17:24   7   short for human intelligence.  And it is going after

02:17:29   8   individuals, human beings, who have the access that we are

02:17:33   9   looking for, and they are our target.

02:17:37  10   **Q.**   And is humint intelligence different from other types of

02:17:42  11   collection?

02:17:43  12   **A.**   Yes, it is.  There's also technical collection.  We

02:17:48  13   might call that signals intelligence.  We have imagery

02:17:51  14   intelligence based on what we are seeing from our

02:17:54  15   satellites.  So those are the main categories of

02:17:57  16   intelligence.

02:17:58  17   **Q.**   Are there times when someone who works in humint

02:18:02  18   intelligence, like yourself, has to work with another person

02:18:07  19   who's doing cyber or signals intelligence?

02:18:11  20   **A.**   Yes.  The intelligence process is combining all those

02:18:14  21   different sources, all those different approaches to provide

02:18:17  22   the best intelligence possible for U.S. government policy-

02:18:21  23   makers.

02:18:22  24   **Q.**   All right, sir.  Have you heard of the term "recruitment

02:18:26  25   cycle"?

OLSON - DIRECT (Mangan)                                          20

02:18:26   1   **A.**   Yes.  Recruitment cycle I am very familiar with.

02:18:30   2              MR. MANGAN:  If I could, Your Honor, could we show

02:18:32   3   the witness Exhibit 100?  It has not yet been admitted.

02:18:36   4              THE COURT:  Yes, we'll show it to the witness.

02:18:39   5   BY MR. MANGAN:

02:18:39   6   **Q.**   It will show up on your screen there.

02:18:41   7        Do you see that, Mr. Olson?

02:18:43   8   **A.**   Not yet.

02:18:46   9        Yes, there it is.

02:18:48   10  **Q.**   Okay.  And would this exhibit help you explain the

02:18:52   11  recruitment cycle to the jury?

02:18:53   12  **A.**   Yes, it will be helpful.

02:18:57   13             MR. MANGAN:  Your Honor --

02:18:59   14             THE WITNESS:  Generally, we describe the recruitment

02:19:01   15  cycle --

02:19:03   16  BY MR. MANGAN:

02:19:03   17  **Q.**   Hang on.  Before I get it, I want to show it to the jury.

02:19:07   18  So they don't see it yet.

02:19:08   19  **A.**   Sorry.

02:19:09   20             MR. MANGAN:  Your Honor, we'd move to admit Exhibit

02:19:12   21  100 as a demonstrative exhibit.

02:19:15   22             MR. McBRIDE:  No objection, Your Honor.

02:19:15   23             THE COURT:  It's admitted as a demonstrative

02:19:15   24  exhibit.

02:19:16   25        (Government's Exhibit 100 was received in evidence.)

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

OLSON - DIRECT (Mangan)                                         21

| | | |
|---|---|---|
| 02:19:16 | 1 | MR. MANGAN: May we publish? |
| 02:19:17 | 2 | THE COURT: Yes. We will show it to the jury. |
| 02:19:20 | 3 | BY MR. MANGAN: |
| 02:19:21 | 4 | Q. One moment and it will come up on their screens. |
| 02:19:23 | 5 | A. All right. |
| 02:19:23 | 6 | Q. And then I wanted to ask you, Mr. Olson, if you can go |
| 02:19:26 | 7 | ahead and tell us, what is the recruitment cycle? And then |
| 02:19:30 | 8 | we'll walk through the steps. |
| 02:19:32 | 9 | A. The recruitment cycle is what we spies do. It's |
| 02:19:40 | 10 | something that's universal. All intelligence services go |
| 02:19:43 | 11 | through the same process to recruit spies, and it is the |
| 02:19:46 | 12 | bread and butter of our human intelligence business. And it |
| 02:19:49 | 13 | is a step-by-step process. |
| 02:19:52 | 14 | Q. All right. Let's talk through the beginning parts of it. |
| 02:19:54 | 15 | Can you walk through these steps and explain what they mean? |
| 02:19:57 | 16 | A. Yes. Spotting is looking for individuals who have the |
| 02:20:05 | 17 | information or the technology that corresponds to your |
| 02:20:10 | 18 | requirements. This is what you are looking for, and you are |
| 02:20:14 | 19 | looking for people who have that information, who have that |
| 02:20:18 | 20 | access, who have that technology. So that is spotting, |
| 02:20:23 | 21 | finding people that are potential sources for you. |
| 02:20:28 | 22 | Q. Let me -- before we kind of go through some of these |
| 02:20:31 | 23 | other items, with respect to the MSS, can you talk about how |
| 02:20:36 | 24 | they do spotting? |
| 02:20:37 | 25 | A. Their spotting is very aggressive. It's very |

| | | |
|---|---|---|
| 02:20:43 | 1 | efficient.  They look at American agencies or companies that |
| 02:20:50 | 2 | they are interested in.  They look for indications of who's |
| 02:20:55 | 3 | employed there, who's working on the specific project that |
| 02:20:59 | 4 | they are interested in.  They use a lot of social media also |
| 02:21:02 | 5 | for that purpose.  So they are looking for people in those |
| 02:21:05 | 6 | companies or in those organizations or agencies that have |
| 02:21:09 | 7 | access to the information or technology they are looking |
| 02:21:13 | 8 | for.  That's called spotting. |
| 02:21:15 | 9 | Q.   So with respect -- to let's talk about the acquisition of |
| 02:21:19 | 10 | technology.  What types of folks does the MSS target for |
| 02:21:25 | 11 | recruitment? |
| 02:21:25 | 12 | A.   They will recruit any American, for example, who has |
| 02:21:31 | 13 | secret information or access to technology that they're |
| 02:21:35 | 14 | interested in. |
| 02:21:36 | 15 | Q.   Is ethnicity a factor? |
| 02:21:39 | 16 | A.   Ethnicity has been a big factor for the MSS. |
| 02:21:44 | 17 | Q.   Explain what you mean by that. |
| 02:21:46 | 18 | A.   The MSS likes to play the ethnic card, and that means |
| 02:21:51 | 19 | that the Chinese intelligence service is looking for ethnic |
| 02:21:56 | 20 | Chinese as targets.  So, for example, if they find a Chinese |
| 02:22:01 | 21 | American who has U.S. citizenship or a green card, that |
| 02:22:06 | 22 | would be someone that they will look at very closely because |
| 02:22:09 | 23 | they believe that ethnic Chinese in the United States may |
| 02:22:14 | 24 | still have some loyalty to Mother China.  They may feel a |
| 02:22:19 | 25 | cultural affinity.  They speak the same language.  And then |

OLSON - DIRECT (Mangan)                                        23

02:22:22    1    they may actually have relatives who still live in China,

02:22:26    2    which gives them leverage.

02:22:27    3        So they look, in the first place, for ethnic Chinese as

02:22:30    4    their targets.  Not exclusively, but when they find it in

02:22:35    5    the Chinese, that's something that they look at very, very

02:22:38    6    carefully.

02:22:39    7    Q.    Is -- are you familiar with LinkedIn?

02:22:43    8    A.    I am, yes.

02:22:44    9    Q.    Is LinkedIn used in the spotting process for the MSS?

02:22:48   10    A.    Massively.

02:22:50   11    Q.    Can you explain that.

02:22:51   12    A.    It may be one of their major spotting mechanisms,

02:22:55   13    because on LinkedIn, what do they find?  They find the

02:22:58   14    resumes of American government officials, former military

02:23:03   15    officers, engineers in high-tech companies, employees at

02:23:08   16    national laboratories who are looking for new employment.

02:23:11   17    And those people post their resumes, in many cases indicate

02:23:16   18    what U.S. government security clearances they had.  They

02:23:18   19    talk about the projects they were involved in.

02:23:20   20        So LinkedIn is like a candy store, if I can put it that

02:23:24   21    way, for Chinese intelligence, because they've already

02:23:27   22    identified people who meet their criteria.

02:23:30   23    Q.    All right.  I'd like to return, if you could walk us

02:23:33   24    through the recruiting cycle.

02:23:35   25    A.    Yes.

OLSON - DIRECT (Mangan)                                    24

02:23:35   1    Q.    We talked a little bit about spotting.  If you could just

02:23:38   2    kind of walk us through some of these other steps so that the

02:23:40   3    jury understands what -- what these terms mean.

02:23:42   4    A.    Right.  After you've spotted a potential target for

02:23:46   5    recruitment, the next step is called assessing.  And

02:23:51   6    assessing is trying to determine, first of all, does this

02:23:54   7    person, in fact, have the access to the information or

02:23:58   8    technology that you're interested in.

02:24:00   9          And then, secondly, you want to know what makes this

02:24:02   10   person tick:  Does this person have some kind of sympathy

02:24:07   11   for Russia -- for China?  Does this person have some kind of

02:24:11   12   vulnerability?  Does this person have relatives in China?

02:24:15   13   Is there something about this person that might make him or

02:24:17   14   her susceptible?  Is this person willing to cut corners?

02:24:23   15         So you're sizing that person up for the expectation

02:24:26   16   that you'd eventually be ale to move down the recruitment

02:24:29   17   cycle.

02:24:29   18   Q.    All right.  As you move through this process -- and I

02:24:34   19   imagine this process may have different speeds for different

02:24:38   20   people; is that fair?

02:24:38   21   A.    Yes.  Yes, it's variable.

02:24:45   22   Q.    Walk us through the next phases of developing and

02:24:48   23   pitching.

02:24:48   24   A.    Once you assess someone positively, you enter into what

02:24:52   25   we call developing.  And that's where you try to establish a

| | | |
|---|---|---|
| 02:24:54 | 1 | personal relationship with this person.  You try to befriend |
| 02:24:59 | 2 | this person.  You wine and dine this person.  You hold out |
| 02:25:02 | 3 | the possibility of a lucrative relationship.  You are trying |
| 02:25:07 | 4 | to urge that person in your direction.  And so you probably |
| 02:25:11 | 5 | will try to introduce some clandestinity in the |
| 02:25:15 | 6 | relationship.  You will gradually test the waters by pushing |
| 02:25:18 | 7 | harder and harder for information and technology to see if |
| 02:25:22 | 8 | this person's willing to move in your direction or not. |
| 02:25:26 | 9 | Q.   All right.  And then as it moves into pitching, is |
| 02:25:31 | 10 | that -- walk us through what you mean by pitching. |
| 02:25:34 | 11 | A.   Pitching is when you actually solicit the cooperation |
| 02:25:39 | 12 | of this person to provide the information or the technology |
| 02:25:44 | 13 | that you're after. |
| 02:25:45 | 14 | Q.   All right. |
| 02:25:45 | 15 | A.   And you generally will present that in terms of some |
| 02:25:49 | 16 | kind of a joint relationship, a cooperation, a |
| 02:25:54 | 17 | collaboration. |
| 02:25:55 | 18 | Q.   All right.  And in this pitching process, I imagine -- |
| 02:26:02 | 19 | well, are there circumstances where the person on the other |
| 02:26:06 | 20 | side knows that they are dealing with an intelligence officer |
| 02:26:13 | 21 | and some instances where they don't know they are dealing with |
| 02:26:16 | 22 | an intelligence officer? |
| 02:26:17 | 23 | A.   Yes, it goes both ways.  Sometimes you, in effect, |
| 02:26:20 | 24 | break cover and announce that you are working for an |
| 02:26:23 | 25 | intelligence service and you're recruiting this person as a |

OLSON - DIRECT (Mangan)                                    26

02:26:28  1    formal spy.  But if you're getting what you want already,

02:26:32  2    you may not need to break cover, and you just kind of

02:26:38  3    continue the pretext of the cover relationship.

02:26:40  4        The important thing is that you're getting the

02:26:42  5    information, the technology that you were after in the first

02:26:45  6    place.

02:26:46  7    Q.   All right.  And then the next few steps are formalizing,

02:26:51  8    producing, and termination.

02:26:53  9    A.   Yes.

02:26:53  10   Q.   Walk us through what you mean by those terms.

02:26:56  11   A.   Well, once you have the cooperation of this individual,

02:26:58  12   and you want to formalize the relationship, and so you begin

02:27:02  13   to build a file on that person.  You try to compromise that

02:27:08  14   person, usually with money.  You want to really kind of sink

02:27:12  15   the hook, we call it, making certain that you do have a

02:27:16  16   person who is working on your behalf.

02:27:20  17       In our system, we might conduct a polygraph

02:27:25  18   examination.  We might ask this person to sign an official

02:27:29  19   agreement with us.  Not always, and that's not always

02:27:33  20   appropriate, but we all do that in our business.

02:27:36  21   Q.   All right.  And then once you have that person more or

02:27:44  22   less working on your side --

02:27:46  23   A.   Yes.

02:27:46  24   Q.   -- are there tasks that you might give the person?

02:27:48  25   A.   Yes, yes.  You give them tasking.  You give them

OLSON - DIRECT (Mangan)                                          27

02:27:53    1    objectives to accomplish.  And once they start doing that,

02:27:58    2    once they are passing information to you, we've moved into

02:28:00    3    the producing phase of the operation.

02:28:02    4        And this is really the purpose of everything.  You're

02:28:05    5    getting the intelligence and the technology that you sought

02:28:08    6    after from the beginning.  So this is the payment.  This is

02:28:13    7    what you are getting for your country, intelligence or

02:28:16    8    technology that is going to be valuable to your country.

02:28:19    9    That's why we spy, to reach the producing phase.

02:28:22   10    Q.   All right.  And then I imagine termination, these things

02:28:28   11    end sometimes?

02:28:29   12    A.   Sure.  All good things come to an end.  Maybe the

02:28:31   13    person no longer has access, maybe you've recruited someone

02:28:36   14    who has better access and you no longer need this person.

02:28:39   15    Maybe this person has started to whine to you, fabricating.

02:28:44   16    Maybe the person is not reliable.  Maybe the person is

02:28:47   17    getting cold feet.  Maybe the person is under suspicion and

02:28:51   18    you terminate the person to protect that person from

02:28:54   19    discovery by the local counterintelligence forces.

02:28:58   20        A lot of reasons why that relationship can come to an

02:29:01   21    end.

02:29:02   22    Q.   Okay.  So let me ask you, are you familiar with something

02:29:10   23    called "exchange programs" in China to recruit foreign

02:29:15   24    technology experts?

02:29:15   25    A.   Yes.

OLSON - DIRECT (Mangan)                                    28

02:29:16  1    **Q.**   All right.  And does the MSS get involved in these

02:29:21  2    exchanges?

02:29:21  3    **A.**   Yes.

02:29:22  4    **Q.**   All right.  Can you explain how the MSS uses those

02:29:25  5    exchanges?

02:29:25  6    **A.**   Well, there are a lot of exchange programs.  The

02:29:29  7    Thousand Talents Program I think is the most prominent,

02:29:33  8    where the MSS works toward identifying people, in the United

02:29:40  9    States primarily, who have access to cutting-edge research.

02:29:44  10   It can be in any area that is going to be valuable to China.

02:29:48  11   It could be in industry.  It could be in high tech.  It

02:29:52  12   could be in agriculture.  It could be in medicine.  Anything

02:29:54  13   that's going to be of value to China.

02:29:57  14        And they find experts in those fields, perhaps on a

02:30:01  15   college campus, and they establish a relationship with them.

02:30:05  16   They cast it as a normal scientific or technical exchange,

02:30:15  17   cultural exchange, something that sounds innocent.  But

02:30:18  18   their purpose is to gradually induce that person to go

02:30:22  19   farther and farther and provide research and information

02:30:27  20   that goes beyond what they would be authorized to do.

02:30:31  21   **Q.**   This recruitment cycle, how long could this take, you

02:30:37  22   know, on the long end?

02:30:39  23   **A.**   It can take a long time.  Sometimes it just falls into

02:30:45  24   your hands.  People are willing to cooperate with you

02:30:48  25   because of varying reasons.  Maybe because they are

OLSON - DIRECT (Mangan)                                    29

02:30:52   1    sympathetic to your country.  Maybe because they are just so

02:30:57   2    venal, so money hungry, that once you put money on the table

02:31:02   3    it's game over.  Sometimes it requires more sophisticated

02:31:09   4    developing of a person to get the person to the point of

02:31:11   5    being willing to provide you with sensitive information of

02:31:16   6    sorts.

02:31:17   7        I've done cases where it was a matter of a couple

02:31:20   8    weeks.  I've done cases where it's been -- I've done cases

02:31:25   9    where it's been a matter of a couple years.

02:31:27  10    Q.    All right.  And as the case officer goes through this

02:31:30  11    recruitment cycle with the agent -- correct?  Am I using the

02:31:36  12    terms right?

02:31:37  13    A.    Yes, you are.  Good job.

02:31:39  14    Q.    As the case officer goes through this process with the

02:31:42  15    agent and they have those communications, is there also a risk

02:31:48  16    for the case officer that they have to, you know, stay aware

02:31:52  17    of?

02:31:52  18    A.    This is a high-risk profession.  Intelligence is not

02:31:56  19    risk free.  Those of us who enter this profession know that

02:31:59  20    we are going to encounter risks.

02:32:03  21        And the risks really come in two forms.  There are

02:32:06  22    basically two categories of case officers.  You have case

02:32:10  23    officers who are under diplomatic cover.  They are operating

02:32:15  24    out of a U.S. embassy or a consulate, for example.  They are

02:32:20  25    credited officially to the United States government as

OLSON - DIRECT (Mangan)                                    30

02:32:23    1    diplomats.  So they have diplomatic status, and they have

02:32:29    2    diplomatic immunity, and that means that if they get caught

02:32:34    3    spying, the worst that's going to happen to them is going to

02:32:38    4    be they are going to be declared persona non grata.  They

02:32:43    5    are going to be expelled from the country.  That's not good,

02:32:46    6    but it's not imprisonment.

02:32:48    7         Now, if you don't have diplomatic immunity, then it's

02:32:51    8    all different.  Because if you get caught spying without

02:32:54    9    diplomatic immunity, you can go to -- you are subject to

02:32:56   10    arrest and imprisonment.

02:32:58   11    Q.   So the first category, you said they are under diplomatic

02:33:03   12    cover?

02:33:03   13    A.   Yes.

02:33:03   14    Q.   The second category, when they do not have diplomatic

02:33:06   15    cover, is there a term for that?

02:33:08   16    A.   We call that nonofficial cover.  Other countries call

02:33:14   17    it other things, but it all boils down to the same thing.

02:33:18   18    If you do not have diplomatic cover, your cover's going to

02:33:23   19    be as a business person or as a member of an institute or a

02:33:29   20    member of an association.  It could be anything that gives

02:33:33   21    you status for being in that country and to be operating as

02:33:36   22    a spy.

02:33:37   23    Q.   So when you say "nonofficial cover," the initials for

02:33:41   24    that, NOC?

02:33:42   25    A.   Yes, NOC.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                            31

02:33:43   1    Q.    That's where that term comes from?

02:33:45   2    A.    NOC, nonofficial cover.  It means that you are posing

02:33:49   3    as something other than a diplomat.  You do not have

02:33:52   4    diplomatic immunity.

02:33:54   5    Q.    Okay.

02:33:55   6    A.    When you go into a position without diplomatic

02:33:59   7    immunity, you know what the risks are, and they are quite

02:34:01   8    severe.

02:34:02   9    Q.    So let's get back to sort of how the MSS operates.  From

02:34:07  10    a risk standpoint, is there an advantage to them in recruiting

02:34:12  11    people to come to China?

02:34:13  12    A.    Oh, very definitely.  They are much more comfortable

02:34:18  13    working on their own turf, in the safety of China.

02:34:22  14    Q.    And does that reduce the risk of arrest?

02:34:24  15    A.    Oh, absolutely, absolutely.  They're not going to be

02:34:28  16    arrested in China.

02:34:29  17    Q.    Is the MSS careful about exposing any officers in the

02:34:34  18    U.S.?

02:34:34  19    A.    Absolutely.  When they operate in the United States,

02:34:39  20    they operate very aggressively here.  They, of course, have

02:34:43  21    a large cadre of people who are here under diplomatic cover.

02:34:49  22    So that's one thing.

02:34:50  23          But they are very wary of operating in the United

02:34:54  24    States without diplomatic immunity because they know what

02:34:58  25    the risk is.  They are afraid of the FBI, quite frankly, and

OLSON - DIRECT (Mangan)                                32

| | | |
|---|---|---|
| 02:35:02 | 1 | they don't want to have their people get caught in the |
| 02:35:04 | 2 | United States and be arrested and prosecuted. |
| 02:35:07 | 3 | Q.   All right.  Let me turn to a slightly different topic. |
| 02:35:12 | 4 | In the recruitment cycle, I think we talked about covers. |
| 02:35:18 | 5 | Are aliases used by intelligence officers? |
| 02:35:21 | 6 | A.   All the time.  Yeah, we all use aliases. |
| 02:35:24 | 7 | Q.   Okay.  Do you have multiple aliases? |
| 02:35:26 | 8 | A.   Yes. |
| 02:35:27 | 9 | Q.   Is that something you used? |
| 02:35:28 | 10 | A.   Yes. |
| 02:35:29 | 11 | Q.   And are you familiar if MSS operates the same way? |
| 02:35:36 | 12 | A.   Absolutely, yes.  Yes, their officers use aliases |
| 02:35:40 | 13 | routinely. |
| 02:35:41 | 14 | Q.   Okay.  Let me ask you about -- have you heard the term a |
| 02:35:44 | 15 | "front company" or a "cover company"? |
| 02:35:45 | 16 | A.   Yes. |
| 02:35:46 | 17 | Q.   Can you explain what that means for the officer? |
| 02:35:49 | 18 | A.   Intelligence services sometimes set up companies.  Some |
| 02:35:54 | 19 | of them actually have legitimate functions, but in some |
| 02:35:59 | 20 | cases they are completely bogus, only for the purpose of |
| 02:36:02 | 21 | providing cover for their personnel. |
| 02:36:04 | 22 | They set up these companies to conceal the fact that |
| 02:36:07 | 23 | they are actually operating on behalf of the intelligence |
| 02:36:10 | 24 | services of that company.  That provides cover for |
| 02:36:15 | 25 | intelligence officers to operate. |

OLSON - DIRECT (Mangan)                                33

02:36:16  1   Q.   So is that company affiliation used in conjunction with

02:36:21  2   the alias?

02:36:21  3   A.   Yes, yes.  You would most likely as part of your alias

02:36:26  4   have a cover that conceals your identity and your

02:36:35  5   intelligence affiliation.

02:36:36  6   Q.   All right.  Does that give the alias some kind of

02:36:39  7   employment or background?

02:36:40  8   A.   Yes.  You would have ostensible duties in that cover

02:36:46  9   company.  You would have a title.  You'd probably have a

02:36:48  10  business card.  You would represent yourself as an employee

02:36:51  11  of that cover.

02:36:53  12       And the cover company's usually are innocent sounding.

02:36:57  13  They sound legitimate.  They are not in any way identifiable

02:37:02  14  as a front company for intelligence.

02:37:05  15  Q.   I'd like to ask you about science and technology

02:37:11  16  associations in China.

02:37:12  17  A.   Yes.

02:37:13  18  Q.   Are you familiar with those?

02:37:14  19  A.   Yes, I am.

02:37:14  20  Q.   All right.  And are they at times used by the MSS in

02:37:19  21  their operations?

02:37:20  22  A.   Frequently.

02:37:21  23  Q.   Can you explain how they're used?

02:37:24  24  A.   They use these technical associations, these scientific

02:37:28  25  associations, these industrial associations to make

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    34

02:37:32   1    themselves appear legitimate.  It's good cover because you

02:37:35   2    sound as if you are doing something that is innocent, that

02:37:40   3    is in no way affected with or connected with intelligence.

02:37:43   4        So, yes, they use associations, think tank institute,

02:37:50   5    university covers routinely in China.

02:37:52   6    Q.   You just mentioned academic, I think.  Do they sometimes

02:37:56   7    use university or academic covers as well?

02:37:58   8    A.   Yes.

02:37:59   9    Q.   Okay.  And they use them in a similar manner as the

02:38:04   10   science and technology associations?

02:38:07   11   A.   Yes, sir.

02:38:08   12   Q.   Okay.  Now, let me ask you, when we talk about this

02:38:13   13   recruitment cycle and the initial invitation to an agent or

02:38:18   14   potential agent, does the MSS sometimes use another person or

02:38:22   15   a proxy to do the initial invite?

02:38:25   16   A.   That's quite common.  In fact, the front person may be

02:38:30   17   somebody who is prestigious, maybe legitimate but is

02:38:36   18   cooperating with the intelligence services.  So it's quite

02:38:38   19   often another individual who makes the initial contact and

02:38:44   20   probably will issue the invitation to come to China.

02:38:47   21   Q.   From your perspective as a case officer, what's the

02:38:50   22   advantage of using that proxy or that front person?

02:38:54   23   A.   It adds a little bit of prestige, a little bit of

02:38:58   24   luster, a little bit of legitimacy to the process if you

02:39:03   25   have someone who is a known, distinguished person in that

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    35

02:39:06    1    field to reach out to you with an invitation.  You're

02:39:11    2    flattered by it.

02:39:13    3    **Q.**   All right.  Let's talk about those exchange trips where,

02:39:17    4    you know, let's say an employee from a U.S. technology company

02:39:21    5    is invited over for an exchange.

02:39:23    6    **A.**   Yes.

02:39:24    7    **Q.**   Are those typically paid for by China?

02:39:26    8    **A.**   Yes.

02:39:27    9    **Q.**   All right.  And does the MSS get involved in that

02:39:30   10    funding?

02:39:30   11    **A.**   The MSS pays.  They provide the funding for that.

02:39:34   12    That's part of the mechanism that they're using to bring

02:39:38   13    these candidates to the -- to China.

02:39:43   14    **Q.**   When that individual -- let's say the U.S. employee goes

02:39:48   15    over for one of these exchanges.  Is there a risk for them if

02:39:53   16    they bring over their laptop or personal cell phone?

02:39:56   17    **A.**   Oh, there could be, definitely, because it's well-known

02:40:01   18    that the Chinese will tamper with -- with computers brought

02:40:04   19    by visitors if they can get access to them.

02:40:08   20    **Q.**   And if China does get access to them, what ministries in

02:40:13   21    China might be involved in that activity?

02:40:16   22    **A.**   That's an MSS operation.

02:40:19   23    **Q.**   In terms of talking about these potential agents or

02:40:23   24    sources, I wonder if you could explain the process from the

02:40:31   25    standpoint of, do you have to be subtle at the beginning?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

02:40:34  1    A.   Yes, you -- you are kind of keeping up the pretense of

02:40:42  2    a legitimate purpose, and so you are making it sound as

02:40:49  3    though it is a normal exchange.  It is something that is not

02:40:53  4    out of the ordinary, that you are not asking them to do

02:40:55  5    anything inappropriate.

02:40:56  6         But while you are there, then you really get into the

02:40:59  7    assessment process in earnest to see if this person will

02:41:02  8    move a little bit farther.

02:41:03  9         And that's their objective, of course, to lure these

02:41:06  10   people into a more extensive relationship, to give up more

02:41:09  11   and more.

02:41:10  12   Q.   Over time, does the officer, case officer elevate the

02:41:16  13   sensitivity of the information it sought?

02:41:19  14   A.   Absolutely.  They push.  They become increasingly

02:41:23  15   aggressive, more specific in what they're looking for.

02:41:26  16   Q.   And is it -- is that one of the difficult judgment calls

02:41:30  17   as to how quickly to escalate?

02:41:32  18   A.   Yes.

02:41:32  19   Q.   In talking about this recruitment cycle, you mention the

02:41:39  20   producing part of it.

02:41:41  21   A.   Yes.

02:41:41  22   Q.   Is that when you already have an agent or an asset in

02:41:45  23   place somewhere?

02:41:46  24   A.   Yes.  And that person's providing you with information

02:41:52  25   or technology or whatever the objective is.

OLSON - DIRECT (Mangan)                                          37

02:41:54   1   Q.   So if you have an asset within a -- let's say MSS has an

02:41:59   2   asset within a technology company.  Do they want to be

02:42:05   3   selective in which tasks they give that person?

02:42:07   4   A.   Yes.  Yes, you want to be specific to that person's

02:42:10   5   access.  You want to learn what that person's working on,

02:42:15   6   what his or her research area is, what the access is to

02:42:21   7   important information, what kind of computer access they

02:42:23   8   have.  You learn all those things, and then you tailor the

02:42:26   9   tasking accordingly.

02:42:28   10   Q.   Did you review the communication summary related to the

02:42:33   11   planting of malware on a French employee's --

02:42:37   12   A.   Yes, I did.

02:42:38   13   Q.   From your assessment, would that involve the tasking of

02:42:41   14   an in-place agent?

02:42:42   15   A.   Yes.  It was quite clear what was going on there.  It

02:42:46   16   was an MSS operation using Chinese national employees in

02:42:51   17   that French company to plant a device, malware, into the

02:42:57   18   computer of a visiting French engineer.

02:43:04   19   Q.   Would that fall under the category of producing?

02:43:07   20   A.   Yes.

02:43:07   21   Q.   All right.  And would you consider that a humint

02:43:14   22   operation?

02:43:14   23   A.   It would be a humint operation if the ultimate

02:43:20   24   objective were to recruit the French engineer, but it would

02:43:22   25   be more of a technical operation.

OLSON - DIRECT (Mangan)                                      38

02:43:25  1    Q.   All right.  But the agents that you're using inside the

02:43:30  2    company, would they be considered humint agents?

02:43:32  3    A.   Yes, yes.  The people you have inside the company would

02:43:36  4    be humint sources.

02:43:38  5    Q.   Okay.

02:43:43  6              MR. MANGAN:  Are we at a -- this is a logical

02:43:46  7    breaking point, Your Honor.

02:43:48  8              THE COURT:  Yes.

02:43:48  9              MR. MANGAN:  This might be a good point.

02:43:50  10             THE COURT:  Very well.  We are going to take our

02:43:52  11   midafternoon break.  We will break for 20 minutes, up until 3.

02:43:56  12       During the break, take the break.  Breathe deeply.  Don't

02:44:00  13   discuss the case among yourselves or with anyone else.

02:44:03  14   Continue to keep an open mind.  No independent research.

02:44:07  15       Out of respect for you, we'll rise as you leave for a

02:44:10  16   20-minute break.

02:44:11  17             THE COURTROOM DEPUTY:  All rise for the jury.

02:44:13  18        (Jury out at 2:37 p.m.)

02:44:47  19             THE COURT:  The jury's left the room.  We're going

02:44:49  20   to break for 20 minutes.  Anything require my attention before

02:44:52  21   we start that break from the government?

02:44:53  22             MR. MANGAN:  No, Your Honor.

02:44:54  23             THE COURT:  From the defense?

02:44:55  24             MR. McBRIDE:  No, Your Honor.

02:44:56  25             THE COURT:  The government will take care of the

OLSON - DIRECT (Mangan)                                    39

02:44:58  1   witness and admonish.

02:44:59  2         We are in recess until that time.

02:45:01  3             THE COURTROOM DEPUTY:  The court is now in recess.

02:45:04  4         (Recess from 2:37 p.m. until 3:07 p.m.)

03:07:19  5             THE COURT:  Back in the courtroom.  Is the

03:07:20  6   government ready to proceed?

03:07:22  7             MR. MANGAN:  Yes, Your Honor.

03:07:23  8             THE COURT:  The defense as well?

03:07:24  9             MR. McBRIDE:  Yes, sir.

03:07:25  10            THE COURT:  Let's call for the jury, please.

03:07:47  11        The witness can take his mask off if he wants to.  He

03:07:51  12   doesn't have to.

03:07:52  13            THE WITNESS:  Thank you, Your Honor.

03:08:44  14            THE COURTROOM DEPUTY:  All rise for the jury.

03:08:45  15        (Jury in at 3:01 p.m.)

03:09:14  16            THE COURT:  You may all be seated.

03:09:17  17        The jury has rejoined us after break.  One more time,

03:09:22  18   thank you for your continuing attention and hard work.

03:09:25  19        We'll continue with this witness who remains under oath.

03:09:29  20        Mr. Mangan, you may proceed when you're read.

03:09:33  21            MR. MANGAN:  Thank you, Your Honor.

03:09:34  22        If we could put Exhibit 100 back up on the screen.

03:09:34  23   BY MR. MANGAN:

03:09:39  24   **Q**.  Mr. Olson, in terms of going back to this recruitment

03:09:43  25   cycle, we talked a little bit about the exchanges that are

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

OLSON - DIRECT (Mangan)                                          40

03:09:45   1   done in China with technical experts.  Do you recall that?
03:09:48   2   A.    Yes.
03:09:49   3   Q.    And in walking through kind of how -- could we walk
03:09:54   4   through how that fits the recruitment cycle?  So when an
03:09:57   5   individual is invited over for a presentation, what phase
03:10:01   6   would you consider that to be?
03:10:02   7   A.    I would phase that as the beginning of assessment.
03:10:06   8   Q.    All right.  And so when they are listening to the
03:10:10   9   presentation, is that necessarily to get the ultimate
03:10:16  10   production at that point or is it more a matter of starting
03:10:19  11   the -- starting this process?
03:10:22  12            THE COURT:  Is there an objection?
03:10:24  13            MR. McBRIDE:  Lack of foundation, Your Honor.
03:10:26  14            THE COURT:  Sustained as to form.
03:10:29  15   BY MR. MANGAN:
03:10:32  16   Q.    If you could -- we were talking about when folks get
03:10:36  17   invited over for these presentations.  You mention that that
03:10:43  18   might be the assessing part of the assessing step?
03:10:45  19   A.    Yes, that's part of the assessment.
03:10:47  20   Q.    Okay.  Is there usually a payment related to those?
03:10:54  21   A.    Yes.
03:10:54  22   Q.    Okay.  And how does that factor into the cycle?
03:10:57  23   A.    That's still the assessment and beginning of the
03:11:01  24   development phase.
03:11:02  25   Q.    All right.  And then what other steps are taken in

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    41

03:11:08   1    relation to those exchanges towards developing that particular

03:11:11   2    agent?

03:11:11   3    A.    Well, invitation is a pretext to get that person on to

03:11:18   4    Chinese soil.  And while that person is there, they're being

03:11:22   5    sized up.  They're confirming that they have the technology,

03:11:25   6    the information that they are looking for.  They are looking

03:11:29   7    for the personality characteristics, the affinity to China,

03:11:36   8    if any, the existence of relatives in communist China.  They

03:11:43   9    are wining and dining them.  They are playing to their ego.

03:11:46   10   They are flattering them.  They are holding out the

03:11:49   11   opportunity for a continuing positive relationship.  And

03:11:55   12   they are just looking for any indication that this person is

03:11:59   13   a good follow-on target.

03:12:03   14          MR. MANGAN:  All right.  We can take that down.

03:12:03   15   BY MR. MANGAN:

03:12:05   16   Q.    Mr. Olson, did you review communications between Xu

03:12:11   17   Yanjun and a GE employee leading up to the arrest in April of

03:12:14   18   2018?

03:12:15   19   A.    Yes, I did.

03:12:16   20   Q.    And did you evaluate those communications in light of

03:12:18   21   your experience as an intelligence officer?

03:12:21   22   A.    Yes, I analyzed it very carefully.

03:12:27   23   Q.    Did you notice any aspects of the recruitment cycle in

03:12:30   24   that sequence?

03:12:31   25   A.    Yes.  By that stage they were far into development.  He

OLSON - DIRECT (Mangan)                                              42

03:12:35  1    was pushing for more and more sensitive technology.  He was

03:12:40  2    building rapport.

03:12:41  3    Q.    Let me go back to the beginning.  Did you see --

03:12:47  4          Let's talk about the initial invitation through LinkedIn.

03:12:51  5    Where would that fit in the recruitment cycle?

03:12:53  6    A.    That would be the end of the spotting process.  Once

03:12:57  7    they saw his LinkedIn posting, that constituted spotting of

03:13:02  8    someone who potentially had good access that fit their

03:13:05  9    requirements.  And then they would pursue it to try to get

03:13:09  10   that person to China for assessment and development.

03:13:14  11   Q.    How about the use of the university person named Chen

03:13:19  12   Feng to extend the invitation?

03:13:21  13   A.    That was quite typical of a Chinese intelligence

03:13:25  14   operation.  They would use someone like Chen Feng as kind of

03:13:30  15   a front.  He was a distinguished, knowledgeable person in

03:13:35  16   the aviation industry in China.  I'm sure that the defendant

03:13:39  17   was flattered that someone of that level would take an

03:13:44  18   interest in him and would invite him to China.

03:13:47  19         But the longer-term purpose was, of course, to turn him

03:13:52  20   over, turn the GE engineer over to an intelligence officer.

03:13:58  21              MR. MANGAN:  If we could show Exhibit 63b, which has

03:14:03  22   been previously admitted, Your Honor.

03:14:04  23              THE COURT:  Yes.  You can show it to everyone.

03:14:08  24   BY MR. MANGAN:

03:14:10  25   Q.    With respect to this business card, did you see this

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    43

```
03:14:12   1    previously, Mr. Olson?
03:14:13   2    A.    Yes, I saw that.
03:14:14   3    Q.    All right.  I think previously we talked about the
03:14:20   4    science and technology associations?
03:14:22   5    A.    Yes.
03:14:22   6    Q.    How would this be consistent with the use of aliases or
03:14:28   7    cover companies?
03:14:28   8    A.    It's very consistent with the cover used by an
03:14:32   9    intelligence officer.  It sounds prestigious.  It gives him
03:14:36   10   reason to be pursuing someone in the aviation industry.
03:14:42   11   Q.    All right.  In the follow-on communications, there were
03:14:45   12   emails and there were WeChats using a couple different
03:14:49   13   handles.
03:14:50   14   A.    Yes.
03:14:50   15   Q.    What significance, if any, did you attribute to those
03:14:53   16   modes of communication?
03:14:54   17   A.    They were very characteristic of an intelligence
03:14:58   18   operation.  Intelligence officer will use email, phone
03:15:04   19   calls, messaging services like WeChat routinely in their
03:15:08   20   communications with their -- their target.
03:15:11   21   Q.    All right.  After the initial visit, what would be the
03:15:18   22   typical step in terms of a subsequent visit or what the goals
03:15:22   23   are for the case officer?
03:15:23   24   A.    If the pretext visit, the invitation for the lecture,
03:15:28   25   for the consulting is encouraging --
```

OLSON - DIRECT (Mangan)                                      44

03:15:31  1            MR. McBRIDE:  Your Honor?

03:15:32  2            THE COURT:  Yes.

03:15:32  3            MR. McBRIDE:  Objection.  This is really getting

03:15:34  4  into speculation.

03:15:35  5            THE COURT:  It's overruled.  Subject to cross.

03:15:40  6       You may reask the question, or he can answer it if he

03:15:43  7  remembers it.

03:15:44  8  BY MR. MANGAN:

03:15:44  9  Q.   Are you able to continue with your answer?

03:15:45  10 A.   I can continue.

03:15:46  11       If the results of that pretext visit are encouraging

03:15:51  12 and they think that they have potential for someone with

03:15:55  13 access to maintain a relationship with, they will follow up.

03:15:59  14 And the follow-up will be done by email, by phone calls, or

03:16:04  15 by WeChat.

03:16:09  16            MR. MANGAN:  All right.  If we could take this

03:16:11  17 exhibit down.  I'd like to show Exhibit 69.  If we could start

03:16:15  18 with the email on page 2.

03:16:17  19       This has previously been admitted, Your Honor.

03:16:19  20            THE COURT:  And you wish to publish it?

03:16:21  21            MR. MANGAN:  Yes, Your Honor.

03:16:21  22            THE COURT:  Okay.  Everybody can see it.

03:16:27  23 BY MR. MANGAN:

03:16:28  24 Q.   All right.  If we take a look at the bottom there, can

03:16:31  25 you see it, Mr. Olson?

OLSON - DIRECT (Mangan)                                        45

03:16:31  1   **A.**   Yes, I can.

03:16:32  2   **Q.**   All right.  And with respect to this particular email,

03:16:38  3   let me turn to the second sentence.  And I'll read it.  "Since

03:16:43  4   I am not the expert in this field, I want you to spend some

03:16:46  5   time to dialog with the experts in China for a more precise

03:16:50  6   connection.

03:16:51  7       Based on your experience as a case officer, what do

03:16:56  8   you -- how do you understand that?

03:16:59  9   **A.**   Well, that is an important step in the recruitment

03:17:03  10  cycle.  They want to sit this person down with true experts

03:17:08  11  in the field who can ask more direct questions, who can get

03:17:12  12  to the heart of the access that this person has, and to

03:17:16  13  continue a technical and personal assessment of the

03:17:19  14  individual.

03:17:21  15  **Q.**   From an espionage tradecraft perspective, how are these

03:17:26  16  experts used by the case officer?

03:17:28  17  **A.**   They are --

03:17:30  18           MR. McBRIDE:  Objection.

03:17:31  19           THE COURT:  Basis?

03:17:32  20           MR. McBRIDE:  Your Honor, again, we're getting to

03:17:34  21  speculation, Your Honor.

03:17:35  22           THE COURT:  Overruled.

03:17:38  23           THE WITNESS:  They are an integral part of the

03:17:40  24  process.  The Chinese intelligence services rely heavily on

03:17:45  25  experts in the different technologies as their collaborators

OLSON - DIRECT (Mangan)                                         46

| | | |
|---|---|---|
| 03:17:50 | 1 | in this -- in this operation. |
| 03:17:52 | 2 | BY MR. MANGAN: |
| 03:17:55 | 3 | **Q.**   We talked previously about trying -- for a case officer |
| 03:17:59 | 4 | to try to determine requirements. |
| 03:18:01 | 5 | **A.**   Yes. |
| 03:18:01 | 6 | **Q.**   Right?  Would this be consistent with what you explained |
| 03:18:06 | 7 | earlier? |
| 03:18:06 | 8 | **A.**   Yes, it's very consistent.  The Chinese MSS system |
| 03:18:11 | 9 | requires the interaction with the aviation industry people, |
| 03:18:15 | 10 | for example, to provide them with the requirements for what |
| 03:18:21 | 11 | it is exactly they are looking for in the way of advanced |
| 03:18:25 | 12 | U.S. technology. |
| 03:18:26 | 13 | **Q.**   If we look to the last sentence on that page, where it |
| 03:18:30 | 14 | says, "Also, attached file is some domestic requirements that |
| 03:18:35 | 15 | I know of.  Can you take a look and let me know if you're |
| 03:18:39 | 16 | familiar with those?" |
| 03:18:40 | 17 | **A.**   Yes. |
| 03:18:41 | 18 | **Q.**   And what was your understanding from reading that |
| 03:18:43 | 19 | sentence? |
| 03:18:43 | 20 | **A.**   My understanding was this is intelligence officer's |
| 03:18:49 | 21 | pressing, who is pushing for additional cooperation, wants |
| 03:18:53 | 22 | to see how the target will respond to that request. |
| 03:18:58 | 23 |         MR. MANGAN:  If I could turn to page 4, which is the |
| 03:19:09 | 24 | attachment that was discussed in the previous email. |
| 03:19:13 | 25 | BY MR. MANGAN: |

OLSON - DIRECT (Mangan)                                    47

| | | |
|---|---|---|
| 03:19:13 | 1 | **Q.**   In looking at the top there, Mr. Olson, do you see the |
| 03:19:17 | 2 | top sentence where it says, "Regarding the current development |
| 03:19:20 | 3 | situation and future development direction of foreign |
| 03:19:24 | 4 | countries' structural materials for fan rotor blades made from |
| 03:19:30 | 5 | composite materials." |
| 03:19:33 | 6 | Did you see any significance in the use of that phrase |
| 03:19:35 | 7 | "foreign countries"? |
| 03:19:37 | 8 | **A.**   Yes.  It meant that the objective was to obtain this |
| 03:19:42 | 9 | technology from foreign countries. |
| 03:19:44 | 10 | **Q.**   All right.  How consistent is this kind of list with the |
| 03:19:50 | 11 | type of requirements that you were discussing earlier that a |
| 03:19:54 | 12 | case officer might typically be pursuing? |
| 03:19:57 | 13 | MR. McBRIDE:  Objection, Your Honor. |
| 03:19:59 | 14 | THE COURT:  Excuse me.  Objection. |
| 03:20:02 | 15 | MR. McBRIDE:  This gentleman's not an expert on |
| 03:20:04 | 16 | aviation, Your Honor. |
| 03:20:05 | 17 | THE COURT:  This is his opinion based on his |
| 03:20:06 | 18 | experience.  The objection is overruled. |
| 03:20:11 | 19 | BY MR. MANGAN: |
| 03:20:11 | 20 | **Q.**   Mr. Olson, how is -- is this consistent with the type of |
| 03:20:16 | 21 | requirements you were testifying about earlier? |
| 03:20:18 | 22 | **A.**   Yes, it's consistent with what I believe an |
| 03:20:21 | 23 | intelligence service would have in the form of requirements. |
| 03:20:29 | 24 | **Q.**   All right.  And we talked earlier about the importance of |
| 03:20:31 | 25 | those requirements to the case officer's mission, correct? |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                        48

| | | |
|---|---|---|
| 03:20:33 | 1 | **A.**   Yes. |
| 03:20:34 | 2 | **Q.**   Can you again explain to the jury how those requirements |
| 03:20:38 | 3 | fit into the steps that an officer takes? |
| 03:20:41 | 4 | **A.**   Yes.  An intelligence officer's working from these |
| 03:20:45 | 5 | requirements, and they guide all of his or her actions to |
| 03:20:50 | 6 | make certain that the espionage operations under way here is |
| 03:20:55 | 7 | responsive to what the country needs.  And so for that |
| 03:20:59 | 8 | purpose you are paying close attention to the requirements |
| 03:21:03 | 9 | and you are issuing these requirements to the target to see |
| 03:21:08 | 10 | how that target will respond. |
| 03:21:13 | 11 | **Q.**   All right. |
| 03:21:15 | 12 |         MR. MANGAN:  If we could take that exhibit down. |
| 03:21:17 | 13 |     Your Honor, I'd like to publish Exhibit 70, please, which |
| 03:21:21 | 14 | has previously been admitted. |
| 03:21:22 | 15 |         THE COURT:  Yes, we'll publish it to all.  Perhaps. |
| 03:21:41 | 16 | There it is. |
| 03:21:42 | 17 |         MR. MANGAN:  If we could turn to the second page. |
| 03:21:42 | 18 | BY MR. MANGAN: |
| 03:21:53 | 19 | **Q.**   Mr. Olson, do you recall seeing emails where there was a |
| 03:21:56 | 20 | request for a directory of a computer? |
| 03:21:58 | 21 | **A.**   Yes, I remember that. |
| 03:22:00 | 22 | **Q.**   All right.  And from your perspective as an experienced |
| 03:22:05 | 23 | case officer, what was your assessment of that request for a |
| 03:22:09 | 24 | computer directory? |
| 03:22:10 | 25 | **A.**   My assessment was -- |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    49

03:22:12   1            MR. McBRIDE:  Objection.  Lack of foundation, Your
03:22:14   2    Honor.
03:22:14   3            THE COURT:  Overruled.  His testimony's been the
03:22:17   4    foundation.
03:22:17   5        You may answer.
03:22:19   6            THE WITNESS:  My assessment was this was a further
03:22:23   7    step in the process of determining how cooperative this
03:22:27   8    person's going to be, asking for a directory of something that
03:22:31   9    would be highly desirable for an intelligence service to find
03:22:35   10   out what files are existing in that company.  And if he
03:22:41   11   complies with that, which he did, that was a very positive
03:22:44   12   indication that you are getting cooperation.
03:22:46   13   BY MR. MANGAN:
03:22:47   14   Q.   All right.  So if the directory is sent back to the case
03:22:51   15   officer, is this still -- are we still in the assessing phase
03:22:58   16   at that point?
03:22:59   17   A.   Yes, you're still assessing but you are also trying to
03:23:03   18   strengthen the relationship and determine how cooperative
03:23:06   19   this person's going to be.  So that is already into the
03:23:09   20   development phase as well.
03:23:13   21           MR. MANGAN:  All right.  If we could turn to -- if I
03:23:15   22   could publish Exhibit 67c, Your Honor, which was previously
03:23:20   23   admitted.
03:23:21   24           THE COURT:  Yes.
03:23:22   25           MR. MANGAN:  I'd like to turn to page 20.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                        50

03:23:21  1    BY MR. MANGAN:

03:23:27  2    Q.    Mr. Olson, did you read these WeChat communications that

03:23:30  3    went back and forth?

03:23:36  4          You can go further down.

03:23:43  5    A.    Yes, I saw that.

03:23:45  6    Q.    All right.  So these communications are the first

03:23:53  7    communications after that directory was sent back?

03:23:55  8    A.    Yes.

03:23:56  9    Q.    From the case officer?

03:23:57  10   A.    Yes.

03:23:57  11   Q.    So from your perspective, what do these communications

03:24:03  12   indicate to you?

03:24:03  13   A.    Indicates to me that the MSS is encouraged by what's

03:24:11  14   going on.  They want to pursue it.  They want to see how far

03:24:15  15   this person will go.  They want to have a further meeting, a

03:24:19  16   personal meeting.

03:24:24  17         As an intelligence officer, I actually chuckled as the

03:24:27  18   last statement, "The U.S. is not in my plan."  That, of

03:24:31  19   course, is consistent with my knowledge that the MSS does

03:24:35  20   not like to operate inside the United States without

03:24:38  21   diplomatic immunity.

03:24:39  22   Q.    We talked earlier about the preference to invite

03:24:43  23   individuals to China and operate on their own home turf,

03:24:47  24   correct?

03:24:47  25   A.    Yes.

OLSON - DIRECT (Mangan)                                           51

03:24:47  1    Q.    In this, there is an indication about meeting in a

03:24:52  2    foreign country?

03:24:53  3    A.    Yes.

03:24:53  4    Q.    Does that indicate to you a change in this relationship

03:24:58  5    or at least a willing to take a different risk?

03:25:01  6    A.    It's a definite advancement in the relationship.  The

03:25:05  7    fact that they were willing to meet in another country

03:25:09  8    indicates that they had reason to believe that this was

03:25:11  9    going very, very well.

03:25:14  10   Q.    I assume most of your career you were operating in a

03:25:20  11   foreign country, correct?

03:25:21  12   A.    Yes.

03:25:21  13   Q.    All right.  If an officer is able to operate within their

03:25:25  14   own country, is that considerably safer for the officer?

03:25:29  15   A.    Oh, absolutely.

03:25:31  16   Q.    What type of precautions do you need to take if a case

03:25:38  17   officer is going to operate in a foreign country?

03:25:40  18   A.    Without diplomatic immunity?

03:25:43  19   Q.    Yes.

03:25:43  20   A.    Extreme precautions.  You would plan it very, very

03:25:47  21   carefully.  You would be particular about which location it

03:25:51  22   was, what the circumstances of the meeting, where the

03:25:52  23   meeting was to take place, how you would communicate once

03:25:55  24   you got there.  It would be meticulously planned.

03:26:00  25         MR. MANGAN:  All right.  If we could take this down.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                          52

03:26:02  1    Your Honor, I'd like to publish Exhibit 75b, which was

03:26:06  2    previously admitted.

03:26:07  3              THE COURT:  Yes.

03:26:11  4    BY MR. MANGAN:

03:26:12  5    Q.    Mr. Olson, do you recall repeat -- excuse me -- do you

03:26:16  6    recall reading a transcript of a phone recording with the GE

03:26:20  7    employee and the defendant?

03:26:40  8    A.    Yes, I recall that message.

03:26:41  9    Q.    All right.  I'll move down in a few minutes to one of the

03:26:48  10   later pages, but with respect to the discussion about personal

03:26:55  11   items, such as family matters or worklife, can you explain why

03:27:04  12   that is significant to a case officer?

03:27:06  13   A.    It's standard MO for all of us in the intelligence

03:27:11  14   business.  We want to know as much about this person as we

03:27:13  15   possibly can.  We want to build a file.  We want to know

03:27:18  16   everything we can about that person's family status,

03:27:21  17   employment, interests, everything we possibly can.

03:27:27  18         It's just part of our business.  You never know what's

03:27:30  19   going to be useful later on.  So you do everything you can

03:27:33  20   to assemble as much personal knowledge as you can about this

03:27:37  21   person.

03:27:37  22   Q.    So when a case officer is talking to a potential agent

03:27:42  23   and they're talking about how work is going --

03:27:47  24   A.    Yes.

03:27:48  25   Q.    -- or just family issues or child care, is that different

OLSON - DIRECT (Mangan)                                53

03:27:52   1   from chitchat for an everyday person?

03:27:55   2   **A.**   It's different from chitchat because there's a purpose

03:27:58   3   to it.  What the case officer is doing is trying to build

03:28:01   4   rapport, a personal relationship with this agent, to build

03:28:05   5   some kind of friendship, some kind of a closeness on a

03:28:12   6   personal level, which will then facilitate their progress

03:28:16   7   and the professional side of the relationship.

03:28:19   8            MR. MANGAN:  All right.  If we could turn to page 7,

03:28:21   9   please.  Towards the bottom half there.

03:28:21  10   BY MR. MANGAN:

03:28:32  11   **Q.**   If you'll see the part starting with Mr. Qu, where it

03:28:37  12   says, "by the way, because you sent me a document list last

03:28:40  13   time," and he says, "we took a look.  I think that that is

03:28:44  14   pretty good stuff.  I wonder if it is convenient for you to

03:28:47  15   bring that stuff, this time to Europe, if you can bring that

03:28:51  16   stuff along."

03:28:52  17            And then the employee responds, "I for sure will bring my

03:28:56  18   computer with me."

03:29:00  19            What is the -- from the standpoint of a case officer in

03:29:05  20   the recruitment cycle, what is the significance of that kind

03:29:09  21   of ask?

03:29:10  22            MR. McBRIDE:  Your Honor?

03:29:10  23            THE COURT:  Yes.

03:29:11  24            MR. McBRIDE:  Objection.  May we have a sidebar?

03:29:14  25            THE COURT:  Yes.

OLSON - DIRECT (Mangan)                                    54

03:29:15   1          (At sidebar.)

03:29:37   2              MR. McBRIDE:  Sir, I understand that this man is an

03:29:40   3   expert and widely educated and very experienced, but I think

03:29:45   4   his testimony is really getting into the province of the jury

03:29:48   5   where he looks at some language that's in evidence and makes

03:29:50   6   an opinion about what this -- what our defendant is doing or

03:29:54   7   his co-conspirators are doing.  That's really a fact for the

03:29:58   8   jury to determine.  So I think it's excludable under 704(b),

03:30:03   9   Your Honor.

03:30:04  10              MR. MANGAN:  Our response, Your Honor, is that we're

03:30:06  11   dealing with a different kind of case where we're talking

03:30:09  12   about espionage tradecraft.  And this language and these steps

03:30:15  13   where they are asking for things or telling things have a

03:30:18  14   significance within the world of espionage, and that's why we

03:30:21  15   brought on an espionage tradecraft expert, to opine on the

03:30:27  16   significance.

03:30:28  17              THE COURT:  Do you want a last word before I confer

03:30:31  18   with my law clerk?

03:30:33  19              MR. McBRIDE:  Yes, sir.

03:30:34  20              THE COURT:  Okay.

03:30:34  21              MR. McBRIDE:  I understand what the government is

03:30:36  22   doing and that they are certainly allowed to lay out espionage

03:30:40  23   techniques and how spies operate.  That will all be subject to

03:30:46  24   cross-examination.  However, I think they are going a step too

03:30:50  25   far where this gentleman is saying this is an indication that

OLSON - DIRECT (Mangan)                                    55

03:30:52   1   this defendant is doing A, B, and C, or X, Y, and Z.  I think

03:30:58   2   that remains the province of the jury, Your Honor.

03:31:00   3            THE COURT:  Very well.  If you will give me a

03:31:03   4   moment.

03:31:07   5            MR. McBRIDE:  Yes, sir.

03:31:09   6        (Pause.)

03:31:43   7            THE COURT:  I just wanted to check with my law clerk

03:31:50   8   to confirm my visceral reaction.

03:31:53   9        The objection is overruled.  He's not testifying to

03:31:57   10  ultimate facts.  He's laying out his opinion based on his

03:32:00   11  experience, and I find it acceptable.

03:32:03   12       Your objection is of record and overruled.

03:32:06   13            MR. McBRIDE:  Thank you for hearing me, Your Honor.

03:32:08   14            THE COURT:  Very well.

03:32:28   15       (In open court.)

03:32:33   16            THE COURT:  You may proceed.

03:32:36   17            MR. MANGAN:  Yes.  If we could bring that exhibit

03:32:38   18  back up, please.

03:32:36   19  BY MR. MANGAN:

03:32:40   20  Q.   Mr. Olson, if you recall, we were talking about this

03:32:44   21  discussion related to bringing the computer to Europe.  Do you

03:32:47   22  recall that?

03:32:47   23  A.   Yes.

03:32:48   24  Q.   And based on your experience and the recruitment cycle we

03:32:54   25  discussed previously, what is your assessment of this?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                56

| | | |
|---|---|---|
| 03:32:57 | 1 | **A.** I assess this as moving into the producing stage. |
| 03:33:04 | 2 | They've already been producing documents. And I see here a |
| 03:33:08 | 3 | case officer, in my opinion, from China who is increasingly |
| 03:33:13 | 4 | aggressive, pushing for the additional stuff, to bring the |
| 03:33:20 | 5 | computer. I think that he's very encouraged by how this is |
| 03:33:25 | 6 | going. He has a -- an agent, potential agent who he thinks |
| 03:33:33 | 7 | is going to be very compliant. So this is a very nice step |
| 03:33:35 | 8 | for him. |
| 03:33:36 | 9 | THE COURT: What happened to your volume? |
| 03:33:37 | 10 | THE WITNESS: Excuse me, sir? |
| 03:33:40 | 11 | THE COURT: What happened to your volume? Will you |
| 03:33:41 | 12 | speak up? |
| 03:33:42 | 13 | THE WITNESS: I will speak up. |
| 03:33:44 | 14 | BY MR. MANGAN: |
| 03:33:44 | 15 | **Q.** You can pull that a little closer. |
| 03:33:45 | 16 | **A.** I've got it. |
| 03:33:47 | 17 | MR. MANGAN: If we can turn in this exhibit to page |
| 03:33:49 | 18 | 12. About midway down. |
| 03:33:49 | 19 | BY MR. MANGAN: |
| 03:34:00 | 20 | **Q.** There's a statement in the middle there, Mr. Olson, where |
| 03:34:04 | 21 | it says, "All right. We really don't need to rush to do |
| 03:34:07 | 22 | everything in one time, because, if we are going to do |
| 03:34:11 | 23 | business together, this won't be the last time, right?" |
| 03:34:14 | 24 | **A.** Yes. |
| 03:34:14 | 25 | **Q.** All right. And how is that indicative of the recruitment |

OLSON - DIRECT (Mangan)                                           57

03:34:20  1   cycle in espionage work?

03:34:22  2   **A.**   It's very significant.

03:34:23  3   **Q.**   Can you explain to the jury why?

03:34:25  4   **A.**   It's significant because we, as case officers, always

03:34:29  5   want to have a long-term relationship with our agents, with

03:34:33  6   our sources.  We don't want a one-time hit.  We want to see

03:34:40  7   this thing continue.  And so right from the beginning of the

03:34:43  8   relationship the case officer will be looking for every

03:34:45  9   opportunity to reinforce the fact that you and I are going

03:34:49  10  to work together for an extended period.

03:34:52  11       This is Case Officer 101, as far as I was concerned.

03:34:58  12          MR. MANGAN:  Thank you.  If we could take that

03:35:00  13  exhibit down.

03:35:01  14       Your Honor, I'd like to publish Exhibit 67c, which has

03:35:05  15  previously been admitted.

03:35:06  16          THE COURT:  Yes.

03:35:08  17          MR. MANGAN:  And if we could turn to pages 33.  If

03:35:21  18  we could go midway down.  Further down, please.

03:35:31  19  BY MR. MANGAN:

03:35:32  20  **Q.**   Mr. Olson, do you recall an exchange about whether or not

03:35:35  21  the company -- whether or not those company documents would be

03:35:43  22  able to be downloaded and viewed back in China?

03:35:45  23  **A.**   Yes.

03:35:47  24          MR. MANGAN:  All right.  And then if we could turn

03:35:49  25  to page -- the top of page 34, please.  And further down.

OLSON - DIRECT (Mangan)                                    58

03:35:59  1   Thank you.

03:35:59  2   BY MR. MANGAN:

03:36:03  3   **Q.**   Part way down there, sir, do you see the question,

03:36:06  4   "Regarding the document directly you sent last time, is it

03:36:09  5   possible to dump it to a portable hard drive or USB drive from

03:36:14  6   work computer in advance?"

03:36:16  7   **A.**   Yes, I saw that.

03:36:17  8   **Q.**   And in your professional assessment and experience, what

03:36:23  9   is your assessment of this particular request?

03:36:25  10  **A.**   I see that very consistent with a case officer's effort

03:36:30  11  to maximize the production.

03:36:34  12       Case officers, all of us love downloads because you can

03:36:37  13  get access to a lot of information that way.

03:36:43  14            MR. MANGAN:  If we could turn to page 36.  About

03:36:49  15  midway down.

03:36:50  16  BY MR. MANGAN:

03:36:50  17  **Q.**   You mentioned case officers like downloads.  You see the

03:36:57  18  statement there on March 10, 2018?

03:37:00  19  **A.**   Yes, I see it.

03:37:01  20  **Q.**   That states, "Since there's still more time, download

03:37:05  21  more data and bring them.  Anything design related will would

03:37:09  22  work."

03:37:10  23  **A.**   Yes.

03:37:10  24  **Q.**   Explain to the jury what you mean by, you know, how case

03:37:15  25  agents love downloads.  Why is that significant?

03:37:18   1   **A.**   It's significant because it's a very efficient way to

03:37:22   2   acquire a lot of information safely and quickly.  It's the

03:37:27   3   new era of spying.  It used to be that we had small

03:37:32   4   quantities of paper documents, and the new age is spying

03:37:36   5   with downloads with databases.  You can get the entire

03:37:40   6   store.  You can empty out the database of everything you're

03:37:46   7   interested in.

03:37:47   8       So it is something that all case officers push for

03:37:50   9   early on in the relationship.  Let's get things downloaded.

03:37:54   10  Bring them out in disk.  Do you have access to your

03:37:57   11  computer?  Can you download it?  It's a standard practice by

03:38:02   12  all case officers.

03:38:05   13          MR. MANGAN:  Thank you.  We can take this exhibit

03:38:07   14  down.

03:38:07   15  BY MR. MANGAN:

03:38:08   16  **Q.**   Let me turn to -- before we turn to the actual visit in

03:38:13   17  Belgium, as far as the process of traveling into another

03:38:17   18  country to do an intelligence operation -- we talked about

03:38:23   19  sort of the risks and the precautions that you need to take.

03:38:26   20  **A.**   Yes.

03:38:26   21  **Q.**   In traveling into a new or a foreign country, would a

03:38:33   22  case officer use an alias or could they travel in true name?

03:38:38   23  **A.**   You could do it either way.  Sometimes a true name is

03:38:43   24  easier and safer because it's so well backstopped.  It

03:38:48   25  depends on the security procedures, how deep your cover is.

OLSON - DIRECT (Mangan)                                          60

```
03:38:52   1        But in any case, even if you go in in true name, you
03:38:56   2    are going to assume an alias for operational purposes once
03:39:00   3    you get into that country.
03:39:01   4    Q.   Okay.  Is it possible to travel in true name but using an
03:39:05   5    employment cover?
03:39:05   6    A.   Yes, yes.
03:39:08   7    Q.   Did you review some of the documents related to a company
03:39:13   8    called Nanjing Luote?
03:39:15   9    A.   Yes.
03:39:15  10    Q.   When traveling oversees for an operation, are there
03:39:23  11    certain steps that case officers need to take to make sure
03:39:27  12    everyone knows each other's cover story?
03:39:30  13    A.   Yes.
03:39:30  14    Q.   And how does that work?
03:39:31  15    A.   You want to make certain that you are sufficiently
03:39:35  16    briefed on your cover company and who the officers are and
03:39:39  17    what the mission of that cover company is.  Because you're
03:39:42  18    not actually doing that work.  It is all fiction.  And so
03:39:46  19    you want to make certain that you are at least sufficiently
03:39:49  20    conversant with the activities and the personnel of that
03:39:52  21    company to withstand kind of first-level questioning.
03:39:58  22    Q.   And is that information conveyed verbally or in writing?
03:40:01  23    How is that often done?
03:40:03  24    A.   In my experience, we always did that by memorizing it
03:40:07  25    before we went.  But I suppose you could also have some kind
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                   61

| | | |
|---|---|---|
| 03:40:12 | 1 | of company documentation with you to refresh your memory. |
| 03:40:17 | 2 | MR. MANGAN:  Your Honor, if we could publish Exhibit |
| 03:40:20 | 3 | 56b? |
| 03:40:22 | 4 | THE COURT:  Yes. |
| 03:40:23 | 5 | MR. MANGAN:  Which has previously been admitted. |
| 03:40:25 | 6 | BY MR. MANGAN: |
| 03:40:25 | 7 | Q.   Did you see this previously, Mr. Olson? |
| 03:40:27 | 8 | A.   Yes, I did. |
| 03:40:28 | 9 | Q.   And based on your experience, did this relate to the |
| 03:40:37 | 10 | discussion we just had about background information for a |
| 03:40:40 | 11 | cover? |
| 03:40:40 | 12 | A.   Yes.  In my opinion, this was a pre-briefing document, |
| 03:40:49 | 13 | operational preparation for someone who was traveling to |
| 03:40:53 | 14 | Europe.  It listed specific questions on the next page that |
| 03:40:55 | 15 | related to various countries.  It's a kind of -- we would |
| 03:41:00 | 16 | call it a gouge.  Kind of an overview of the cover company |
| 03:41:03 | 17 | that you would then be able to use to withstand kind of a |
| 03:41:09 | 18 | first level of questioning. |
| 03:41:10 | 19 | Q.   So what is a gouge, and how do you spell that? |
| 03:41:13 | 20 | A.   G-O-U-G-E.  That's slang in the intelligence business. |
| 03:41:19 | 21 | It is a short operational briefing paper or statement that |
| 03:41:23 | 22 | gives you kind of useful information that you may be called |
| 03:41:26 | 23 | upon to -- to use. |
| 03:41:27 | 24 | Q.   All right. |
| 03:41:30 | 25 | MR. MANGAN:  Thank you.  If we could take this down. |

OLSON - DIRECT (Mangan)                                          62

03:41:34   1    BY MR. MANGAN:

03:41:36   2    Q.   Mr. Olson, I believe you saw some of the communications

03:41:38   3    back and forth about which country --

03:41:40   4    A.   Yes.

03:41:40   5    Q.   -- they would meet in.  What is the significance to a

03:41:44   6    case officer of moving a meeting place from one country to

03:41:47   7    another?

03:41:47   8    A.   You move it to one country to another if you have some

03:41:53   9    kind of concerns about the security in that country.  You

03:41:59   10   want to make certain that you are meeting in a country where

03:42:02   11   you are comfortable, where the security forces are not

03:42:05   12   likely to be a problem for you.  You're always assessing the

03:42:10   13   risk factors in various countries, and I think that was what

03:42:16   14   was going on here.

03:42:16   15   Q.   All right.  Let's talk about the actual meeting in

03:42:19   16   Brussels, Belgium, and some of the items that were found.

03:42:23   17   A.   Yes.

03:42:23   18   Q.   Based on what you reviewed, did you observe any aspects

03:42:26   19   of tradecrafts specific to that meeting?

03:42:30   20   A.   It was tradecraft across the board.  The case officer

03:42:34   21   was planning a meeting very, very carefully.  He was quite

03:42:40   22   interested in where the meetings were to take place -- a

03:42:43   23   cafe in the hotel, whether or not the employees, associates,

03:42:52   24   colleagues would be in a position to observe the fact that

03:42:55   25   they were together.

OLSON - DIRECT (Mangan)                                         63

03:42:58  1         Yeah, it was very, very systematic, and they were

03:43:02  2    preparing it as an operational meeting.

03:43:05  3    Q.    In terms of the target or the agent pushing for a

03:43:11  4    different meeting location, does that create operational

03:43:14  5    problems for a case officer?

03:43:15  6    A.    It could, depending on which country it's being moved

03:43:21  7    to.  But if you're comfortable with that other country and

03:43:25  8    you are eager to meet, as I think was the case here, you

03:43:28  9    would probably accede to the convenience, the professional

03:43:33  10   requirements of the agent.

03:43:34  11   Q.    All right.  Does the presence of the envelopes of cash

03:43:41  12   have any significance to you in your assessment?

03:43:43  13   A.    Yes, it does.

03:43:44  14   Q.    How's that?

03:43:45  15   A.    Very significant.  A case officer is very eager to get

03:43:51  16   the recruit to accept cash, to accept money, because that

03:43:59  17   compromises the agent and it establishes a complicity

03:44:03  18   between the two of them.  It makes it harder for that person

03:44:06  19   to back away later on.  So we always try to get our agents

03:44:10  20   to accept money.

03:44:13  21   Q.    When you have that situation and an agent turns over

03:44:20  22   secret information in exchange for cash, does the nature of

03:44:24  23   the relationship change?

03:44:25  24   A.    By then it's very clear to both parties what's going

03:44:28  25   on, and the agent realizes that he is selling information

| | | |
|---|---|---|
| 03:44:33 | 1 | for money. |
| 03:44:38 | 2 | **Q.**   There were -- I believe you saw some of the records |
| 03:44:42 | 3 | relating to the fact that each individual who was arrested had |
| 03:44:47 | 4 | two different phones. |
| 03:44:48 | 5 | **A.**   Yes. |
| 03:44:48 | 6 | **Q.**   How would phones typically be handled with respect to an |
| 03:44:55 | 7 | intelligence operation? |
| 03:44:56 | 8 | **A.**   When you're operational overseas, you would have phones |
| 03:45:02 | 9 | for different purposes, and I think that was what I would |
| 03:45:05 | 10 | interpret was going on here.  If the case officers had more |
| 03:45:10 | 11 | than one phone, they had designated them for specific |
| 03:45:13 | 12 | purposes. |
| 03:45:15 | 13 | **Q.**   Before an operation, are steps taken to clean those |
| 03:45:20 | 14 | devices or remove some history on them? |
| 03:45:23 | 15 | **A.**   They should, yes. |
| 03:45:25 | 16 | **Q.**   All right.  To the extent there is the use of code names |
| 03:45:30 | 17 | for individuals, you know, not their real names but names like |
| 03:45:34 | 18 | Tom or Jerry, is that ever used in intelligence operations? |
| 03:45:38 | 19 | **A.**   Almost always. |
| 03:45:40 | 20 | **Q.**   Always? |
| 03:45:40 | 21 | **A.**   Yes. |
| 03:45:41 | 22 | **Q.**   All right.  Are these related to your aliases, or are |
| 03:45:45 | 23 | these completely different names? |
| 03:45:46 | 24 | **A.**   They can be randomly chosen, but you don't want to use |
| 03:45:51 | 25 | true names or even your alias names in most cases on any |

OLSON - DIRECT (Mangan)                                          65

03:45:55   1    kind of an operational phone call.

03:45:58   2    Q.   All right.  And are these for communications within the

03:46:02   3    intelligence team?

03:46:03   4    A.   Yes.

03:46:04   5    Q.   All right.  Now, I believe you saw the information

03:46:14   6    related to photos of the GE employee's family?

03:46:19   7    A.   Yes.

03:46:19   8    Q.   From your assessment as someone who's worked as a case

03:46:24   9    officer, why would a case officer want that type of

03:46:30   10   information?

03:46:30   11   A.   A case officer would want that kind of information

03:46:32   12   because it contributes to your knowledge of this person from

03:46:35   13   a personal standpoint.  As I said earlier, you want to

03:46:40   14   really know everything you can about this person, and family

03:46:43   15   is extremely important in your dealings with this -- with

03:46:46   16   this agent because you may have a position -- have the

03:46:50   17   opportunity to call upon loyalty concerns about the family

03:46:56   18   later on to increase the relationship.

03:46:59   19   Q.   All right.  Are there multiple uses for that kind of

03:47:03   20   information?

03:47:03   21   A.   There could be.  I could conceive of a situation where

03:47:08   22   you would use personal information like that just to remind

03:47:12   23   the agent of how much you know about him, how deep this

03:47:16   24   relationship is already becoming.  I could see that it could

03:47:22   25   even be used potentially for some kind of subtle

OLSON - DIRECT (Mangan)                                    66

03:47:26  1    intimation.  I think that would probably not be a wise
03:47:32  2    move for a case officer, but it's possible.
03:47:35  3    Q.   Regardless of how it's used, is this the type of
03:47:39  4    information a case officer would want to gather and have?
03:47:43  5    A.   You would scrub everything you could to get as much
03:47:45  6    information about the agent, including photographs, as you
03:47:48  7    possibly can.
03:47:49  8    Q.   All right.  What about the things like the laptops and
03:47:57  9    the storage devices that were recovered, what did that
03:48:03  10   indicate to you?
03:48:03  11   A.   They could have been used for spy purposes.  They could
03:48:08  12   have had uses for downloading.  They could have been used
03:48:13  13   for communications among themselves.  They might have had
03:48:16  14   documents there they wanted to refer to.  A lot of multiple
03:48:26  15   reasons you would want that with respect to a spy.
03:48:30  16   Q.   With respect to the phone, you are aware of one of the
03:48:34  17   phones being wiped, correct?
03:48:35  18   A.   Yes.
03:48:35  19   Q.   From your standpoint, in terms of an intelligence
03:48:38  20   operation, why would someone want to wipe a phone afterwards?
03:48:43  21   A.   You would want to wipe a phone because it has
03:48:46  22   incriminating information on it.  It's got communications,
03:48:49  23   it's got data that you don't want the adversary to see.  So
03:48:54  24   whenever possible you would wipe your phone.
03:48:56  25   Q.   And would that be indicative of espionage tradecraft?

OLSON - DIRECT (Mangan)                                     67

03:48:59   1   **A.**    Yes.

03:49:00   2          MR. MANGAN:  I'd also like to publish, if I could,

03:49:03   3   Your Honor, Exhibit 6f.

03:49:11   4          THE COURT:  It's been admitted?

03:49:12   5          MR. MANGAN:  It has, Your Honor.  Yes, I'm sorry.

03:49:15   6          THE COURT:  Yes, you may.

03:49:17   7          MR. MANGAN:  If we could turn to the next page.  We

03:49:21   8   will start at the top half.

03:49:22   9   BY MR. MANGAN:

03:49:22   10  **Q.**    Do you recall seeing this letter that was on one of the

03:49:26   11  phones in Belgium?

03:49:27   12  **A.**    Yes, I do.

03:49:28   13  **Q.**    And based on your experience, do you see indications of

03:49:33   14  espionage tradecraft with respect to this list?

03:49:36   15  **A.**    Yes, I do.  In fact, I smiled when I saw that.  The

03:49:40   16  Chinese are using questionnaires similar to the ones that we

03:49:44   17  use where you want to know everything you can about

03:49:46   18  biographical information, family information, interests,

03:49:50   19  personality.  This is quite typical.

03:49:52   20  **Q.**    If we walk through this, if you can explain to the jury

03:49:58   21  sort of, you know, what is this -- you said this is typical of

03:50:02   22  a list that you would have used in the CIA?

03:50:05   23  **A.**    Yes.

03:50:05   24  **Q.**    All right.  And have you trained people on this kind

03:50:08   25  of -- this list of questions?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                              68

| | | |
|---|---|---|
| 03:50:11 | 1 | **A.**   Right.  It's expected of a case officer when you have a |
| 03:50:14 | 2 | relationship with an agent to have obtained all of this |
| 03:50:17 | 3 | information, this personal biographic information, so that |
| 03:50:21 | 4 | it's included in the front part of the file. |
| 03:50:23 | 5 | **Q.**   So the first two topics cover family situation and work |
| 03:50:29 | 6 | situation.  Why is that information important to a case |
| 03:50:34 | 7 | officer? |
| 03:50:34 | 8 | **A.**   You want to understand the work situation because |
| 03:50:37 | 9 | that's where your agent is going to be able to provide the |
| 03:50:41 | 10 | information, the technology you are looking for.  If you |
| 03:50:45 | 11 | want to understand exactly what the employment status is, |
| 03:50:48 | 12 | you would also want to know the wife's employment status |
| 03:50:51 | 13 | because that could figure in in some way in the future as |
| 03:50:54 | 14 | well. |
| 03:50:55 | 15 | **Q.**   If we look under Number 1 in that second line, it talks |
| 03:51:01 | 16 | about family finance, living expenses, and economical or other |
| 03:51:06 | 17 | pressures/difficulties. |
| 03:51:08 | 18 | **A.**   Yes. |
| 03:51:09 | 19 | **Q.**   For a case officer, why are financial difficulties for a |
| 03:51:16 | 20 | potential agent significant? |
| 03:51:18 | 21 | **A.**   That's significant because if you have an agent who has |
| 03:51:21 | 22 | financial problems, the incentive for that person to accept |
| 03:51:26 | 23 | money from you to deal with those problems can be increased |
| 03:51:31 | 24 | greatly. |
| 03:51:31 | 25 |        This is something that a case officer likes to see.  He |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    69

03:51:34   1    likes to see someone who needs money because if you can

03:51:38   2    provide that money, in many cases the person will agree to

03:51:43   3    cooperate.

03:51:44   4    Q.   I mean, to put this in blunt terms, I mean, was part of

03:51:49   5    your job as a case officer to exploit these kinds of

03:51:52   6    difficulties?

03:51:53   7    A.   Yes.

03:51:53   8    Q.   All right.  If we could turn to the work situation.

03:51:59   9    Going down a couple lines where it talks about -- the very

03:52:02   10   last part of the third line, where it says, "whether the job

03:52:06   11   is secure."  Do you see that?

03:52:09   12   A.   Yes.

03:52:10   13   Q.   All right.  Does that fit into the same kind of analysis

03:52:16   14   you just mentioned?

03:52:17   15   A.   Yes.  And in other transcripts, I saw kind of a

03:52:19   16   preoccupation by the case officer about whether or not the

03:52:22   17   employment at GE is secure, because if not, this is no

03:52:27   18   longer worthwhile.  So you're hoping that this person has

03:52:31   19   stable employment, will be there for a long time, his

03:52:34   20   relationship will be profitable for an extended period of

03:52:37   21   time.

03:52:38   22        MR. MANGAN:  All right.  If we could scroll down a

03:52:39   23   little further.  A little bit further.

03:52:39   24   BY MR. MANGAN:

03:52:46   25   Q.   So there's a section called "Information.  What else do

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - DIRECT (Mangan)                                    70

03:52:50  1   we know?"
03:52:51  2        And then the next one is called "Personal needs."  Do you
03:52:55  3   see that?
03:52:55  4   A.   Yes.
03:52:56  5   Q.   And then it goes through a few different -- a few
03:53:03  6   different topics.
03:53:04  7        When it goes through things like, at the very bottom,
03:53:12  8   "How to contact, how's the working environment, the actual
03:53:16  9   operating procedure, who treats" you know, what do those
03:53:22  10  statements mean to you?
03:53:23  11  A.   That is providing guidance on how you will interact
03:53:28  12  with the agent, whether you will use a formal relationship
03:53:34  13  or you will make it more relaxed.  How do you address the
03:53:37  14  person.  Who pays for your meals, other expenses like that.
03:53:45  15  All very standard for establishing what kind of relationship
03:53:48  16  you're going to have with this person.
03:53:52  17            MR. MANGAN:  If we could take that down.
03:53:53  18  BY MR. MANGAN:
03:53:54  19  Q.   So, Mr. Olson, have you looked at the information
03:53:57  20  relating to this GE employee and these events?
03:54:05  21  A.   Yes.
03:54:05  22  Q.   Did you see aspects of espionage tradecraft in that
03:54:10  23  cycle?
03:54:11  24  A.   Yes, I did.  In fact, the conversations and the actions
03:54:16  25  of this individual are those of an intelligence officer

OLSON - DIRECT (Mangan)                                       71

03:54:21  1    conducting espionage.  I had no question about that at all.

03:54:27  2            MR. MANGAN:  One moment, Your Honor.

03:54:28  3            THE COURT:  Very well.

03:54:31  4        (Pause.)

03:54:31  5            MR. MANGAN:  No further questions.

03:54:33  6            THE COURT:  Very well.

03:54:39  7        Mr. McBride, do you want to launch now or do you have

03:54:43  8    another proposal?

03:54:46  9            MR. McBRIDE:  Your Honor, this might be a great time

03:54:48  10   for a break, or do you want to break for the day, Your Honor?

03:54:51  11           THE COURT:  You are not going to trap me.

03:54:54  12           MR. McBRIDE:  No, sir.

03:54:55  13           THE COURT:  But maybe.  If it would help you for a

03:54:58  14   break, we'll break for 15 minutes and figure out where we are,

03:55:02  15   get the juice flowing in the jurors.  They have had a long

03:55:08  16   day.

03:55:08  17       We are going to break for 15 minutes, send you upstairs,

03:55:11  18   and then we will ask you to come back.  During the break, take

03:55:13  19   a break.  Don't discuss the case among yourselves or with

03:55:16  20   anyone else.  No independent research.  Continue to keep an

03:55:20  21   open mind.

03:55:21  22       We will rise for you as you leave for 15 minutes.

03:55:25  23           THE COURTROOM DEPUTY:  All rise for the jury.

03:55:32  24       (Jury out at 3:48 p.m.)

03:56:00  25           THE COURT:  The jury's left the room.  The door is

OLSON - DIRECT (Mangan)                                72

03:56:03  1    closing.  You may all be seated.
03:56:11  2        From my perspective, this is a natural break.  We are
03:56:15  3    coming up on 4:30.  But you all know better than I where you
03:56:18  4    are in the case.
03:56:19  5        Is the cross-examination likely to be extensive or not?
03:56:28  6            MR. McBRIDE:  Your Honor, I think I can get it done
03:56:31  7    in a half an hour, 40 minutes at the most.
03:56:34  8            THE COURT:  From the government's perspective, you'd
03:56:37  9    just as soon plunge ahead; is that right?
03:56:40 10            MR. MANGAN:  We would, Your Honor.
03:56:41 11            THE COURT:  Do you have more witnesses after this
03:56:44 12    one?
03:56:45 13            MR. MANGAN:  We do not.
03:56:46 14            THE COURT:  I'm sorry we took a break.  We'll be
03:56:49 15    back at 4:05, and I am going to rely on you.
03:56:53 16        We are in recess until that time.
03:56:55 17            THE COURTROOM DEPUTY:  All rise.  The court is now
03:56:57 18    in recess.
03:56:58 19        (Recess from 3:49 p.m. until 4:04 p.m.)
04:11:19 20            THE COURT:  Remain seated.  Court's in session, back
04:11:21 21    in session.
04:11:22 22        Are we ready for the jury from the government's
04:11:25 23    perspective?
04:11:27 24            MR. MANGAN:  Yes, Your Honor.
04:11:27 25            THE COURT:  From the defense as well?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - CROSS (McBride)                                    73

| | | |
|---|---|---|
| 04:11:29 | 1 | MR. McBRIDE:  Yes, Your Honor. |
| 04:11:30 | 2 | THE COURT:  Let's get the jury. |
| 04:12:41 | 3 | THE COURTROOM DEPUTY:  All rise for the jury. |
| 04:12:43 | 4 | (Jury in at 4:05 p.m.) |
| 04:13:15 | 5 | THE COURT:  Please be seated. |
| 04:13:17 | 6 | 15 jurors have rejoined us.  Welcome back, jurors. |
| 04:13:22 | 7 | I want to push ahead.  The defense has an opportunity to |
| 04:13:26 | 8 | ask questions of this witness, and perhaps the government a |
| 04:13:29 | 9 | few questions.  I may have to keep you a little after 4:30, |
| 04:13:33 | 10 | and by that I mean a little. |
| 04:13:36 | 11 | Can anybody not abide with that? |
| 04:13:36 | 12 | (No response.) |
| 04:13:39 | 13 | THE COURT:  Very well.  Mr. McBride, you may |
| 04:13:43 | 14 | proceed. |
| 04:13:43 | 15 | The witness remains under oath. |
| 04:13:44 | 16 | MR. McBRIDE:  Thank you, Your Honor. |
| 04:13:47 | 17 | **CROSS-EXAMINATION** |
| 04:13:47 | 18 | BY MR. McBRIDE: |
| 04:13:49 | 19 | **Q.**   Good afternoon, Mr. Olson.  My name is Bob McBride.  I |
| 04:13:52 | 20 | represent Mr. Xu, along with my colleagues. |
| 04:13:54 | 21 | **A.**   Good afternoon. |
| 04:13:54 | 22 | **Q.**   Good afternoon.  I want to ask you some questions about |
| 04:13:58 | 23 | your testimony, if I may. |
| 04:13:59 | 24 | When did you leave active service as a case officer? |
| 04:14:03 | 25 | **A.**   In 1999. |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - CROSS (McBride)                                        74

04:14:13  1   **Q.**   And then I understand roughly you went to CIA

04:14:16  2   headquarters?

04:14:17  3   **A.**   Yes.

04:14:17  4   **Q.**   When did you leave CIA headquarters, sir?

04:14:21  5   **A.**   I left in 1998.

04:14:26  6   **Q.**   All right.  I believe you told us that you felt you were

04:14:30  7   a case -- or you were a case officer beyond that date,

04:14:33  8   correct, sir?

04:14:33  9   **A.**   Yes.  I still had some operational responsibilities.

04:14:40  10  **Q.**   When you became a professor at your current position, you

04:14:45  11  had to come out from undercover, correct?

04:14:46  12  **A.**   Yes, sir.

04:14:47  13  **Q.**   So you were undercover for approximately 32 years?

04:14:50  14  **A.**   Yes, sir.

04:14:50  15  **Q.**   You mentioned that your parents didn't know you were

04:14:54  16  undercover?

04:14:54  17  **A.**   That's right.

04:14:55  18  **Q.**   32 years they didn't know?

04:14:57  19  **A.**   They didn't know.

04:14:58  20  **Q.**   And your children, they didn't know either?

04:15:00  21  **A.**   They did not know.

04:15:01  22  **Q.**   Except for the one time that your children and you became

04:15:04  23  under threat and you let your 17-year-old know, correct?

04:15:08  24  **A.**   Yes.  And we were in Vienna.

04:15:13  25  **Q.**   What countries did you operate in?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - CROSS (McBride)                                           75

| | | |
|---|---|---|
| 04:15:15 | 1 | **A.**   I operated in Russia and in Austria and in Mexico. |
| 04:15:24 | 2 | **Q.**   And who was the primary enemy at that time? |
| 04:15:28 | 3 | **A.**   Our number one adversary during the Cold War was |
| 04:15:36 | 4 | Russia. |
| 04:15:37 | 5 | **Q.**   Would you agree with me that Russia culturally is much |
| 04:15:40 | 6 | more like the United States than is China? |
| 04:15:42 | 7 | **A.**   I would probably agree with that, although the Russian |
| 04:15:49 | 8 | culture is distinctly different from ours. |
| 04:15:53 | 9 | **Q.**   Understood.  You testified today about your opinions |
| 04:16:04 | 10 | related to the evidence that you saw, correct, sir? |
| 04:16:08 | 11 | **A.**   Yes. |
| 04:16:08 | 12 | **Q.**   And those opinions were based only on the evidence that |
| 04:16:14 | 13 | was provided to you, sir, correct? |
| 04:16:15 | 14 | **A.**   And on my training and experience, yes. |
| 04:16:17 | 15 | **Q.**   You applied your training and experience only to the |
| 04:16:20 | 16 | evidence that was presented to you by the government, correct, |
| 04:16:22 | 17 | sir? |
| 04:16:22 | 18 | **A.**   Yes. |
| 04:16:23 | 19 | **Q.**   You didn't read any outside sources on China and China |
| 04:16:27 | 20 | espionage, did you? |
| 04:16:27 | 21 | **A.**   I do that routinely in my duties as a professor. |
| 04:16:30 | 22 | **Q.**   But not for this case, correct? |
| 04:16:32 | 23 | **A.**   No, sir. |
| 04:16:33 | 24 | **Q.**   I think you testified that -- and correct me if I'm |
| 04:16:46 | 25 | wrong -- that the evidence that you saw was consistent with |

OLSON - CROSS (McBride)                                         76

04:16:49  1    the early phases of the development?

04:16:51  2    **A.**   Yes.

04:16:52  3    **Q.**   The recruitment cycle?

04:16:53  4    **A.**   Yes.

04:16:54  5    **Q.**   And tell me again what that was, sir.  What was the --

04:16:58  6    what was that that you saw, sir, that made you think that?

04:17:01  7    **A.**   I saw the classic recruitment cycle used by

04:17:06  8    intelligence services, including the MSS, to spot targets

04:17:10  9    and then to assess them, to develop them, and then to enter

04:17:15  10   into a productive relationship.

04:17:17  11   **Q.**   Yes, sir, I understand that.  What was it in the

04:17:20  12   development phase that you looked that made you think they

04:17:23  13   were developing this man as a spy?

04:17:25  14   **A.**   I saw the case officer pushing for more and more

04:17:29  15   production.  I saw him trying to build a personal and

04:17:33  16   professional relationship.

04:17:35  17   **Q.**   Sir, you don't know that this man is a case officer, do

04:17:38  18   you?  That's simply your opinion.

04:17:40  19   **A.**   It is not my opinion.  I saw his admissions in the

04:17:44  20   transcripts that he is an MSS officer.

04:17:47  21   **Q.**   That doesn't mean he is a case officer, does it, sir?

04:17:50  22   **A.**   He is a case officer.  He is an operator.

04:17:54  23   **Q.**   Sir, nowhere in the evidence it says he's a case officer,

04:17:58  24   does it?

04:17:58  25   **A.**   The entire pattern of his behavior tells me, based on

OLSON - CROSS (McBride)                                        77

04:18:02   1   my experience, that he is an MSS case officer.

04:18:05   2   Q.   Well, I want to talk about that pattern of behavior.

04:18:10   3        So I think you told us that spotting in this case

04:18:14   4   happened via LinkedIn, correct?

04:18:16   5   A.   That was probably the initial spotting.

04:18:20   6   Q.   So LinkedIn is used for a variety of other purposes, is

04:18:25   7   it not?

04:18:25   8   A.   It can be.

04:18:25   9   Q.   One of the purposes is to advertise your professional

04:18:32  10   credentials, correct?

04:18:33  11   A.   Yes.

04:18:34  12   Q.   Perhaps to get a new job, correct?

04:18:36  13   A.   Yes.

04:18:36  14   Q.   Perhaps to get -- build your network of people, correct?

04:18:39  15   A.   It could be.

04:18:40  16   Q.   You could also use it if you wanted to identify somebody

04:18:43  17   in your own profession, correct?

04:18:44  18   A.   Yes.

04:18:44  19   Q.   Or if you were looking for an expert in another field,

04:18:47  20   correct?

04:18:48  21   A.   Could be.

04:18:49  22   Q.   For example, an expert witness, correct?

04:18:52  23   A.   Yes.

04:18:52  24   Q.   Such as you are today, correct?

04:18:54  25   A.   Yes.

OLSON - CROSS (McBride)                                         78

| | | |
|---|---|---|
| 04:18:58 | 1 | **Q.**   And that would be a typical use of LinkedIn, would it |
| 04:19:01 | 2 | not? |
| 04:19:01 | 3 | **A.**   Yes. |
| 04:19:02 | 4 | **Q.**   And that's completely indistinguishable from the contact |
| 04:19:06 | 5 | that was made through LinkedIn in this case; is it not? |
| 04:19:11 | 6 | **A.**   The use of LinkedIn in this case was for intelligence |
| 04:19:16 | 7 | spotting purposes. |
| 04:19:16 | 8 | **Q.**   Sir, you don't know what it was for in this case.  You |
| 04:19:20 | 9 | have an opinion, correct? |
| 04:19:21 | 10 | **A.**   I have a professional opinion based on my knowledge of |
| 04:19:25 | 11 | how Chinese intelligence services operate, and LinkedIn is a |
| 04:19:29 | 12 | standard spotting mechanism for the MSS. |
| 04:19:32 | 13 | **Q.**   But you don't really know what they were doing, do you? |
| 04:19:35 | 14 | **A.**   It's transparent to me what was going on. |
| 04:19:39 | 15 | **Q.**   So for all you know, Chen Feng is a legitimate professor |
| 04:19:45 | 16 | or -- correct, with NUAA? |
| 04:19:50 | 17 | **A.**   Yes, I -- |
| 04:19:50 | 18 | **Q.**   And NUAA -- I'm sorry.  I didn't mean to cut you off, |
| 04:19:54 | 19 | sir. |
| 04:19:54 | 20 | **A.**   Yes, I believe he is. |
| 04:19:55 | 21 | **Q.**   And so NUAA is, of course, a legitimate organization; is |
| 04:19:58 | 22 | it not? |
| 04:19:58 | 23 | **A.**   Yes. |
| 04:19:58 | 24 | **Q.**   A well-respected science and technology university in |
| 04:20:01 | 25 | China, correct? |

OLSON - CROSS (McBride)                                    79

04:20:02   1    **A.**    Correct.

04:20:02   2    **Q.**    And there is -- we in America have well-respected science

04:20:07   3    and technology universities here, correct?

04:20:10   4    **A.**    Yes.

04:20:11   5    **Q.**    And those universities conduct exchanges with other

04:20:14   6    academics and professionals, do they not?

04:20:16   7    **A.**    Yes.  Quite often.

04:20:17   8    **Q.**    So in all perspectives, the invite to China of Dr. Zheng

04:20:28   9    was in all respects exactly the same as any other exchange,

04:20:32  10    professional exchange?

04:20:33  11    **A.**    No.  It was different because it was an ulterior

04:20:38  12    motive.  It was an intelligence operation to bring that

04:20:41  13    person to China for intelligence purposes.

04:20:43  14    **Q.**    Sir, you don't know that there is an ulterior motive

04:20:47  15    here.

04:20:47  16    **A.**    I know how the MSS operates, and this is a common

04:20:51  17    practice.

04:20:52  18    **Q.**    How do you know -- well, let me talk about how you know

04:20:56  19    how the MSS operates.  How many bureaus does the MSS have?

04:21:01  20    **A.**    I cannot tell you.

04:21:02  21    **Q.**    Do you know what JSSD is?

04:21:07  22    **A.**    Yes.

04:21:07  23    **Q.**    What is it?

04:21:08  24    **A.**    It is the Jiangsu Science and Technology Association.

04:21:15  25    **Q.**    Where is that located?

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

OLSON - CROSS (McBride)                                        80

| | | |
|---|---|---|
| 04:21:17 | 1 | **A.** I believe it's in Nanjing. |
| 04:21:20 | 2 | **Q.** Do you know how many people are employed by that |
| 04:21:22 | 3 | organization? |
| 04:21:23 | 4 | **A.** No, I do not. |
| 04:21:24 | 5 | **Q.** Do you know how many people are employed by MSS? |
| 04:21:26 | 6 | **A.** No, I do not. |
| 04:21:27 | 7 | **Q.** Do you know whether -- |
| 04:21:29 | 8 | **A.** But I -- |
| 04:21:30 | 9 | **Q.** I'm sorry. I thought there was an objection. My |
| 04:21:33 | 10 | apologies. |
| 04:21:34 | 11 | Do you know whether everybody that's employed by MSS is |
| 04:21:37 | 12 | an agent? |
| 04:21:38 | 13 | **A.** I do not know that. |
| 04:21:39 | 14 | **Q.** Do you know whether there are -- part of their mission is |
| 04:21:43 | 15 | to collect open-source information? |
| 04:21:46 | 16 | **A.** I know that all intelligence services do that. |
| 04:21:51 | 17 | **Q.** And intelligence is really a collection and analysis of |
| 04:21:56 | 18 | just information; is it not? |
| 04:21:58 | 19 | **A.** It's not a collection of just information. It's a |
| 04:22:01 | 20 | collection of secrets and controlled information. |
| 04:22:06 | 21 | **Q.** Sometimes, sir, correct? |
| 04:22:07 | 22 | **A.** Always, in my experience. |
| 04:22:09 | 23 | **Q.** Always, in you your experience, but not necessarily in |
| 04:22:14 | 24 | China, correct? |
| 04:22:14 | 25 | **A.** Chinese services also operate the way we do. They use |

OLSON - CROSS (McBride)                                          81

04:22:22  1    their intelligence services, and particularly their case

04:22:24  2    officers, to collect not publicly available information.

04:22:28  3    **Q.**   Sir, what kind of training do MSS officers have?

04:22:30  4    **A.**   I don't know specifically because that's confidential,

04:22:34  5    but I assume it's very rigorous.  Similar to ours, I would

04:22:39  6    guess.

04:22:39  7    **Q.**   So you don't know what their initial training phase is?

04:22:42  8    **A.**   No.

04:22:43  9    **Q.**   And you don't know what kind of spycraft they are taught?

04:22:45  10   **A.**   No, I do know what kind of spycraft they use, so I

04:22:49  11   assume that's what they were taught.

04:22:50  12   **Q.**   My question was, you don't know how they're trained, do

04:22:53  13   you?

04:22:53  14   **A.**   No.

04:22:54  15   **Q.**   Okay.  And you don't know who trains them, do you?

04:22:57  16   **A.**   That's not publicly available.

04:23:00  17   **Q.**   You know also that the PLA has a large intelligence-

04:23:07  18   gathering organization, correct?

04:23:08  19   **A.**   Yes.

04:23:09  20   **Q.**   You know also that China has significant institutes that

04:23:16  21   collect open-source information, correct?

04:23:18  22   **A.**   Yes.

04:23:18  23   **Q.**   And, in fact, China's evaluation of open-source

04:23:24  24   information is quite institutionalized; is it not?

04:23:27  25   **A.**   I would assume so.

OLSON - CROSS (McBride)                                    82

04:23:29  1    **Q.**   You don't know?

04:23:30  2    **A.**   No.

04:23:31  3    **Q.**   You would agree with me that China is behind us in

04:23:41  4    science and technology, correct?

04:23:43  5    **A.**   Would you repeat that?

04:23:45  6    **Q.**   Do you agree that China is behind us in science and

04:23:50  7    technology generally?

04:23:51  8    **A.**   Generally behind us?

04:23:52  9    **Q.**   Yes.

04:23:52  10   **A.**   Yes.

04:23:53  11   **Q.**   And also in aviation.  Would you agree with that?

04:23:55  12   **A.**   Yes.

04:23:55  13   **Q.**   And that to catch up with aviation areas, they are using

04:24:01  14   American companies to provide products for them?

04:24:04  15   **A.**   Yes.

04:24:05  16   **Q.**   What are your concerns about technology transfers that

04:24:10  17   are perfectly legal?

04:24:11  18   **A.**   I think that those are positive.  It's commercial.

04:24:16  19   It's business.  It's open.  As long as the technology in

04:24:23  20   question is not trade secret or controlled technology.

04:24:28  21   **Q.**   So it's okay to do an academic exchange where no secrets

04:24:32  22   are released; is that correct?

04:24:33  23   **A.**   If there are no secrets, an academic exchange is

04:24:37  24   legitimate.

04:24:38  25   **Q.**   Are you aware that in this case no secrets were released

OLSON - CROSS (McBride)                                         83

04:24:41  1   when Dr. Zheng went to China?

04:24:45  2   **A.**   I don't know the substance of his lecture.  I don't

04:24:48  3   know how much information he contributed.  But I do know

04:24:53  4   that it was encouraging to the MSS because they followed up.

04:24:56  5   **Q.**   So the government didn't tell you that no information --

04:25:00  6   no secrets were released at the NUAA lecture by Dr. Zheng?

04:25:05  7   **A.**   No, I don't know what that information was.

04:25:07  8   **Q.**   Did they tell you that Dr. Zheng took steps to make sure

04:25:11  9   he released no secret information?

04:25:14  10  **A.**   No, I was not told that.

04:25:17  11  **Q.**   I want to go back to this issue of information

04:25:28  12  development.  So I believe you testified that operators -- I

04:25:36  13  want to make sure I get this wrong [sic], so if I get the

04:25:39  14  wrong terminology, please forgive me.

04:25:41  15       Case agents identify operators or agents to obtain

04:25:47  16  information their seniors want, correct?

04:25:49  17  **A.**   Yes.

04:25:49  18  **Q.**   And in our case, in the United States' case, it's the

04:25:52  19  President, correct?

04:25:53  20  **A.**   We have a mechanism for consolidating requirements

04:25:58  21  through the national director of intelligence.

04:26:01  22  **Q.**   But it comes from the top down, correct?

04:26:03  23  **A.**   It comes from the executive branch primarily.

04:26:06  24  **Q.**   All right.  And in those cases, they are general requests

04:26:12  25  for information, correct?

OLSON - CROSS (McBride)                                    84

04:26:13    1    **A.**    Not always.  Some of them are very specific.

04:26:16    2    **Q.**    How high up do they come from?

04:26:18    3    **A.**    Any senior government official can solicit requirements

04:26:25    4    from the intelligence community, secret information that

04:26:29    5    that official believes would be useful for national

04:26:33    6    security.

04:26:37    7    **Q.**    And in this case, there is no communications from any

04:26:41    8    national government that you have seen specifying information

04:26:46    9    to be asked for?

04:26:47   10    **A.**    I know how the requirement process works, and it comes

04:26:52   11    from a lot of different bureaus and agencies of the United

04:26:58   12    States government.  Many of them submit collection

04:27:00   13    requirements for the intelligence community.

04:27:03   14    **Q.**    But in this case, there is no such evidence of that

04:27:05   15    coming from China, is there?

04:27:07   16    **A.**    China operates differently.

04:27:11   17    **Q.**    China operates differently.  So does the MSS operate

04:27:15   18    differently or exactly the same way the CIA operates?

04:27:18   19    **A.**    It operates differently.  It lists its requirements

04:27:23   20    from experts in the different fields.

04:27:25   21    **Q.**    Um-hmm.  There are no names of experts in these fields

04:27:30   22    mentioned in any of the information you reviewed, was there?

04:27:32   23    **A.**    No.  They were just described as unidentified males.

04:27:35   24    **Q.**    Um-hmm.  You mention the use of multiple platforms for

04:27:44   25    communication as evidence of spycraft, correct?

OLSON - CROSS (McBride)                                    85

| | | |
|---|---|---|
| 04:27:47 | 1 | **A.** Yes. |
| 04:27:47 | 2 | **Q.** Do you have email? |
| 04:27:50 | 3 | **A.** Yes. |
| 04:27:51 | 4 | **Q.** Do you have text messages? |
| 04:27:53 | 5 | **A.** Yes. |
| 04:27:53 | 6 | **Q.** Do you use Instagram? |
| 04:27:57 | 7 | **A.** I do not. |
| 04:27:57 | 8 | **Q.** Do you have grandkids? |
| 04:27:59 | 9 | **A.** Yes. |
| 04:27:59 | 10 | **Q.** Do they use Instagram? |
| 04:28:01 | 11 | **A.** I don't know.  I would guess they probably do. |
| 04:28:04 | 12 | **Q.** How about Twitter?  Do you use Twitter? |
| 04:28:06 | 13 | **A.** I do not. |
| 04:28:07 | 14 | **Q.** I assume you don't use WeChat, correct? |
| 04:28:10 | 15 | **A.** I do not. |
| 04:28:11 | 16 | **Q.** All right.  Do you have the same email address for work |
| 04:28:13 | 17 | as you do for home? |
| 04:28:15 | 18 | **A.** I have two email addresses. |
| 04:28:17 | 19 | **Q.** Are they the same? |
| 04:28:18 | 20 | **A.** No. |
| 04:28:19 | 21 | **Q.** So they have different names, correct? |
| 04:28:23 | 22 | **A.** Yes. |
| 04:28:24 | 23 | **Q.** Not just domain names, correct? |
| 04:28:26 | 24 | **A.** No. |
| 04:28:27 | 25 | **Q.** All right.  Would you agree with me that it's not unusual |

OLSON - CROSS (McBride)                                    86

| | | |
|---|---|---|
| 04:28:33 | 1 | in modern life for people to use more than one name on |
| 04:28:38 | 2 | platforms? |
| 04:28:39 | 3 | **A.**    A name?  You mean their personal name? |
| 04:28:44 | 4 | **Q.**    Or identifier, sir.  That was a bad question.  Let me |
| 04:28:47 | 5 | rephrase it, if I may. |
| 04:28:49 | 6 | Is it not usual in modern life for people to use a |
| 04:28:53 | 7 | different identifier for themselves on different platforms? |
| 04:29:00 | 8 | **A.**    Yes.  Some email addresses are very creative and do not |
| 04:29:03 | 9 | have a name in it. |
| 04:29:05 | 10 | **Q.**    So someone may use one identifier on an email address and |
| 04:29:08 | 11 | another one on an Instagram account, correct? |
| 04:29:11 | 12 | **A.**    That could happen, yes. |
| 04:29:13 | 13 | **Q.**    It could also happen that the one -- they would have a |
| 04:29:16 | 14 | different identifying -- identifier address on their Twitter |
| 04:29:22 | 15 | account than they would on their Instagram account, correct? |
| 04:29:25 | 16 | **A.**    Yes. |
| 04:29:25 | 17 | **Q.**    And does it stand to reason that the same thing could be |
| 04:29:30 | 18 | true for WeChat? |
| 04:29:31 | 19 | **A.**    Yes. |
| 04:29:31 | 20 | **Q.**    All right.  And is it unusual today for people to use |
| 04:29:35 | 21 | email and text messages in communicating with each other? |
| 04:29:39 | 22 | **A.**    No, it's not unusual. |
| 04:29:43 | 23 | **Q.**    So that in and of itself is not indicative of spycraft, |
| 04:29:48 | 24 | is it? |
| 04:29:48 | 25 | **A.**    That's right. |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - CROSS (McBride)                                    87

04:29:49  1   **Q.**   You talked about the photographs that were found during

04:30:02  2   the trip to Belgium.  Do you remember that, sir?

04:30:04  3   **A.**   Yes, I do.

04:30:05  4   **Q.**   All right.  Those photographs were on WeChat.  Did you

04:30:07  5   know that?

04:30:07  6   **A.**   Yes.

04:30:08  7   **Q.**   And that -- did you know that Dr. Zheng had friended Chen

04:30:15  8   Feng and Qu Hui on WeChat?

04:30:21  9   **A.**   Yes.

04:30:21  10  **Q.**   You knew that?

04:30:22  11  **A.**   Not specifically, but I assumed so.

04:30:24  12  **Q.**   All right.  And you know that people can download images

04:30:27  13  or photographs from WeChat, correct, sir?

04:30:30  14  **A.**   Yes.

04:30:30  15  **Q.**   That in and of itself is not indicative of tradecraft, is

04:30:35  16  it?

04:30:35  17  **A.**   It's consistent of tradecraft for a case officer to

04:30:40  18  want to do that with the agent.

04:30:41  19  **Q.**   But in and of itself it's not indicative of tradecraft,

04:30:48  20  is it?

04:30:48  21  **A.**   Standing alone it might not be.

04:30:50  22  **Q.**   Thank you.  There was also $7,000 found in U.S. dollars

04:30:57  23  in Belgium; is that correct, sir?

04:30:58  24  **A.**   Yes.

04:31:02  25  **Q.**   And that money was never transferred to anybody, was it?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - CROSS (McBride)                                      88

04:31:05    1    **A.**    No.

04:31:06    2    **Q.**    It's not unusual for Chinese people to pay in U.S.

04:31:19    3    dollars, is it?

04:31:20    4    **A.**    I don't know that.

04:31:21    5    **Q.**    Okay.  Does it stand to reason that one would spend

04:31:23    6    $7,000 to buy multimillion dollar technology?

04:31:31    7    **A.**    No, it doesn't sound that that would be sufficient.

04:31:36    8    **Q.**    Okay.  You mentioned about the Safran incident.  Do you

04:31:47    9    remember that, sir?

04:31:48   10    **A.**    Yes, I do.

04:31:48   11    **Q.**    China is a surveillance state, is it not?

04:31:51   12    **A.**    Yes.

04:31:52   13    **Q.**    All right.  So if you're a company doing business in

04:31:54   14    China, it's likely that there's going to be some sort of

04:31:57   15    surveillance, correct?

04:31:58   16    **A.**    It's almost certain.

04:31:59   17    **Q.**    Almost certain.

04:32:01   18           Did you know that there is no evidence that the malware

04:32:06   19    searched for any files once it was in place?

04:32:09   20    **A.**    I don't know how the malware was specifically used.  I

04:32:13   21    just know it was implanted.

04:32:14   22    **Q.**    All right.  So the government didn't tell you that the

04:32:17   23    malware did not search for any particular files, correct?

04:32:20   24           MR. MANGAN:  Objection.

04:32:21   25           THE COURT:  Basis?

OLSON - CROSS (McBride)                                          89

```
04:32:22   1                    MR. MANGAN:  Misleading, misstating the evidence.
04:32:24   2                    THE COURT:  Sustained as to form only.
04:32:35   3     BY MR. McBRIDE:
04:32:35   4     Q.   Sir, did you know there was no evidence that the malware
04:32:41   5     extracted information from the computer?
04:32:45   6                    MR. MANGAN:  Objection.  Same objection.
04:32:56   7                    THE COURT:  Sustained.
04:33:06   8     BY MR. McBRIDE:
04:33:14   9     Q.   I want to go back one question for -- about MSS, sir.
04:33:22   10    You don't know what the Sixth Bureau does, do you?
04:33:25   11    A.   No.
04:33:32   12                   MR. McBRIDE:  May I have a moment, Your Honor?
04:33:34   13                   THE COURT:  Yes.
04:33:36   14                   MR. McBRIDE:  I'm close to done.
04:33:43   15         (Pause.)
04:33:51   16    BY MR. McBRIDE:
04:33:52   17    Q.   Sir, I've got your book *Fair Play* here.
04:33:56   18    A.   Yes.
04:33:57   19    Q.   I'd like to read you a couple of lines out of it if I
04:34:05   20    may, tell me if I read them correctly.
04:34:06   21                   MR. MANGAN:  Objection, Your Honor.
04:34:08   22                   THE COURT:  Basis?
04:34:11   23                   MR. MANGAN:  Hearsay, improper impeachment.
04:34:18   24                   MR. McBRIDE:  Your Honor, it's his book, his words.
04:34:21   25    Goes to his credibility.
```

OLSON - CROSS (McBride)                                          90

| | | |
|---|---|---|
| 04:34:23 | 1 | THE COURT: I don't know how you are going to use |
| 04:34:25 | 2 | it. You may proceed. |
| 04:34:27 | 3 | BY MR. McBRIDE: |
| 04:34:27 | 4 | **Q.** Sir, you wrote this book *Fair Play*? |
| 04:34:29 | 5 | **A.** Yes, I did. |
| 04:34:30 | 6 | **Q.** And this is -- touches on the morality of spycraft? |
| 04:34:33 | 7 | **A.** Yes. |
| 04:34:33 | 8 | **Q.** All right. And in this book, don't you say that you |
| 04:34:38 | 9 | lied, cheated, and stole, misled people, et cetera, in service |
| 04:34:43 | 10 | of the United States? |
| 04:34:43 | 11 | **A.** Yes, I did. |
| 04:34:44 | 12 | **Q.** That was, in your mind, a noble cause? |
| 04:34:47 | 13 | **A.** Yes. I believed I was serving our country. |
| 04:34:58 | 14 | **Q.** Would a conviction here serve the intelligence |
| 04:35:02 | 15 | community's objectives? |
| 04:35:04 | 16 | MR. MANGAN: Objection. |
| 04:35:06 | 17 | THE COURT: Overruled. |
| 04:35:10 | 18 | You can answer the question. |
| 04:35:11 | 19 | THE WITNESS: It's hard for me to speculate on that. |
| 04:35:17 | 20 | I believe that Chinese espionage needs to be stopped. I |
| 04:35:22 | 21 | believe this would be a step in the right direction, because I |
| 04:35:27 | 22 | know spying when I see it, and this is spying. I believe that |
| 04:35:31 | 23 | a conviction would be -- in my opinion, it would be -- it |
| 04:35:37 | 24 | would be justice. |
| 04:35:38 | 25 | BY MR. McBRIDE: |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - REDIRECT (Mangan)                                    91

| 04:35:38 | 1 | Q.   So it's your testimony you know a spy when you see it? |
| 04:35:41 | 2 | A.   Yes. |
| 04:35:43 | 3 | MR. McBRIDE:  That's all I have, Your Honor.  Thank |
| 04:35:45 | 4 | you. |
| 04:35:45 | 5 | THE COURT:  Very well. |
| 04:35:49 | 6 | Redirect, if any. |
| 04:35:58 | 7 | **REDIRECT EXAMINATION** |
| 04:35:58 | 8 | BY MR. MANGAN: |
| 04:35:59 | 9 | Q.   Mr. Olson, when you evaluated the information in this |
| 04:36:01 | 10 | case, did you rely on any one indicator or were you looking at |
| 04:36:07 | 11 | a collection of indicators to form your opinion? |
| 04:36:10 | 12 | A.   In counterintelligence, we don't look at single |
| 04:36:16 | 13 | incidents, we look at the incidents in their totality, we |
| 04:36:20 | 14 | look at the context, we look at the patterns, and then we |
| 04:36:24 | 15 | draw our conclusions. |
| 04:36:25 | 16 | I looked at the totality of the evidence in this case. |
| 04:36:29 | 17 | Q.   And regarding exchanges in the initial presentation, does |
| 04:36:33 | 18 | the content of that initial presentation affect your opinion |
| 04:36:38 | 19 | that it's part of the assessment phase? |
| 04:36:40 | 20 | A.   No. |
| 04:36:41 | 21 | Q.   All right.  Lastly, Mr. McBride asked you about the |
| 04:36:47 | 22 | things that you did in your career -- |
| 04:36:49 | 23 | A.   Yes. |
| 04:36:49 | 24 | Q.   -- on behalf of the United States. |
| 04:36:51 | 25 | A.   Yes. |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - RECROSS (McBride)                                    92

04:36:51  1   **Q.**   You were taking risks, right?

04:36:55  2   **A.**   Yes.

04:36:55  3   **Q.**   And if you had been caught in a foreign country, there

04:36:58  4   would have been consequences?

04:37:00  5              MR. McBRIDE:  Objection.

04:37:00  6              THE COURT:  Overruled.

04:37:02  7   BY MR. MANGAN:

04:37:02  8   **Q.**   Would there have been consequences?

04:37:04  9   **A.**   Yes.  It would have been severe.  It's better not to

04:37:07  10  get caught.

04:37:08  11             MR. MANGAN:  That's all I have, Your Honor.

04:37:09  12             THE COURT:  Recross, if any.

04:37:12  13                  **RECROSS-EXAMINATION**

04:37:15  14  BY MR. McBRIDE:

04:37:21  15  **Q.**   If you had been caught in a country with an extradition

04:37:28  16  treaty for another country --

04:37:29  17  **A.**   Yes.

04:37:30  18  **Q.**   -- all right, and arrested, you could have been

04:37:32  19  extradited and sent to the country and prosecuted, right?

04:37:36  20  **A.**   If there were an extradition treaty that applied to my

04:37:40  21  case, yes.

04:37:41  22  **Q.**   All right.  Did you avoid those countries of which there

04:37:46  23  were such extradition treaties?

04:37:49  24  **A.**   If I had a mission in a foreign country where I did not

04:37:52  25  have diplomatic immunity, I accepted the risk.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OLSON - RECROSS (McBride)                                     93

04:37:57   1            MR. McBRIDE:  Thank you.

04:38:02   2            THE COURT:  Sir, you have completed your testimony.

04:38:05   3   You are welcome to step down and leave.

04:38:27   4        (Proceedings reported but not transcribed.)

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                    CERTIFICATE OF REPORTER

2

3          I, Mary A. Schweinhagen, Federal Official Realtime

4    Court Reporter, in and for the United States District Court

5    for the Southern District of Ohio, do hereby certify that

6    pursuant to Section 753, Title 28, United States Code that the

7    foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is

10   in conformance with the regulations of the Judicial Conference

11   of the United States.

12

13   s/Mary A. Schweinhagen

14   _____  31st of October, 2021

15   MARY A. SCHWEINHAGEN, RDR, CRR
     FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25