1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -

UNITED STATES OF AMERICA,       : CASE NO. 1:18-cr-0043
                                :
          Plaintiff,            :
            vs.                 : **FINAL PRETRIAL CONFERENCE**
                                :
YANJUN XU, also known as XU     :
YANJUN, also known as QU HUI,   : 13th of October, 2021
also known as ZHANG HUI,        : 11:04 a.m.
                                :
          Defendant.            :
                        - - -
**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE**
                        - - -

APPEARANCES:
For the Plaintiff:
                    Timothy S. Mangan, Esq.
                    Emily N. Glatfelter, Esq.
                    Assistant United States Attorneys
                    221 East Fourth Street, Suite 400
                    Cincinnati, Ohio 45202
                            and
                    Matthew John McKenzie, Esq. (By phone)
                    DOJ-Nsd, National Security Division
                    950 Pennsylvania Avenue
                    Washington, DC 20530

For the Defendant:
                    Ralph William Kohnen, Esq.
                    Jeanne Marie Cors, Esq.
                    Sanna-Rae Taylor, Esq.
                    Taft Stettinius and Hollister
                    425 East Walnut Street, Suite 1800
                    Cincinnati, Ohio 45202
                            and
                    Robert K. McBride, Esq.
                    Amanda Johnson, Esq.
                    Taft Stettinius and Hollister
                    50 East RiverCenter Boulevard
                    Suite 850
                    Covington, Kentucky 41011

                                    and
                     Florian Miedel, Esq.
                     Miedel & Mysliwiec, LLP
                     80 Broad Street, Suite 1900
                     New York, New York 10004

Law Clerk:           Cristina V. Frankian, Esq.

Courtroom Deputy:    Rebecca Santoro

Stenographer:        Lisa Conley Yungblut, RDR, RMR, CRR, CRC
                     United States District Court
                     100 East Fifth Street
                     Cincinnati, Ohio 45202

**Proceedings recorded in stenotype.**
**Transcript produced with computer-aided transcription.**

(Proceedings held in open court at 11:04 a.m.)

THE DEPUTY:  All rise.  This United States District Court for the Southern District of Ohio is now in session, the Honorable Timothy Black presiding.

THE COURT:  Please be seated.  Good morning.  I use the adjective as I normally do.  We are here on the record in the courtroom for a final pretrial conference in the criminal case of the *United States versus Xu*.

I would like to begin with the lawyers entering their appearances for the record.  Who appears as the attorneys for the United States?

MR. MANGAN:  Good morning, Your Honor.  Tim Mangan on behalf of the government along with Emily Glatfelter here in the courtroom.  Also on speaker phone from Washington is Matthew McKenzie.

THE COURT:  Very well.  Good morning, Mr. Mangan, Ms. Glatfelter, and Mr. McKenzie.  Can you all hear us? This is Judge Black.

MR. McKENZIE:  Yeah.  Good morning, Your Honor.

THE COURT:  Good morning.  Who will the government have at trial as a designated agent, if you know?

MR. MANGAN:  Your Honor, we will have agent -- Special Agent Bradley Hull, H-U-L-L.

THE COURT:  Very well.  And are you going to have other people with you in your area of the room?

MR. MANGAN: We do anticipate having Mr. McKenzie as well as a paralegal, Jackie Prim.

THE COURT: Ms. Grim, is that what I heard?

MR. MANGAN: Prim, P-R-I-M.

THE COURT: Prim. And is she here today?

MR. MANGAN: She is not here today.

THE COURT: Okay. And you're in charge of IT or are you going to have an expert here with you?

MR. MANGAN: That will be Ms. Prim.

THE COURT: Very well. And on behalf of the defense, who appears as attorneys for the defendant?

MR. KOHNEN: Your Honor, good morning. Ralph Kohnen on behalf of Mr. Xu.

THE COURT: Mr. Kohnen.

MR. KOHNEN: With me is my colleague and partner, Robert McBride.

THE COURT: Mr. McBride.

MR. McBRIDE: Yes, sir. Good morning, Your Honor.

MR. KOHNEN: Also, Jeanne Cors.

MS. CORS: Good morning, Your Honor.

THE COURT: Ms. Cors.

MR. KOHNEN: And Mr. Florian Miedel, the New York lawyer, is present today, Your Honor.

MR. MIEDEL: Good morning, Your Honor.

THE COURT: Mr. Miedel, an honor and great

privilege.

MR. KOHNEN:  Also present is Sanna-Rae Taylor and Amanda Johnson.

THE COURT:  Very well.  Ms. Taylor is present, and is that her last name?  Is that how I am to address her?  The hyphenated name is the first name?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Very well.  She's capable of identifying her own name apparently.  Welcome back.  Apologize for the prior experience.

Are you going to have a paralegal with you?

MR. KOHNEN:  We do not, Your Honor; although, we do expect to have one of our attorneys, a young lady named Courtney Lynch, with the Court's permission, will be coming and going from the courtroom.

THE COURT:  Very well.  And IT?

MR. KOHNEN:  No IT, Your Honor.

THE COURT:  Perhaps, Ms. Taylor is going to assist in that regard?

MS. TAYLOR:  We'll be working with a group called Litigation Support Services, and they will have a representative who is signed on under the protective order to help us.

THE COURT:  So there will be a person here with you for IT support; is that right?

MS. TAYLOR: Yes, Your Honor.

THE COURT: While we're chatting, we're all going to have to keep our voices up. I had trouble hearing you, Ms. Taylor. And, in fact, while we're talking about that, I'm inclined to require everyone in the courtroom to wear masks. If a witness -- if we're having trouble hearing a witness, I would permit the witness to take their mask down. Likewise, inquiring attorneys, if we're having trouble hearing you, I would consider letting the masks go down. Typically, in the courtroom, I don't require masks if everyone is vaccinated, but with the presence with a number of a jurors, I think we need to send the message that we're doing everything to keep everyone safe and so we will be wearing masks.

Masks present some challenge, perhaps occasionally inaudible, but the actual real truth is that you really need to speak into the microphone when you're speaking or examining a witness. And if your notes are to your left or right and you turn to look at your notes and are talking, the mike doesn't pick you up. And without being gender-specific, I'm having trouble hearing women's voices particularly.

And I would suggest that one practice it, have somebody come sit here in my absence and get a feel for how it is that you can be heard most audibly. Typically, I would

require people to stand when they're addressing the Court. Standing takes you from the microphone. We'll see how that goes. But I want you all to make sure that you can be heard, and I would suggest you practice that in the open courtroom.

We have four charges going to -- to be presented. Count I is conspiracy to commit economic espionage, 15 years. Count II is conspiracy to commit trade secret theft, up to 10 years. Count III is attempt to commit economic espionage, up to 15 years. Count IV is attempt to commit trade secret theft, up to 10 years.

Is the government able to acknowledge that I've stated the charges correctly?

MR. MANGAN: Yes, Your Honor.

THE COURT: Very well. I was talking about standing physically when addressing the Court. If in the midst of testimony you have an objection, I need you to stand. As soon as I see you stand, when there's a break, I will indicate I see you standing, do you wish to be heard, and then you state your objection succinctly and the basis, may get a response, we'll rule on it. But by standing, you draw my attention to the fact that you wish to intervene.

Voir dire will commence this coming Monday at 9:30. Like you in the courtroom by 8:30. Typically, prior to voir dire in any case, the Court addresses the defendant prior to

the start of voir dire to put on the record any plea offers extended by the government and to confirm that the defendant has rejected said offers. Is that appropriate in this case from the government's perspective?

MR. MANGAN: Yes, it is, Your Honor.

THE COURT: All right. The government -- the defense acknowledges I'm going to need to do that prior to voir dire on Monday?

MR. KOHNEN: Yes, Your Honor.

THE COURT: Very well. Is there anything else the Court needs to address with defendant personally before voir dire and trial commence?

MR. KOHNEN: May I have just a moment, Your Honor?

THE COURT: Yes.

MR. KOHNEN: No, thank you, Judge.

THE COURT: Very well. As to the defendant's appearance in court, I would presume that he would prefer to be in street clothes rather than prison garb. Is that accurate from the defendant's perspective, Counsel?

MR. McBRIDE: Yes, Your Honor.

THE COURT: Okay. As to restraints, it's in the Court's discretion, as most matters are, in all criminal trials where the defendant is in custody, we first consult with the marshals and then make a careful, independent determination as to how much security is actually necessary.

Critical point is that restraints are inherently prejudicial only if they're actually visible to jurors during the trial.

If we determine that some level of restraint is necessary, we'll go to great lengths to ensure jurors do not see cuffs or leg shackles.  Our counsel tables have a full wood panel in front, so any leg restraints are entirely shielded from the jury's view.  Leg restraints are also wrapped so as to reduce any sound.  Marshals' request is leg shackles at a minimum.

The four factors I need to address -- and before I address them, I am leaning toward requiring the defendant to be shackled at the legs, not visible to the jury.  I have to consider the factors of record, temperament, desperateness, state of the courtroom/courthouse, defendant's physical condition, any less prejudicial means of security.  Leg shackles only are a less prejudicial alternative to full restraints.

Does the defendant wish to be heard on the issue?

MR. McBRIDE:  May I briefly, Your Honor?

THE COURT:  Yes.

MR. McBRIDE:  I have spent a great deal of time with this man.  He is intellectual.  He is calm.  His time at the BOP, he had very -- he had almost no incidents, even though he was in the shoe for a long time.  The administration allowed him to go to the regular detention

center there where he had no time.

I've experienced no violence with him. I have seen no anger from him. To be honest, Judge, I think he is a little resigned to his situation because he comes from a different culture where things are predetermined in a court, which obviously we're not suggesting that here.

One problem we may have with shackles, Judge, we are going to need to have an interpreter with him to interface with him, Mae Harmon, and it may be a little restrictive there.

He is currently in the county jail. He has had no problems there. We interact with him on a regular basis, Judge. He is quite intelligent. He is quite articulate within the confines of his language limitations. He is 41, I believe. He is physically fit. So that is a factor that the Court has to consider, I understand that, but I would ask the Court to consider his temperament.

I understand this is a national security case and of great importance, but I don't believe that this gentleman represents a threat either to the Court, the marshals, prosecution, the gallery, if there is one, or a risk of flight, Your Honor.

THE COURT: Thank you, sir. How would leg shackles be restrictive as to the interpreter?

MR. McBRIDE: I'm going to assume, Judge, the

**11**

interpreter is going to sit with him --

THE COURT: Right.

MR. McBRIDE: -- and move in and out. They actually have quite a good relationship, Judge, and what we have found is she is very useful in helping explain to him the legal concepts that are going on. He's quite inquisitive. She used to be a lawyer in China. And I'm afraid moving around documents, that sort of thing, may make it difficult for them.

THE COURT: I hear you. In general, I don't think leg shackles are going to interfere with the interpreter. I'll touch base with the marshal again, but the marshal recommends at the very least leg shackles. I don't think full restraints are necessary. I don't like stun belts. Leg shackles and no restraints are what I am considering and I'm leaning toward leg restraints.

As to record, temperament, desperateness, according to the marshals, defendant has never caused any trouble. That said, desperateness comes into play. State of the courtroom/courthouse, we're on the eighth floor, so he's not likely to get far if he tries to run; but given his close proximity to the courtroom door, some limitation on mobility may well be warranted. The unlikelihood of escape does not eliminate a potential attempt.

As to defendant's physical condition, the marshals can

definitely handle him, but they've still expressed concern over him having free range. In terms of less prejudicial means of security, leg shackles only are a less prejudicial alternative to full restraints, and I'm comfortable foregoing full restraints with the defendant. I think leg shackles are appropriate and that is my determination at this time. I'll touch base with the marshal again in light of what Mr. McBride presented, which frankly did not surprise me.

MR. McBRIDE: Thank you, Your Honor.

THE COURT: Very well. As to street clothes, it is the defendant's counsel's responsibility to get the defendant's street clothes to the marshals before trial, so that's on you, not us, not the marshal. You take care of it and he'll be dressed in street clothes and leg shackles hidden from view.

As to final pretrial issues, length of trial, we're scheduled from Monday, October 18th to December 1, 2021, which is an extended version of what you have proposed just so we've got enough jurors in case it goes longer than what has been suggested. But we will not have trial on Monday, November 11th, Veteran's Day. We will not have trial on Wednesday, November 24th; Thursday, the 25th; Friday, the 26th, in honor of Thanksgiving. And it may well be that we have to take Friday, November 8th, off as there's one

prospective juror who is unavailable that day, and if he or she gets selected, we may have to take that Friday off.  I'm wondering about a half day on Tuesday, November 2nd, Election Day.

Calculating how many days to set aside for trial, can't just count time for presentation of evidence.  Our calculation also accounts for voir dire, jury selection, opening statements, charging conference, jury instruction, closing arguments, and deliberations.

Considering all of this, do the parties believe that October 18th to December 1st is still reasonable, from the government's perspective?

MR. MANGAN:  Yes, we do, Your Honor.

THE COURT:  The defense as well?

MR. KOHNEN:  Yes, Judge.

THE COURT:  Very well.  If there are any timing concerns, you need to tell us now so we can plan for that eventuality.  Today, what is the government's estimate for the government's case?  And I know you can't predict the length of cross.

MR. MANGAN:  Your Honor, we would estimate about two weeks.

THE COURT:  Very well.  Is the defense in a position to estimate what time it may consume in defense or are you not there yet?

MR. KOHNEN: Judge, I'm able to tell the Court that if we do put on a case, our evidence -- pardon me, would last no more than a week, including government cross-examination.

THE COURT: Okay. Including something in cross-examination?

MR. KOHNEN: I'm sorry, cross-examination by the government attorneys.

THE COURT: Very well. The fact that we've set aside extensive time to make sure we're able to get this done in its entirety does not mean to suggest that you need to go longer than what you anticipate is necessary.

All right. As to voir dire, begins Monday, the 18th, at 9:30. Let me tell you where we are on jurors. We have about 35 jurors so far. Questionnaires are still coming in. In anticipation of trial, Court called over 350 prospective jurors; only 175 returned their summons. We sent supplemental questionnaires to all of those who responded, and so far we've received about 150 back.

On September 30th, the Court, this Judge, held a videoconference on the record with Mr. Xu's participation to address prospective jurors. At that time, the parties agreed, including Mr. Xu, that the Court can pre-exclude any prospective jurors, who are: 1, unwilling to wear a mask in contravention of the General Order of the Court applicable

to the entire Southern District of Ohio.  2, anyone who has a hardship, serious, e.g., work, financial, medical or personal.  And, 3, anybody who's unavailable due to prepaid travel or scheduled medical procedure.

The Court has received, reviewed, each one of the questionnaires received so far.  Of those, about 35 people said they would not mask, and an additional 80 or so have been excused for unavailability or hardship.  Assuming we select 4 alternates, we will need a minimum of 36 prospective jurors in order to allow each side to take the number of preemptory strikes to which they are entitled.  We should be able to get to that number of 36 before trial starts on Monday.  We're at 35 and they continue to come in.

There are an additional four individuals who have indicated that they are available and will wear a mask, but they are unvaccinated.  In truth, I think it creates a serious risk of the safety of everyone in the courtroom, most significantly, the other jurors, and risks causing a potential outbreak and resulting in mistrial for us to have unvaccinated individuals on the jury.

Trial is actually scheduled over a seven-week span with two holidays and potential holiday travel in the middle, and an unvaccinated juror poses a significantly higher risk of contracting COVID over the course of the next several weeks and then coming to the courthouse and exposing everyone

else.  If that happens, it puts everyone's health and safety at risk, not to mention that we'll all have to quarantine, I'll have to declare a mistrial, trial will have to start all over.

I have a responsibility to protect to the best of my ability the welfare and safety of everyone here.  I also have an obligation to ensure the orderly proceeding of any case in the courtroom.  And I believe the best way to accomplish these objectives is by excluding these four unvaccinated individuals from serving as a juror on this case.  They will remain in the jury pool and may be called for another case either this month or in the coming months, but I don't believe that it's worth the risk to everyone's health and the risks to the proceedings as a whole for us to include them on our prospective jury list in this case.

Do the parties oppose the Court's proposed exclusion of unvaccinated individuals from the voir dire panel and the actual jury?

MR. MANGAN:  No, Your Honor.

THE COURT:  Government indicates no.

And the defense?

MR. KOHNEN:  No, Your Honor.

THE COURT:  Will you please get the defendant's approval in writing on that issue for me?

MR. KOHNEN:  Yes, we will, Your Honor.

THE COURT: All right.

MR. KOHNEN: We will submit it to him for approval and I assume we'll get his approval.

THE COURT: Understood. Sound like a lawyer. Do you need to be heard further on that issue?

MR. KOHNEN: Your Honor, not on that issue, but on something you spoke about a few moments ago. I just wanted to make sure, we've got 35 petit jurors who have cleared the process that you've described so far?

THE COURT: Correct.

MR. KOHNEN: And I did not -- do we have any kind of estimate how many more are going to get through that gauntlet?

THE COURT: A couple.

MR. KOHNEN: Just a couple? So like many people, Your Honor, I became a lawyer because I'm bad at math.

THE COURT: Keep your voice up for this old man.

MR. KOHNEN: Pardon, Judge?

THE COURT: Would you speak up, please?

MR. KOHNEN: So looking at your -- we've got a total available number of strikes by each party of 23, if you include the alternates; is that right, Judge?

THE COURT: I thought the government had 16, plus 2 for alternates, that's 18, plus 2 for alternates, my math puts that at 20.

MR. KOHNEN:  The Court still has jurors that will be excused from that panel for cause.  I guess it will be --

THE COURT:  I don't know what you meant by that sentence, I'm sorry.

MR. KOHNEN:  I'm sorry, Your Honor?

THE COURT:  I didn't understand that sentence.

MR. KOHNEN:  I think there still may be some jurors after this process who once voir dire is underway we suggest to the Court might be excused for cause, that's an intangible at this time.  I'm just trying to make sure that we've got enough.  We'll do our best.

THE COURT:  I appreciate it.  We have 40ish as opposed to 36 or 35 as of this day.  Some of them may have bias and we'll simply learn that more from their participation in the courtroom than from their questionnaire.  But if we have 20 preemptory strikes and a little room for cause, I think we can get it done. Ms. Frankian has worked long and hard with the assistance of the jury commissioner gathering this pool.  We asked 350 people; 170 responded.  With a seven-week trial period, a lot of people are flat-out unavailable.

And on the other issues that I was given authority by the parties to pre-excuse, I think it would be helpful if Ms. Frankian would speak now as to where we stand so I didn't muck it up and that's -- yes, go ahead.  You'll need

to scream, you don't have a microphone.

MS. FRANKIAN: We have --

THE COURT: Would you be willing to take your mask off? I can't hear you. Sorry. Excuse me for just a minute.

Is that your phone, Mr. Kohnen? Very well. Go ahead.

MS. FRANKIAN: We have possibly 40 to 42 jurors who are available. There are about five of them who have indicated some level of potential bias, specifically as it relates to whether or not the defendant should testify. A lot of people checked the box for yes, he should testify, but they may have misunderstood the question. So those individuals, anyone who has not indicated bias or anyone who has I think maybe misunderstood the question or something, I counted those people. And so the ones I counted come to 35, but there are additional -- some additional 5 to 7 people, and there will be more from the questionnaires.

THE COURT: So there are 35, but 40 in the group, and some of the 40 will need to be examined on bias; is that accurate?

MS. FRANKIAN: Correct.

THE COURT: Do you have any questions for my first lieutenant?

MR. KOHNEN: No, Your Honor. I appreciate the clarification. It seems to me that a lot of jurors who

were -- would be sort of vetted in the traditional sense are already gone, so I think that we won't need nearly as many excuses for cause and we may make the cut here.

THE COURT:  Right.  And in the spirit of full disclosure, they were asked do you believe that a defendant is presumed innocent.  If they answered, no, that's a problem.  If they said -- if they were asked should the defendant testify at trial and they said, yes, it's his case and he ought to have a chance to tell his story, I'm going to instruct them, obviously, right away that the defendant is presumed innocent unless and until the government proves by competent evidence beyond a reasonable doubt his guilt, and he has the absolute right not to present any evidence or any testimony.  He's not required to testify himself and you cannot use that against him.  And it's my experience that the judge -- or the jurors acknowledge that, but I'm going to have to do that perhaps as it arises.  I think we have enough to get through it.

Anything further on that issue?

MR. MANGAN:  No, Your Honor.

MR. KOHNEN:  Thank you, Judge.  We truly appreciate all of the work the Court has done on this.

THE COURT:  It's a royal "we."  Credit needs to go to Ms. Frankian.

Okay.  As to the schedule on Monday, with voir dire set

to begin at 9:30, we'll open the courtroom and the ADR suite by 8:15.  The ADR suite has been set aside for the defense team, and we had to muscle up to kick some other folks out of there, but we finally got that accomplished, and that's where the defense team will be.

On Monday, I would like the attorneys here in the courtroom no later than 8:30.  Court will address at that time some preliminary matters on the record, e.g., rejected plea offer, finalizing any oral rulings, et cetera.  Then, we'll recess briefly.

At that time the lawyers, the parties, will receive the re-randomized list of jurors.  The attorneys will have about 30 minutes to review and reorganize their lists.  Parties and counsel should be back in the courtroom just before 9:30 a.m. so we can call for the jurors.  As to voir dire and jury selection procedures, we provide you with a two-page document that lays that out.  We have hard copies here today as well.

After a jury is selected and sworn in, we'll likely break briefly and then return for opening statements on Monday after we've selected the jury.  Depending on what time it is, we'll either recess for the day at that point, or if there's time, we'll take another short break and then the government can call its first witness.

If you'd like to be heard on the Monday schedule, let's

discuss it now.  We'll do voir dire.  I'd love to get opening statements under our belt and not surprise anybody with that.  And if it all happens rapidly, it would be nice to go to a first witness.  If you all want to be heard on that, let's talk it through now.  What's the government make of the Monday anticipated calendar?

MR. MANGAN:  Your Honor, we think it would be great, obviously, if we can get through the jury selection and the opening statements.  Obviously, given the circumstances you just discussed, jury selection may be quicker than normal for a case like this.  We'll see.

If we get to the point where we are through opening statements and there is time for a first witness, I do want to indicate our first witness is coming from out of town.  I need to double check exactly when he is coming in town.  We wanted to make sure he was obviously here to start first thing Tuesday morning, but, frankly, I would need to double check to make sure he would be here if we needed to start him late Monday, but we will look into that.

THE COURT:  My suspicion is that in all likelihood we won't get to a first witness on Monday.  And I was fishing for whether you needed commitment to that or whether he will be available if we blow through this voir dire and opening.

MR. MANGAN:  It's certainly easier for us to

organize if we know the first witness is starting at a set time, you know, on a set day. I realize that can't always be the case, but if we could say that we will start witnesses Tuesday morning, that would certainly help the logistics.

THE COURT: Let me hear the defendant's perspective on the Monday calendar and specifically whether we roll into their first witness, which I believe is going to be an extensive witness; is that right?

MR. MANGAN: It won't be multiple days, but he'll take at least a couple of hours.

THE COURT: Okay.

MR. KOHNEN: Your Honor, I think that the best case scenario that the Court laid out is acceptable to us, but we agree that it might be -- it's pretty ambitious, but we're happy to start with the testimony as soon as we're finished with opening statements. We're also amenable to breaking off at the end of opening statements and preparing the case in earnest to begin on Tuesday.

We would like to know as soon as possible who the government's first witnesses are, and if -- I don't want to be cute here, Your Honor, but if an insistence on the first witness starting on Monday gets us notice of those witnesses a little bit earlier, then, we may change our tune.

THE COURT: To be perfectly frank, I'm leaning

toward everybody understanding that Monday is voir dire and opening statements and we break and then we start the testimony Tuesday. It's cleaner for everybody. I wanted to make sure that there was not an objection from either side. We'll circle back today and pin it down before you leave, but that's the way I lean; understood and there's no objection?

MR. KOHNEN: No, thank you, Judge.

MR. MANGAN: No objection.

THE COURT: Very well. Now, on trial days, trial begins each day at 9:30 a.m. Told you to be here at 8:30 on the Monday morning of voir dire. And on trial days, I would ask that you be in the courtroom by 9:15 so we can address anything before we bring the jury down at 9:30. Lunch break will be approximately from 12 to 1:15. There will be two 15-minute breaks, one in the morning at around 10:30, another in the afternoon at around 2:45. We'll break for the day at approximately 4:30. I want to try to maintain that consistent schedule every day, but the timing of lunch breaks and recesses will vary depending on the flow of the trial.

Presumably, parties wish to have witnesses excluded, is that the government's position?

MR. MANGAN: Yes, that would be fine, Your Honor.

THE COURT: And is the defense amenable as well?

MR. KOHNEN: Absolutely, Your Honor. Thank you.

THE COURT: All right. Is there going to be anything tricky there, experts get to hear testimony, a designated rep, a witness?

MR. MANGAN: I would say the only thing, Your Honor, is that the designated person who'll be sitting here, Special Agent Hull, will be testifying. I wouldn't consider that tricky, but there's nothing like you mentioned in terms of experts needing to sit in and hear testimony.

THE COURT: Is that the defense's understanding as well?

MR. KOHNEN: Yes, Your Honor, and we understood Special Agent Hull to be the government representative during the trial.

THE COURT: You're going to need to keep your voice up as you speak.

MR. KOHNEN: I will, Judge, I'm sorry. I lost a mask about four or five weeks ago and I'm still getting used to it again.

THE COURT: Likewise. And this trial is going to be an important event in my life when I determine whether or not I need hearing aids, so bear with me.

How long will opening statements be and who is giving opening on behalf of the government?

MS. TAYLOR: Your Honor, I'll be doing opening

statements. I anticipate no longer than 45 minutes.

THE COURT: Thank you, entirely responsive.

On the defense, do you know if you're going to give opening statements after the government or defer until later or do you not yet know?

MR. KOHNEN: Judge, our plan is to follow the government with an opening statement. We're going to -- I'm going to give it. I will try to stay, limit my time, to an hour given that the government only needs 45 minutes. I'll do my best on that, Judge.

THE COURT: Very well, entirely responsive.

If you're using audio/visual equipment, you're welcome to come in and test your equipment. Let us know, and we'll set up a time with IT.

Have there been any stipulations reached or anticipated? And, in particular, I would begin with authenticity issues, are we going to have a battle on that or have you guys worked it through such that we can do this expeditiously?

MR. MANGAN: That's been sort of a breaking news item we've been working on recently. There are some records that we've agreed to in terms of authenticity, but there are a large number of them that we have not reached an agreement on. And if I can briefly summarize, and if I'm summarizing it inaccurately, they can tell me.

But, for example, when we're talking about, let's say, an e-mail account where we've received the subscriber records as well as the content of the e-mails from, let's say, Google, and then that comes with a certificate of authenticity from Google, in those situations, the defense has agreed to the authenticity of the subscriber records but not the content. So we will have to go through I think an issue there.

We can -- you know, I don't know how the Court wants to handle objections. In general, I know you wanted us to stand. I realize sidebars are going to be difficult or impossible in this situation. So if we're going to have a prolonged argument about that issue, I don't know if the Court would like to address it now versus, you know, in the flow of things with a witness.

THE COURT: Well, right this minute in the flow, perhaps, and I don't find having sidebars a problem.

MR. MANGAN: Okay.

THE COURT: But I'm hoping you guys can anticipate what the issues are going to be, work as hard as you can to resolve them, and then we'll deal with what presents.

Is there any stipulation as to venue yet? All or part of the events occurred within the Ohio Southern District.

MR. MANGAN: We have not addressed it, Your Honor.

THE COURT: Will you chat it through with the other

side?

MR. MANGAN:  Sure.

THE COURT:  You're amenable to at least chatting, Mr. Kohnen?

MR. KOHNEN:  I'm sorry, Your Honor?

THE COURT:  I asked whether there was any stipulation as to venue, as to whether all or part of the offense occurred within the Ohio Southern District.  Mr. Mangan indicated no stipulation has been addressed, but he's willing to chat with you about it.  Are you ready to chat that issue through outside my presence?

MR. KOHNEN:  We're ready to chat it through outside your presence.  I'm ready to speak on it inside with your presence here as well, Your Honor.  We do not have a problem with that jurisdictional question.

THE COURT:  Venue?

MR. KOHNEN:  Correct.

THE COURT:  Okay.  Sounds like a stipulation may be forthcoming, Mr. Mangan.  Will you work it through with the other side?

MR. MANGAN:  Yes, Your Honor.

THE COURT:  Is there anything else you can stipulate to?

MR. MANGAN:  There was an agreement reached regarding certain records that came over from France

pursuant to an MLAT, and that's as to authenticity and admissibility. I think the main issue, Your Honor, will be with respect to records that were received from Internet service providers like Google, Apple, and so on. It will be the issue over the authenticity and admissibility of those records, such as the content of the e-mails, the content of the cloud production.

THE COURT: Very well.

MR. MANGAN: I don't think -- the only other item I would say that we discussed had to do with translations.

THE COURT: Yes.

MR. MANGAN: And the issue there was, obviously, the Court is aware of the process we went through to narrow down and resolve any final issues on the translations. I believe they're -- obviously, there were disputes there. I don't know if the defense wants to in a way preserve their position on the certain disputed ones; but, otherwise, I think we would say that the parties agree to the translation.

And then my understanding from the defense is that they are still asking the government to introduce the more or less original Chinese characters into evidence as well even though there will be translations presented.

THE COURT: Well, if you guys continue working on it, that would be helpful.

MR. MANGAN: Did I summarize that correctly?

MS. TAYLOR: Yes, I agree with that.

THE COURT: Thank you. Ms. Frankian e-mailed you all regarding the translator's resolutions and I had hoped that that was behind us. If there are any stipulations, at an appropriate time during the presentation of evidence, counsel should prompt me to read the stipulations at the appropriate time.

*Jencks* and *Brady* material. *Jencks* doesn't need to be provided until after direct exam. Court cannot order it to be provided earlier, but as a courtesy and to promote efficiency, the government agreed to provide it by September 21st, I believe. Was that done, Mr. Mangan?

MR. MANGAN: It was, Your Honor. There was an initial production at that time and then a supplemental one shortly thereafter.

THE COURT: Is there anything outstanding in that regard?

MR. MANGAN: No, not to our understanding.

THE COURT: Is that the defendant's understanding?

MR. KOHNEN: Generally, yes, Your Honor. We received the *Jencks* and the *Giglio* material from the government. We haven't received any -- anything identified as *Brady* material. I don't know whether that's forthcoming or there is none.

THE COURT: The government able to respond to that inquiry at this time?

MR. MANGAN: Yes, Your Honor. We have nothing separately culled out as *Brady*. To the extent there was any *Brady* or they would interpret it as *Brady* within what we've already produced in the *Jencks* slash *Giglio* production, we would say we've already produced it, but we have nothing outstanding.

THE COURT: The government has responded. Did you wish to be heard further, Mr. Kohnen?

MR. KOHNEN: No, Your Honor. I just know that -- no, no, I'm fine with that.

THE COURT: And as to the translators, we asked for objections to any of it when Ms. Frankian e-mailed you. We didn't get any, so I believe that's behind us.

As to jury instructions, we've received proposed instructions from both time -- both sides timely. Prior to the charging conference, the Court will provide its jury instructions to both sides by e-mail and then we'll have the charging conference.

Is there a preference as to whether -- you'll have a copy of the jury instructions fully approved before closing. Is there a preference for the Court to read the jury instructions before closing or after closing? Do you understand the thrust of the question, from the government's

perspective, and is there a preference?

MS. GLATFELTER: Your Honor, we would prefer before closing.

THE COURT: Okay. All right. And the first time I really didn't hear you and I don't think the jury will. The second time when you got to the mike, they will. I missed the substance of the response.

MS. GLATFELTER: The government would prefer that we do jury -- or the Court issue jury instructions before closing arguments.

THE COURT: The defense have a preference?

MR. KOHNEN: May I have just a moment, Your Honor?

THE COURT: Yes.

MR. KOHNEN: We're fine, Your Honor, whatever is the Court's pleasure on that issue.

THE COURT: Well, if the government has a preference and the defense doesn't, I would afford either side of their preference. So it sounds like we're going to do reading of the instructions to the jury before closing argument. And we needed to know that because it takes a long time to pump out all of the jury instructions for each individual member to have a copy while I read it. So that's resolved.

If you have objections to instructions from the opposing party, they must be in writing, must include

citations to authority, and need to be filed no later than Friday, October 22nd. Failure to object will constitute waiver of any objections. So you've got a heads-up that that's out there on the radar.

Court will consider supplemental instructions which may become relevant during the course of the trial. Supplemental instructions should be presented within 48 hours after the need for the instruction arises. Any objection to a supplemental instruction must be filed within 24 hours of the submitted instruction. Failing to timely file an objection will constitute waiver.

Any limiting or curative instructions that the party believe may become necessary during the trial must be filed no later than October 18th or as it arises. Anybody anticipating at this time any limiting or curative instructions? Seems premature, but I will ask the government, have any of that at this time? Take a moment.

MR. KOHNEN: May I have just a moment, Your Honor?

THE COURT: Yes.

MR. KOHNEN: Judge, we expect there may be, depending on how the evidence comes, some limiting instructions, particularly one that may pertain to Rule of Evidence 404(b) and Rule 801(d)(2)(E), other things like that. I just want to put the Court and opposing counsel on notice that that's a likelihood, but that's all.

THE COURT:  In the scope of the entire deal, the sooner you can get stuff to me or give me a heads-up that there's going to be an issue, the better I'll be at responding.

MR. MANGAN:  Your Honor, if I could just add one other item.  We understand kind of what the defense just mentioned.  In addition, there was an item that was brought up when we were discussing with the defense potential stipulations on the exhibits.  One of the issues that came up is within our exhibits, you know, many of the documents are the way that we had produced them and they may have protective order markings such as "general" or "sensitive" or "attorneys' eyes only."  They may also within the original document have something that says "unclassified" for the document.  And then for the ones that are Bates labeled, the Bates label says "government production" and then the number, so there's a prefix saying "government production."

The defense asked us after reviewing our exhibits if the government would take out all of those various labels, which would be fairly extensive within the documents to take out the Bates label prefix, the protective order labels as well as any mention of unclassified.

So as an alternative, we were going to suggest an instruction to the jury that they ignore those types of

markings or labels, but we did -- that was on our list of things to bring up with the Court, because obviously if we need to change the exhibits, that's something we need to start immediately.  So that was -- obviously, that would be an issue we need to work on with the exhibits.  Or if the Court is willing to do an instruction, that would be an additional instruction.

THE COURT:  I'm glad you brought it to my attention.  Give me just a moment.

Go ahead.

MR. MANGAN:  Sorry, could I ask them a quick question?

THE COURT:  Yes.

(Pause.)

MR. MANGAN:  Okay.  The issue I was asking him, Your Honor, was within our exhibits, we had redacted the actual name and, you know, the e-mail identifiers or the GE employee, and I neglected to ask Ms. Taylor if that was an issue with them or not.  Mr. Kohnen just indicated that that was not an issue.  So I think we're okay on that issue, but we still have the issue with the labels or markings.

THE COURT:  Well, I'm glad to know about it.  In all likelihood, I would not think that the jury would see the designation at the bottom when it's presented in court. Instead of an instruction and instead of redacting on

everything, could we just redact on the admitted exhibits at the end?  I think the instruction is the most straightforward and I think it's safe.  I wonder if the defense would react to my reaction.

MR. McBRIDE:  Yes, Your Honor.  We -- let me just start with this.  We had a conversation with Mr. Mangan about this issue.  The government is trying Mr. Xu as a spy.  The documents are marked "unclassified," some of them are marked "classified," "unclassified," and FOUO, which is "for official use only."  Some of the documents also have the designation for the classification under the protective order "sensitive," and there were a few "attorneys' eyes only."  We also have over 50 percent of their documents, 54, 55 percent based on my count -- like Mr. Kohnen, I'm not very good at math -- that have these markings.  So I brought a few examples, Judge, if you want to see them to talk about why we're concerned about them.  If I may.

THE COURT:  Yes.

MR. McBRIDE:  And I have a set for Mr. Mangan and Ms. Glatfelter.  May I approach them and you, Your Honor?

THE COURT:  Yes, at your own risk.  Do you have a third copy by any chance?

MR. McBRIDE:  I'm sorry, I don't.  Thank you, sir.

THE COURT:  Ms. Frankian, would you approach, please?

Ms. Frankian and I have before us the packet you gave me.  Go ahead and be heard, sir.

MR. McBRIDE:  Thank you, Your Honor.  I want to start with Government Exhibit No. 28, which is an example.  This is the admission of Mr. Xu to graduate school at NUAA, and the front side of the document is marked with a government's exhibit and at the bottom it says "sensitive."

THE COURT:  Yes.

MR. McBRIDE:  I'm less concerned, honestly, Your Honor, with the government production number.

THE COURT:  Say that sentence again.  You're less concerned?

MR. McBRIDE:  With the government production number, that's easily explained.  At this point, I'm not asking that they redact those.

THE COURT:  Okay.

MR. McBRIDE:  Then, if you flip the document over, this is the FDI's translation of the document.  We don't have any issue with the translation itself.  You'll see at the top, Judge, "unclassified," again at the bottom, and then marked "sensitive."  Our concern is, in general, that the government is going to produce the evidence, presumably, that Mr. Xu is a spy working for MSS.  The "unclassified" marking is actually a type of classification for classified documents, so is the "FOUO," for official use only.  I think

if somebody sees that, they're going to say, ah-ha, the government -- it changes the content of the document, Your Honor.  Same thing with the "sensitive" at the bottom.

Do you have any questions about that document, Your Honor?

THE COURT:  On that document we're looking at, Government Exhibit 28 --

MR. McBRIDE:  Yes, Your Honor.

THE COURT:  -- on the first page, you want "sensitive" pulled?

MR. McBRIDE:  Yes, sir.

THE COURT:  And on the back of it, you want "unclassified" pulled twice and "sensitive" pulled?

MR. McBRIDE:  Yes, Judge.

THE COURT:  I understand your request.  Go ahead and walk me through your other examples.

MR. McBRIDE:  Is a transcript of a recording which the government is going to enter -- I'm assuming they're going to put the recording in, but it's a transcript of that recording and it involves Mr. Xu.  Again, we don't have an issue with the recording itself or the translation itself.

The front page, Your Honor, we would object to.  It has the FBI emblem on it, has "unclassified" on it, and "FOUO," and "sensitive" at the bottom.  The sheet comes from the interpreter when Special Agent Hull has done a request to

have the interpretation done. It has the names of the interpreter and so on. Again, this has the imprimatur of the government on it. And then every page has the same markings at the top and the bottom.

THE COURT: Okay. I understand.

MR. McBRIDE: And then the third example I have, Judge, is Government 38 -- pardon me, 37B. This is a Cellebrite extraction report that the government is going to admit, and on the back -- there's no, no markings on the front side, Judge. On the back is the translated image of the conversation that the government will admit, and it has the "unclassified," "FOUO," and, again, same markings at the bottom and "sensitive."

So our concern, with over half of their documents having those, there is going to be an impression that this evidence is further validated by the government as opposed to just looking at the evidence and saying, okay, this is what it is.

We're certainly not asking the government to go back and redo all of their binders. What we're asking for is these particular markings being blacked out so that when they're presented to the jury, presumably on the screen, and then one volume when it goes back to the jury, that they don't have these markings. These are in PDF form. They should be able to do that. And then if they have to

assemble a further copy for the jury, they've got a couple of weeks to do that, Your Honor. So that is the basis for our request.

THE COURT: I understand your request. I'm going to have to confer with Ms. Frankian and come back to you promptly.

Does the government wish to be heard further on this at this time? Do you want to be heard further on that issue?

MR. MANGAN: Your Honor, I would simply state, you know, obviously, there would be some degree of work involved in kind of going back and redoing this. That's why we were suggesting the limiting instruction. The other part I would say, just to clarify, the fact that the document says "unclassified" does not mean that it at one time was classified. That's not correct. It just so happens that when they produced the translations, they all said "unclassified" at the top.

So what we were trying to do was -- you know, this is how we produced that to them in discovery with the Bates labels, with these other labels on them. We did not want to start just altering them because that might lead to a different objection and a different direction. So that's why we produced them the way that they are. Obviously, if they -- if the Court wants us to go back and do these redactions, we would obviously ask for some time to get the

corrected set to Ms. Frankian as well as the electronic set.

THE COURT: Of course. I'm not really sure what the defendant's concern is. Does the defense think that the designation makes the exhibit carry more weight?

MR. McBRIDE: I do, Your Honor. I think it fundamentally changes the nature of the exhibit. When you have a translation from -- that is our client or one of the witnesses or people they want to put in and argue about, it's got the imprimatur of the government on it. Nobody says "unclassified" but the government.

THE COURT: Nobody says what?

MR. McBRIDE: The word "unclassified" other than the government, Your Honor.

THE COURT: Okay.

MR. McBRIDE: And I think people will look at that and say that this is an unclassified document from the government, whether they know whether it's a classification marking or not. The only people that use the government -- use that term is the government, and the only place that uses it is either official government, such as intelligence agencies, and I think it's going to fundamentally change how the jury is going to perceive that document.

THE COURT: Why isn't it sufficient for the Court to tell the jury that the designation is added as a matter of course and has no relevance to the weight of the

evidence?

MR. McBRIDE: Judge, the only thing -- I can offer two practical explanations. One, I've been trying cases long enough to know that you cannot unring the bell. And, two, the instructions to the jury really just brings more attention to it.

THE COURT: I'll take the matter under consideration and rule on it promptly, so if the work is required, there will be adequate time.

MR. McBRIDE: Thank you, Your Honor.

THE COURT: Don't you think redacting is going to cause some attention as well, hey, what was there, what did they redact, what are they hiding from us?

MR. McBRIDE: It will, Judge, but it's better than making the government go through and completely whiten the document. We're not trying to make it more difficult. We're trying to make sure our defendant gets a fair trial, Judge.

THE COURT: Fair enough. I understand the argument and I'll address it as promptly as I can.

MR. McBRIDE: Thank you, Your Honor.

THE COURT: Verdict forms. We got one from the government. We didn't get anything from the defense. I would presume our standard verdict form is fine with them, or was that an oversight, or where are we on verdict form

proposed from the defense?

I was asking about the verdict form. I didn't get one from the defense; I did from the government. I wondered if the defense is happy with the Court's standard one or if it was an oversight. Should I anticipate a proposed verdict form from the defense or are you okay with what is before us?

MR. KOHNEN: Judge, I apologize, apparently that was an oversight. We will take a look at it and we will be back to the Court via e-mail to Ms. Frankian with copies to opposing counsel by the end of the day today.

THE COURT: Perfect. Thank you. It's the same one used for *Toki*.

MR. KOHNEN: I liked that one, I guess, Judge.

THE COURT: We will anticipate hearing from you today.

I've said this before, I'll say it again. Do you anticipate any issues to resolve outside the jury's presence? I would urge you to endeavor as best as possible to anticipate such motions or issues, including any evidentiary issues that might require sidebars, so that we can take care of those matters either during lunch or before we start in the morning. We've discussed that.

Is there more we should discuss in that regard at this point or do you understand clearly that I need notice to get

ready, to the degree that you're able?

MR. MANGAN: We understand, Your Honor, what your instruction is.

In the spirit of kind of bringing up some items that might just sort of give you a tip-off, I don't know that this would happen, but it could happen where one of our witnesses, particularly if somebody is like an FBI agent and they are answering questions, the fact is this case does have some material that, you know, is in the world of classified information. To the extent there is a question asked by the defense perhaps unwittingly on cross-examination where the witness could answer but it would require them -- you know, they only know that from classified information, it puts the witness in a bind, frankly.

And I just wanted the Court to be aware that I don't know that that will happen, but if it happens, it may be a situation where we need to stop, ask for a sidebar, and, perhaps, it may be something where they can answer it in a different way. But it's just one of those tricky situations that can come up in this kind of case, and we wanted you to be aware of it.

THE COURT: I appreciate the heads-up.

Did you want to respond at this time to that?

MR. McBRIDE: No, Your Honor. We will simply wait

to see if the circumstance comes up, though, it may affect the defendant's right of confrontation.

THE COURT: Very well. You understand my general philosophy about sidebars, I want to minimize them; if we have to do them, we do them.

MR. McBRIDE: Yes, sir.

THE COURT: Cost Judge Ito his job.

MR. McBRIDE: I'm sorry, Your Honor?

THE COURT: Sidebars cost Judge Ito his job.

MR. McBRIDE: Indeed, Your Honor.

THE COURT: Indeed. Okay. Jury packets we will provide after the final pretrial conference today. We'll give you the jury questionnaires, e-mail you others as they roll in. Just touch base with Ms. Frankian when we recess momentarily and we'll walk through that. We will e-mail you -- that's the royal "we" -- the Court's standard questions to attorneys by tomorrow for voir dire. Counsel can ask new or follow-up questions but avoid repetitive questions.

Who'll conduct voir dire and how much time do you anticipate needing on behalf of the government?

MR. MANGAN: Your Honor, I will. As far as the time, it's a little difficult until we know what we've got in terms of questionnaires, but, you know, perhaps, we could do it in 45 minutes.

THE COURT: Fair enough. I won't hold you to that. I just wanted a sense, but if you're dragging into a fourth or fifth hour, I will probably intervene.

MR. MANGAN: I will not.

THE COURT: Very well. Who'll conduct voir dire for the defendant and how long do you estimate?

MR. KOHNEN: I will do that, Your Honor, and I think that 45 minutes is too ambitious. It's going to take me probably twice that.

THE COURT: That's 90 --

MR. KOHNEN: Yes.

THE COURT: -- ballpark?

MR. KOHNEN: Yes, Judge, ballpark, yes.

THE COURT: All right.

MR. KOHNEN: Your Honor, you know how it is, I mean, one answer can take us on an odyssey we didn't anticipate.

THE COURT: Yes. Are there any sensitive questions that you want the Court to ask the panel that you don't want to ask in voir dire or will you give that some thought and let us know by a time specific?

MR. MANGAN: We'll give that some thought, Your Honor. Nothing right now.

MR. KOHNEN: Ditto, Your Honor. One thing that comes to mind and something we've been struggling with a

little bit, for weeks actually, is the question of bias. And now we're learning a lot, we as a community, about bias and intrinsic bias, and that's particularly acute, I would submit, given the circumstances that our client comes from. I was going to wait until I saw whether the Court addresses that in any fashion, but we will definitely see to it that it's addressed. It's one of those circumstances, Your Honor, where less may be more, but more may be more, and that's sort of the essence.

THE COURT: I'm glad you flagged that for me. I will do the best I can do not belabor it but to be really direct. And you're welcome to follow up if between now and then you have some thoughts as to specific questions I might ask in that regard, and you present them to the other side and to me, it would be helpful to all of us.

MR. KOHNEN: Okay. Thanks, Judge.

THE COURT: That's a good red flag.

During voir dire, and perhaps even in preliminary instructions before testimony starts, the Court typically tells the parties what the case is about, a statement of the case. Can you all come up with two paragraphs, three paragraphs, statement of the case jointly, or is that something I need to do without your assistance? Remember that the statements coming from the Court will be instructive, not argumentive. If you can't come up jointly

with a neutral statement, the Court will have to prepare its own.

What's your thought in that regard in the first instance, Mr. Mangan?

MR. MANGAN:  We're certainly willing to try, Your Honor.  That may be a difficult process sort of to negotiate between the two of us.  It might work, frankly, a little more efficiently if the Court proposes one and then the parties comment, but I'm certainly willing to address it however the Court pleases.

THE COURT:  We'll come up with one paragraph. We'll share it with you, and you'll have a chance to react to make sure it's neutral.

Ground rules for questioning jurors.  Notwithstanding any trial procedures I may have published somewhere, individual questioning of jurors is permitted.  In the interest of efficiency, because the Court's questions are already very thorough, please try to keep the individual questions limited to following up on a questionnaire, following up on an answer to one of the judge's questions, or follow-up on an answer to one of the attorney's questions.  But you address your questions to the entire pool, but there's nothing that says that you can't go directly to Juror No. 2 and ask them a direct question.  We have provided for you, and have hard copies here, the

Court's jury selection procedures and preemptory strike challenge.

We were planning hopefully on four alternates. If the pool is thin, we might have to have less alternates. Any visceral reaction to alternates, hoping for four and realizing we might have less, from the government?

MR. MANGAN: No comment, Your Honor.

MR. KOHNEN: We're fine with that, Judge.

THE COURT: Very well. Peremptory strikes, assuming 4 alternates, I stated this, 6 for the government plus 2 for alternates, total of 8; defense, 10 plus 2 for alternates, total of 12; totaling 20. The voir dire and jury selection procedures reflect the procedures for challenges for cause. If there are any Batson challenges, we'll resolve those, if any, as they arise using the standard three-step inquiry. Burden is on the opponent of challenge to make a prima facia case of discrimination. If satisfied, burden shifts to the other side to give neutral reasons for mistrial, and if the Court is satisfied with the neutral reasons, then, the Court must determine the ultimate question of discrimination.

Jury will be informed that there are four alternates -- if it's four or three or two, among them, but they will not know who they are. Is there any objection to that approach from the government?

MR. MANGAN:  No, Your Honor.

THE COURT:  From the defense?

MR. KOHNEN:  No, Your Honor.

THE COURT:  Very well.  Quick review of ground rules and procedures as to objections.  Stand the minute you need to make one, state the objection, objection, hearsay, response, yada, yada, ruling.  I don't want a lot of discussion of challenges of objections.  If I need to, I'll call you to the sidebar.  Trying to avoid bench conferences and sidebars.

In terms of approaching witnesses and the jury, it's polite to ask the Court if you can approach the witness.  I won't hold you in contempt if you don't.  I don't think you should be approaching the jury.

When you're examining witnesses, I would prefer that you come to the lectern, although, I can hear you on that. I've asked you to stand when speaking.  If there are offers of proof to be had, those are to be offered during recess on the record.

Prefer that you use the lectern.  Talk to me about the lectern versus counsel table; does that present a difficulty?

MR. MANGAN:  With respect to examining witnesses, Your Honor?

THE COURT:  Yeah.  Just mechanically, are you okay

questioning from the lectern as opposed to counsel table?

MR. MANGAN: We're fine with either one. I prefer to stand and it's probably easier to stand there. The sight line is a little bit odd, but we're fine using the lectern. I don't know if it's movable, but the sight line is what it is.

THE COURT: Okay. From the defense?

MR. KOHNEN: No, no problem at all, Your Honor, with the one proviso that the Court has in the past been generous in allowing us to come back to counsel table, confer with co-counsel, et cetera, and I assume that that is still the way you operate.

THE COURT: Absolutely. My portrait is not on the wall.

MR. KOHNEN: Yet.

THE COURT: Exhibit and witness lists. Has the government provided, and has the defense provided, their list of witnesses to each other yet?

MR. MANGAN: No, we have not at this point, Your Honor.

THE COURT: And when would you propose to do that? How would you propose to do that? The sooner they know who's coming the next day or in general, the better.

MR. MANGAN: I don't know what your practice has been. I know in at least past trials that I've had with

some other judges, they've asked us to provide them either a day in advance or a day-and-a-half in advance so that they can sort of stay up on them as they go.  So we're prepared to go with that practice.

THE COURT:  What's the defense -- you raised it and now I'm raising it.

MR. KOHNEN:  Your Honor, you know, as I mentioned awhile ago, we would prefer to get -- to find out who the witnesses are and what their order is as quickly as possible.  We understand that that can be a fluid situation from the government.  We think because of the complexity of this case and frankly the number of exhibits, that if we could get, you know, a good idea by the end of court who the government intends to call on the next day and maybe at least a suggestion of who they're planning to call on the day following, it would make things go a lot more smoothly here in the courtroom.

I assure you, Your Honor, once we find out who the witnesses are -- and we haven't yet, we've only got a few days -- we will have general cross-examination materials prepared.  But in order for the attorneys to do their job and present the best case to the jury, we would like to know who the government's witnesses are 48 hours in advance.

THE COURT:  Typically, I've asked parties to provide their upcoming witnesses at the end of a day, who's

coming next that day; that seems the minimum. I've also thought that I asked both sides to preside -- present their entire witness list before voir dire and then on a daily basis say who's coming next. Does the government object to that approach?

MR. MANGAN: No, Your Honor. We could do that. So just provide the full list and then, you know, each day we say here's who's coming the next day.

THE COURT: I did most of what you asked. I didn't do 48 hours. Are you okay with what I suggested?

MR. KOHNEN: Yes, absolutely, Judge, and we appreciate that.

And when appropriate, there is one witness who we may call. May I speak on that subject?

THE COURT: Yes.

MR. KOHNEN: We've identified two of the witnesses with our expert disclosures, and as things stand, there are only two witnesses. We have right now a witness who is only a consulting expert to the case, but we may choose to call depending on the evidence the government brings out.

I'll give you an example particularly closely related to this consulting expert we have. The government has advised us that they may bring, may bring, an expert witness in from GE Aviation to testify about the fan blades and the technology involved there. In the event that they do that,

there's a very good chance that this consulting expert -- we will ask that person to testify. That decision hasn't been made because it can't be made, but we want to the put the Court and, frankly, the other side on notice.

THE COURT: Does the government wish to be heard on that disclosure?

MR. MANGAN: Just this is the first we've heard of it. We don't know anything about the identity of the person or what their qualifications are and if it will be considered expert testimony. Obviously, we preserve our objections to when and if they present this witness.

THE COURT: Right. If you make a decision you're going to call that witness, is there going to be adequate time to provide that information to the government before you proceed?

MR. KOHNEN: Absolutely, there will, Your Honor. And I stress that, you know, we haven't decided yet whether this would be a rebuttal witness or a witness in our case in chief, but, with all due respect, it will be the government's decision that prompts our decision.

THE COURT: But you understand the notion that if you decide you're going to call this person they know nothing about, it's incumbent upon you to provide that information expeditiously, adequate time?

MR. KOHNEN: I understand, absolutely, Your Honor.

I know that feeling well.

THE COURT: You understand absolutely and what?

MR. KOHNEN: I know that feeling well.

THE COURT: I saw you smirking. I just didn't want to miss the smirk.

All right. We have the exhibit binders from the government. Defense has no exhibits, but the government's exhibits are extensive. When will parties exchange exhibit binders and witness lists? We decided before voir dire, so that's coming right up, the witness list, both sides, and then the day -- at the end of the day, who's coming the next day.

And where are we on when the government will provide its exhibit binders to the defense?

MR. MANGAN: Your Honor, when we provided the exhibits to the Court, we also provided an electronic version of the exhibits to the defense.

THE COURT: Okay.

MR. MANGAN: So they have our exhibits. Obviously, there will be some -- you know, and there's already been a little bit of tweaking here and there, but they have an exhibit list and they have our exhibits --

THE COURT: Very well.

MR. MANGAN: -- subject to whatever revisions we need to work through.

THE COURT: We've given you a How to Publish Exhibits handout. Got a hard copy if you want it today. We will e-mail it to you or get it to you.

As to the procedure for checking on admitted exhibits, each party must designate one person, paralegal or attorney, to confirm all admitted exhibits with Ms. Santoro or Ms. Frankian at the end of each day. We compare lists, make sure there's no dispute as to what was identified and what was actually admitted. Any disputes we'll resolve the following day after checking a rough transcript.

Are you able to identify who'll take on responsibility for the checking with Ms. Frankian or Ms. Santoro at the end of each day indicating what exhibits were identified and what we're missing, who might do that from the government, if you know?

MR. MANGAN: Your Honor, most likely our paralegal, Jackie Prim.

THE COURT: And the defense?

MR. KOHNEN: Your Honor, that will be Ms. Johnson, who's here in the courtroom.

THE COURT: Very well.

The witness room is just outside the courtroom. Parties are responsible for calling their own witnesses from the witness room at the appropriate time. Typically, when the attorneys call the next witness, their paralegal will go

to the witness room and escort the witness into the courtroom.  If the witness' testimony is interrupted by a recess, the attorney who called that witness is responsible for making sure their own witness follows any instructions given by the Court, i.e., when the witness needs to return, not discussing his or her testimony with anyone, et cetera.

In terms of break rooms, I told the defense we've reserved the ADR suite on the second floor.  And can I confirm that the government is using your own satellite office in this building?

MR. MANGAN:  Yes, Your Honor.

THE COURT:  Is that on the 7th floor?

MR. MANGAN:  Yes.

THE COURT:  Very well.  As to transcripts, I do not believe that a daily copy can be accommodated.  I need to talk to the court reporters.  We're going to have different court reporters doing different days.  Often what I've done is indicating that you can't get more than one hour of the day's testimony before the next morning, first come, first served.  Need to note the times, at least generally, of the testimony requested.  The requests must be made directly to the court reporter.

If you know in advance that you'll need a next-day copy of testimony, that it will likely be longer than an hour, tell us as soon as you can so we can confer with the court

reporter and see if it's manageable.  But I just want you to understand, I don't yet believe the daily copy of all testimony is going to be available the next day.  If there's a special one-hour segment you really need, we will try to accommodate them, but I need to talk to the court reporters, and I have not yet had that opportunity.

We have a contact sheet that we're going to provide to you where you give us your contacts for each of you, cell phones and the like, so we can get you.  Make sure we get that back timely.  We'll e-mail that contact sheet to you today.

Do I need to address the statement of the case again?  Very well.

I've been through my outline, and I wonder if there are issues you all want to address before we adjourn the final pretrial conference?  Government have items you want to talk about?

MR. MANGAN:  We do, Your Honor.  One would be I know there was a pending motion in limine regarding the 404(b) issue and the defense brought up again with respect to potential limiting instruction, and then I know that they also filed a supplemental memo recently regarding the -- specifically about the Safran issue.  So the extent the Court has any preliminary guidance, it would impact our opening statements.  We certainly don't want to delve into

an area if the Court is going to later limit it to the extent we can avoid that.

So we just wanted to put that on the Court's radar that that's one of the issues that we're trying to understand. So if there's a ruling forthcoming or any kind of statement on that, that would help us direct our -- obviously, our presentation of evidence, but even earlier than that, the opening.

THE COURT: Pending motions will be addressed by written or oral ruling by Friday afternoon. I thought you asked me very gently.

MR. MANGAN: There's one other one, Your Honor, and you said pending motions, specifically, the CIPA one. I'll now talk about it as gently as I can. But there is a portion of that that would require us to potentially -- depending on how the Court rules, could trigger something for us to do. So we wanted to at least bring that up to the Court because that would impact obviously our duties and our obligations. So as we get closer to the timing, that's more sensitive. So you're nodding, so I know the Court understands.

THE COURT: It's on the radar screen. I actually have to go out there and today is the first opportunity and I've got very little time, but I'm going to get it done, I promise.

MR. MANGAN:  I understand.  Thank you.

The last thing I have, and then I'll double check with Ms. Glatfelter.  With respect to the witnesses, we have -- you know, we have several who are of, you know, Chinese-American descent, at least one of which is quite concerned about their own safety.  We have not yet made a decision.  We wanted to talk with this person again, but we wanted to at least give the Court a heads-up that we may be in a situation where we ask if a witness can testify under pseudonym or under some kind of other name.  I realize we wouldn't want that brought to the attention of any jurors. I am sensitive to how that -- if that was known that that would be prejudicial to the defense, but at the same time, we want the witnesses to feel secure in their own testimony.

And this is generally for those especially who have or may have family still back in China, and if they're aware of the nature of this case, there's concerns they have about testifying in this case.  So we at least wanted to bring it to the Court's attention that this may be an issue that we bring up later, later on.  All right.

THE COURT:  Appreciate that.  Did you want to comment on that in passing or reserve?

MR. KOHNEN:  Not until there's a real possibility that that's --

THE COURT:  I would assume the defense would know

the real name if we ended up using a pseudonym name?

MR. MANGAN: Yes, yes, certainly.

MR. KOHNEN: I don't as I stand here know who Mr. Mangan is talking about. I'm a little surprised when he said several witnesses of Chinese descent. All I can say is let's cross the bridge when we come to it. I'm thinking we might not even come to the bridge.

THE COURT: The last sentence I missed.

MR. KOHNEN: I'm sorry?

THE COURT: I missed your last sentence.

MR. KOHNEN: I said I suggest that we wait to cross the bridge until we come to it because we might not even come to the bridge.

THE COURT: I'm a true believer in that philosophy. Thank you.

Did the government have more? Does Ms. Glatfelter have more?

MR. MANGAN: No.

MS. GLATFELTER: No, Your Honor. Thank you.

THE COURT: Very well.

Defense have other issues you wish to address?

MR. KOHNEN: May I have just a moment?

THE COURT: Yes.

MR. KOHNEN: Judge, this is maybe almost a housekeeping matter, but it's one that's pretty important to

us. As you saw me scrambling around here, I haven't examined the structure of these barriers very carefully, but is there any way at all that we could at least get rid of the middle barrier between the lawyers? It makes communicating among us a lot more difficult.

THE COURT: What barrier are you talking about?

MR. KOHNEN: This one right here, Judge. (Indicating.)

THE COURT: I'm just trying to protect you from Mr. McBride.

MR. KOHNEN: Well, Mr. McBride has been vaccinated and he's even been injected with distemper, so I feel safe. No, seriously, seriously, Your Honor, we've been -- we're all vaccinated, we've been working closely together for months now, and it would sure make our jobs -- our job a lot easier.

THE COURT: I lean that way. Let me process it, but I'm glad you raised it.

MR. KOHNEN: The only other thing I would say, Your Honor, is I want to join Mr. Mangan in the importance of a ruling on the Safran evidence, but nothing more needs to be said in light of your answer.

THE COURT: Where's the defendant going to be sitting? It may have to do with the barrier.

MR. KOHNEN: Oh, he's going to be sitting at the

front desk.

THE COURT:  Right.

MR. KOHNEN:  And what we were tentatively planning to do is to have the interpreter next to him.  So what we likely would do is have three people here at the front table, which you'll recall has been done before sans barrier, and that's our plan.

THE COURT:  Who's the one in the middle?  You're going to have you and Mr. McBride at the table and a third person in the middle?

MR. KOHNEN:  I think what we'll do is we'll probably rotate attorneys who are here.

THE COURT:  It's not the defendant nor the interpreter?

MR. KOHNEN:  The defendant and interpreter are going to be on the left side.

THE COURT:  To the left of Mr. McBride?

MR. KOHNEN:  Well, pretty much occupying with two people the one space that Mr. McBride is occupying now, but we haven't firmed that up.  And then the plan was to have attorneys who are handling various witnesses take this seat.

THE COURT:  That's fine.  I'm just wondering where the defendant is going to be.  Have you talked through his status?

MR. KOHNEN:  Yeah.  I mean, I think that the goal

is to have the defendant next to the attorney and the translator to the defendant's left.

THE COURT:  One attorney, defendant, translator, at Table 1?

MR. KOHNEN:  Correct.

THE COURT:  With no barrier between the attorney and the defendant?

MR. KOHNEN:  That's essential, frankly.

THE COURT:  I've got to think about that.

MR. KOHNEN:  Okay.

THE COURT:  But I'm glad you raised it.  So right this minute at this table, if Mr. Kohnen were examining the witness, he would be seated where he is, the defendant would be to your left, the interpreter would be to the defendant's left, and that's who's in the front row?

MR. KOHNEN:  That's what we expect, Your Honor. There may be circumstances where one of the attorneys who's going to cross-examine a witness won't occupy this seat. This is going to be kind of a musical chair, if you will, but there will be an attorney here, yes.

THE COURT:  Okay.  So how does it work if you're examining the witness, Mr. Kohnen, and to your left is the defendant and one more to the left is the interpreter, if you have a question of Mr. Xu in the midst of it, how is the interpreter going to hear that?

MR. KOHNEN: Well, without a mask, she's been able to hear very well from that distance and I think she probably still will be able to, but I guess that raises a good point. We may seek the Court's permission to huddle a little bit or put --

THE COURT: Or put the interpreter in the middle?

MR. KOHNEN: Yeah, that might be the best way. You may be right about that.

THE COURT: If this is our most difficult issue, we're going to survive this trial. Fair enough.

Did the defense have anything further today?

MR. KOHNEN: No, thank you, Judge.

THE COURT: Does the government have anything further today?

MR. MANGAN: No, Your Honor. Thank you.

THE COURT: What will Mr. Miedel's role be at trial?

MR. MIEDEL: Your Honor, I expect to be examining one or more witnesses at the trial.

THE COURT: I look forward to it.

MR. MIEDEL: Thank you.

THE COURT: Very well. I just wasn't going to end the day without taking one more whack.

MR. MIEDEL: I completely understand.

THE COURT: Okay. Anything further, Ms. Frankian?

We'll adjourn.  Stay safe, do well, see you soon.

THE DEPUTY:  All rise.  This Court is now adjourned.

(Proceedings concluded at 12:39 p.m.)

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter prepared from my stenotype notes.

/s/ *Lisa Conley Yungblut*                    *01/04/2023*
LISA CONLEY YUNGBLUT, RDR, RMR, CRR, CRC      DATE